UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esq.
Raymond M. Patella, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax (609) 348-6834
mviscount@foxrothschild.com
rpatella@foxrothschild.com

**WHITE & CASE LLP**
John K. Cunningham, Esq. (*pro hac vice* pending)
Richard S. Kebrdle, Esq. (*pro hac vice* pending)
Kevin M. McGill, Esq. (*pro hac vice* pending)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700/fax (305) 358-5744
jcunningham@whitecase.com
rkebrdle@whitecase.com
kmcgill@whitecase.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| REVEL AC, INC., et al., | Case No. 14-22654 (GMB) |
| Debtors.[1] | Joint Administration Requested |

**DECLARATION OF SHAUN MARTIN IN SUPPORT OF FIRST DAY
MOTIONS AND APPLICATIONS**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856).  The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

I, Shaun Martin, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge:

1.      On June 19, 2014 (the "Petition Date"), Revel AC, Inc. ("Revel") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or the "Company") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2.      The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No committee or examiner has been appointed by the Office of the United States Trustee in these Chapter 11 Cases.

3.      I am a member of Winter Harbor LLC ("Winter Harbor") and I currently serve as the Debtors' Chief Restructuring Officer (the "CRO").[2]

4.      I have been a corporate restructuring and reorganization expert for more than sixteen (16) years.  I have served as officer, director and advisor to numerous distressed companies.  My work involves managing all aspects of a financial restructuring process, including developing business plans, performing valuations, raising replacement capital, asset dispositions and structuring and negotiating plans of reorganization.  My partners and I have been involved in restructuring over 100 entities, ranging from smaller, family-owned businesses to publically traded companies.

5.      I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that preceded the commencement of these

---

[2]      My appointment as the Debtors' CRO is subject to approval by the New Jersey Division of Gaming Enforcement.

Chapter 11 Cases and in support of the first day motions and applications (collectively, the "First

Day Motions") filed by the Debtors.  Except as otherwise indicated, all facts set forth in this

Declaration are based upon my personal knowledge, information provided to me by certain of

the Debtors' employees and professionals, my review of relevant documents or my opinion

based upon my experience, knowledge and information concerning the operations and financial

affairs of the Debtors.  If I were called upon to testify, I would testify competently to the facts set

forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.     This Declaration is divided into two sections.  Section I provides a brief

description of the Debtors' current organizational structure and operations, their current financial

condition and the events giving rise to these Chapter 11 Cases.  Section II sets forth those facts

which are most germane to this Court's consideration of the Debtors' First Day Motions and is

intended to supplement any other declarations submitted in direct support of any given motion or

application.

## I.     BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.     The Development of Revel

7.     The Debtors own and operate a casino and resort facility (the "Revel

Casino Resort"), which was conceived and constructed to be a unique and luxurious Atlantic

City entertainment offering.  The Revel Casino Resort was intended to, and does, offer a distinct

array of unique, premium amenities intended to attract gaming, group business and resort

customers.

8.     With Morgan Stanley as the initial financier, construction of the Revel

Casino Resort began in 2007.  After several years of delays and in the wake of the financial

3

crisis, however, Morgan Stanley abandoned the project and wrote down 98% of the approximately $1.25 billion that had been invested in the property.  On February 17, 2011, Morgan Stanley sold Revel Entertainment Group, LLC ("REG"), NB Acquisition, LLC ("NB Acquisition") and Revel Atlantic City, LLC ("Revel Atlantic City") to an investor group headed by Kevin DeSanctis, then chief executive officer of Revel and the project's developer, for approximately $30 million (the "Acquisition").  The lead debtor in these Chapter 11 Cases, Revel, along with Revel AC, LLC were created to complete the Acquisition.[3]  Thereafter, the Company and its new owners raised approximately $1.15 billion in initial financing from a group of lenders led by JPMorgan Chase Bank, N.A. ("JPMorgan") to finish development of the project.

9.      From the Acquisition through April 2, 2012, Revel focused on completing construction of the Revel Casino Resort, which is a state of the art gaming and resort facility unlike any other in Atlantic City.  The facility spans 6.2 million square feet and is located on approximately 20 acres, with 820 feet of boardwalk frontage.  The Revel Casino Resort features the tallest building in Atlantic City, a sleek 47-story, 710-foot high tower.  Revel's 130,000 square foot casino features more than 110 table games and approximately 2,300 slot machines.

10.      The Revel Casino Resort's amenities currently include 1,399 rooms, outdoor facilities, retail boutiques and a wide variety of entertainment amenities, including 11 dining venues (among them three signature restaurants), two nightclubs, a dayclub, five indoor/outdoor pools, a 5,500 seat theater, 160,000 square feet of customizable conference space and a spa.  The resort's outdoor amenities include a 2-acre landscaped rooftop deck with outdoor

---

[3]      A chart depicting the current corporate structure of the Debtors is attached hereto as Exhibit "A".

pools, cabanas, fire pits and a "pine grove" (known as the Sky Garden) with over 30,000 live trees and plants.

11.     Construction of the Revel Casino Resort provided over 2,000 construction jobs in New Jersey and, even prior to beginning operations, the Debtors extended job offers to approximately 800 Atlantic City residents.  New Jersey's Economic Development Authority recognized the Company's important contribution to the struggling local economy when, on February 11, 2011, it awarded the Company a $261.4 million Economic Redevelopment and Growth Grant (the "ERG Grant").

12.     The Revel Casino Resort opened for business on April 2, 2012, a week after the New Jersey Casino Control Commission granted Revel a gaming license.  The Debtors employ approximately 3,140 employees to operate the Revel Casino Resort.  Additionally, the Debtors' retail, food and beverage partners employ hundreds of employees who also work in the Debtors' facility.

**B.     Revel's Challenges and the 2013 Restructuring**

13.     The Atlantic City casino business is highly seasonal; the May-September time frame is critical to success.  Thus, the Revel Casino Resort opened in April 2012 with high hopes, expecting that the facility's differentiated service offerings would be able to surmount the sluggish macroeconomic conditions plaguing the Atlantic City resort and casino market.  Unfortunately, its debt burden, when combined with the challenges facing the Atlantic City casino market and certain issues unique to the Revel Casino Resort, impeded success from the beginning.

5

14.     First, the general contractor hired to manage the construction of the Revel Casino Resort made a series of significant budgeting errors that were not disclosed until right before the April 2012 opening.  The Revel Casino Resort, long believed to be coming along on (if not well under) budget, was in fact significantly over budget.  As a result, among other things, the Company spent over $100 million in construction costs more than had been expected.  Thus, the Company was forced to secure additional funding to complete the project and finance operations that would not have been necessary had the general contractor stayed on budget.[4]

15.     Second, the Company was unable to raise the additional funds needed to construct a dedicated central utility plant (the "CUP") to provide the energy required by the Revel Casino Resort.  Accordingly, REG contracted with a third party, ACR Energy Partners, LLC ("ACR"),[5] to build and operate the CUP on certain real property leased from the Company. To build the CUP, ACR contributed its own capital and raised approximately $118.6 million of 11.67% bonds to finance 75% of the construction costs.  In turn, REG agreed to purchase hot and chilled water, electric and other power exclusively from ACR for at least 20 years pursuant to that certain Second Amended and Restated Energy Sales Agreement dated April 11, 2011 (the "ESA").  Under this arrangement, the Company is forced not only to pay for the actual utilities services provided by ACR, but also for (i) the operation and maintenance of the CUP, (ii) the cost of servicing ACR's bond debt, and (iii) a guaranteed return of 15% (increasing to 18% at year 6) to ACR for its equity investment.  Thus, pursuant to the ESA, the Company is required to pay fixed costs of over $2 million per month over and above its variable monthly energy costs.

---

[4]     Revel is currently engaged in litigation with the general contractor that is responsible for these problems.

[5]     ACR is a wholly owned subsidiary of Energenic, LLC, which is a joint venture between South Jersey Industries and DCO Energy LLC.

MIAMI 1008676 (2K)

16.     Third, while the resort and convention center segments performed reasonably well in the first year of the Revel Casino Resort's operations, the casino segment struggled to attract the traditional Atlantic City patron who does not stay overnight.  Among other things, the property lacked a player's club and affordable food and beverage options, which are important to attract that critical segment of the customer base.  Additionally, the casino segment experienced start-up issues in the marketing and technology areas.

17.     Finally, the devastation of Hurricane Sandy exacerbated the situation.  The Revel Casino Resort was forced to close for six days, from October 28 to November 3, 2012, after a mandatory evacuation was ordered and state of emergency declared for Atlantic County.  The lost revenue from the closure, along with the prolonged impact on travel to Atlantic City and the financial hardship experienced by residents in the area, significantly impacted the Company's earnings.

18.     Collectively, these challenges had a severe, negative impact on the Company's liquidity, forcing the Company to seek additional financing.  Accordingly, first in August and later in December of 2012, the Company incurred additional secured financing of approximately $250 million, hoping such amount would bridge operations over to the 2013 summer season and profitability.  Unfortunately, by early 2013 the Company again lacked sufficient liquidity to continue operations or service its outstanding debt obligations.

19.     Given the extent of the Company's then outstanding debt obligations, the ongoing struggles of the Revel Casino Resort and the fact that the liquidity provided by the 2012 loans was rapidly decreasing, in early 2013 the Company's lenders were not amenable to further advances of credit in the absence of a comprehensive balance sheet restructuring.  The Company

7

thus began restructuring discussions with their stakeholders in early February 2013, which

discussions led to the execution of a restructuring support agreement and the successful

solicitation of votes approving a prepackaged plan of reorganization (the "2013 Plan").

20.    The Company filed cases (the "2013 Cases") under chapter 11 of the

Bankruptcy Code on March 25, 2013.[6]  Less than two months later on May 15, 2013 the 2013

Plan was confirmed and became effective on May 21, 2013.[7]  Under the 2013 Plan, (i) the

Company reduced its funded debt by more than 82%, from approximately $1.5 billion to

approximately $270 million on the effective date of the 2013 Plan, (ii) the Company reduced

annual interest expense by over 68%, from approximately $100 million to approximately $30

million, (iii) holders of approximately $923 million of then outstanding first lien debt exchanged

such debt for 100% of the equity in the reorganized company, (iv) certain holders of then

outstanding first lien debt provided exit facilities consisting of a $75 million revolver, pursuant

to the Original First Lien Credit Agreement (as defined below), and a $260 million term loan,

pursuant to the Second Lien Credit Agreement (as defined below), (v) all unsecured claims and

certain secured claims were unimpaired and (vi) the Debtors rights to the ERG Grant were

preserved, subject to certain contingent payment rights granted under the 2013 Plan.

C.    **Capital and Debt Structure Following 2013 Cases**

21.    <u>First Lien Secured Financing</u>.  On May 21, 2013, the Debtors entered into

that certain first lien credit agreement (the "Original First Lien Credit Agreement") by and

among Revel, as borrower, the remaining Debtors, as guarantors, certain lenders party thereto, as

---

[6]    SI LLC was not a debtor in the 2013 Cases.

[7]    The 2013 Cases were closed on March 31, 2014.

8

lenders, and JPMorgan as administrative and collateral agent (in such capacity, the "First Lien

Agent").  The Original First Lien Credit Agreement provided for a $75 million revolving

commitment with an interest rate of LIBOR plus 6.00% payable in cash and a maturity date of

May 21, 2017.  The obligations under the Original First Lien Credit Agreement were secured by

a first priority security interest in substantially all of the Debtors' assets, other than certain

excluded property and subject to certain permitted liens.

        22.      The Original First Lien Credit Agreement was amended on November 8,

2013, when the Debtors entered into that certain amended and restated first lien credit agreement

(as amended from time to time, the "First Lien Credit Agreement") by and between Revel, as

borrower, the remaining Debtors, as guarantors, certain lenders party thereto, as lenders (in such

capacity, the "First Lien Lenders"), and the First Lien Agent.  Pursuant to the First Lien Credit

Agreement, the amount of the revolving commitment was increased from $75 million to $100

million, and converted into two tranches consisting of (i) tranche A-1 (the "Tranche A-1

Revolving Credit Facility"), having a principal amount of $25 million and an interest rate of

LIBOR plus 6.00% payable in cash, and (ii) tranche A-2 (the "Tranche A-2 Revolving Credit

Facility"), having a principal amount of $75 million and an interest rate of LIBOR plus 6.50%

payable in cash.  The First Lien Credit Agreement also included a new tranche B term loan

facility having a principal amount of $50 million with an interest rate of LIBOR plus 9.00%

payable in kind in the form of an increase of the outstanding principal amount.  The obligations

under the First Lien Credit Agreement mature on June 30, 2015 and are secured by a first priority

security interest in substantially all of the Debtors' assets, other than certain excluded property

and subject to certain permitted liens.

MIAMI 1008676 (2K)

23.     As of the Petition Date, the amounts outstanding under the First Lien Credit Agreement total approximately $137 million in the aggregate.

24.     <u>Second Lien Secured Financing</u>.  On May 21, 2013 the Debtors entered into that certain second lien credit agreement (as amended from time to time, the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Secured Credit Agreements") by and among Revel, as borrower, the remaining Debtors, as guarantors, certain lenders party thereto, as lenders (in such capacity, the "Second Lien Lenders" and, together with the First Lien Lenders, the "Secured Lenders"), and Wilmington Trust, N.A., as administrative and collateral agent (the "Second Lien Agent").  The Second Lien Credit Agreement provides for a senior secured second lien term loan facility in an aggregate principal amount of $275 million with an annual interest rate of either (i) 12.5%, if paid in cash, or (ii) 14.5%, if paid-in-kind.  The obligations under the Second Lien Credit Agreement mature on May 21, 2018 and are secured by a second-priority security interest in substantially all of the Debtors' assets, other than certain excluded property and subject to certain permitted liens.

25.     As of the Petition Date, the amounts outstanding under the Second Lien Credit Agreement total approximately $310 million in the aggregate.

26.     <u>Equity</u>.  Revel is a privately held Delaware company with one class of common stock and approximately 8 million issued and outstanding shares.  Each of the remaining Debtors is a Delaware or New Jersey limited liability company wholly owned, directly or indirectly, by Revel.  NB Acquisition also owns 50% of the equity in Block 73, LLC, a New Jersey limited liability company.

MIAMI 1008676 (2K)

**D.     Events Precipitating the Commencement of these Chapter 11 Cases**

27.     Despite the significant debt reduction realized after the 2013 Cases, the Debtors still projected operating losses through 2013.  Accordingly, the Debtors immediately began a series of aggressive changes designed to stem their continued losses and progress towards profitability.  The Debtors believed that profitability depended upon reduced operational costs and a shifting of their primary focus from sophisticated, high-end, leisure related services towards the Debtors' gaming operations.

28.     First, in addition to transitioning to a new management team and board of directors following the 2013 Cases, the Debtors made significant changes to their employee composition.  They reduced employee headcount by approximately 18% and transitioned towards a workforce with more flexible scheduling opportunities.  Such changes provided the Debtors significant cost savings, and helped position the Debtors' new management team to tackle the operational challenges facing the Debtors.

29.     Second, to address certain perceived weaknesses in their marketing, the Debtors brought in a marketing consultant to evaluate such efforts.  Although the Debtors previously lacked an online marketing presence and had no sales through wholesalers, such as online hotel reservation websites, they have since made substantial improvements in those areas over the past year.  As a result, the Debtors have almost doubled occupancy rates over the past year.

30.     Third, the Debtors recognized that their nightlife and entertainment booking segment needed improvements, as evidenced by such segment's approximately $14 million in losses during calendar year 2012.  In response, the Debtors terminated their

11

engagement with their previous talent buyer and established an in-house talent buying program

to handle the Debtors' entertainment operations.  This change reduced costs and dramatically

improved the Debtors' performance in their nightlife and entertainment segment.

31.     Fourth, the Debtors brought in The Fine Point Group ("Fine Point"), a

casino and gaming consultant, to analyze the Debtors' casino operations and suggest ways to

accelerate growth.  With Fine Point's assistance, the Debtors aggressively marketed the Revel

Casino Resort during the summer of 2013, including marketing strategies such as the "You Can't

Lose" promotion during July 2013 and the "Gamblers Wanted" taglines.  These efforts aided the

Debtors in generating increased revenue and market share and substantially improved the

Debtors' customer database, an important competitive driver in the casino industry.

32.     Finally, and perhaps most importantly, the Debtors implemented

significant modifications to the Revel Casino Resort designed to improve their casino operations.

These changes included, among other things, (i) installing filtration systems on the casino floor

to service designated smoking areas, (ii) investing in signage for the casino, (iii) adding a new

beachfront day club unique to the Atlantic City market, (iv) removing an underperforming poker

room from the casino, (v) adding an upscale player's lounge to the casino, (vi) increasing the

availability and variety of affordable food options and (vii) improving the casino's rewards

program.  Collectively, these changes have led to steady growth in the Debtors' casino revenue

and increase in market share.

33.     The Debtors hoped that these substantial and comprehensive

improvements would lead to a successful summer season that would leave the Debtors well on

their way towards profitability and long-term stability.  Unfortunately, despite the reduction in

operating losses realized by these changes, the Debtors continued to suffer under the weight of

the burdensome ESA obligations and experienced certain severance, litigation and other non-

ordinary expenses following the 2013 Cases.  As a result, the Debtors were again faced with

limited liquidity by late 2013 and were forced to seek additional financing from the Secured

Lenders.

34.     Following extensive arms' length negotiations, in November 2013 the

Debtors and the Secured Lenders agreed to the execution of the First Lien Credit Agreement and

certain amendments to the Second Lien Credit Agreement, providing the Debtors with

approximately $75 million of additional liquidity.[8]  However, the Secured Lenders imposed a

number of restrictive covenants on the Debtors in connection with these amendments which

restricted the Debtors' ability to fully access the additional liquidity.  Importantly, the First Lien

Lenders also required, as a condition to the First Lien Credit Agreement, that the Debtors

execute and deliver that certain letter agreement dated as of November 8, 2013 (the "Letter

Agreement") by and between Revel and the First Lien Agent, whereby the Debtors were required

to immediately begin a strategic process.

35.     Pursuant to the Letter Agreement, the Debtors were required to engage an

investment banker of nationally recognized standing by no later than five days following the

execution of the First Lien Credit Agreement so that such banker could assist the Debtors in

pursuing a sale, merger, equity investment or other similar transaction.  Accordingly, the Debtors

---

[8]      The Debtors' Secured Lenders executed a number of additional amendments to provide the Debtors
continued access to the availability under the First Lien Credit Agreement and allow for continued funding of
operating losses.

MIAMI 1008676 (2K)

retained Moelis & Company ("Moelis") as their investment banker, after which Moelis

immediately began marketing the company.

36.    For several months and as Moelis's marketing process continued, the

Debtors' management, together with Moelis and the Debtors' other advisors, facilitated due

diligence with potential buyers and engaged in negotiations with parties that submitted letters of

interest.  Although the Debtors made substantial progress with certain parties, including

engaging in prolonged negotiations over an asset purchase agreement and postpetition financing

with one such party, the Debtors were unable to reach a deal with any of these potential buyers

prior to the Petition Date.

37.    While the Debtors' prepetition marketing process did not result in a

prepetition sale or stalking horse purchaser, the Debtors believe that the expressions of interest

received and negotiations conducted during such process are promising indications of the value

of the Debtors' assets.   The Debtors further believe that renewed marketing efforts pursuant to

court-approved bid procedures during these Chapter 11 Cases, followed by a public auction

before this Court, will lead to a sale of substantially all of the Debtors' assets (the "Sale") that

will maximize the value of the Debtors' assets.

## II.    FACTS IN SUPPORT OF THE FIRST DAY MOTIONS

38.    Concurrently with the filing of their chapter 11 petitions, the Debtors have

filed the First Day Motions.  The Debtors request that the relief requested in each of the First

Day Motions described below be granted, as each request for relief constitutes a critical element

in preserving the value of the Debtors' estates for the benefit of all parties in interest.

14

MIAMI 1008676 (2K)

A.    **Debtors' Motion for Joint Administration of Cases (the "Joint Administration Motion")**

39.    The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only.  Joint administration will obviate the need for duplicative notices, motions, applications and orders, and thereby expedite the administration of these Chapter 11 Cases and reduce administrative costs for the Debtors, their estates, and this Court without prejudicing the substantive rights of any creditors.

40.    The rights of parties in interest will not be prejudiced by the proposed joint administration of these Chapter 11 Cases because each creditor may still file its claim against a particular estate.  In fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.

41.    Accordingly, the Debtors believe that joint administration of the Debtors' Chapter 11 Cases is in the best interests of the Debtors, their estates and all other parties in interest, and should be granted in all respects.

B.    **Debtors' Motion for Order (I) Authorizing Continued Use of Existing (A) Cash Management System and Bank Accounts and (B) Business Forms; (II) Authorizing Continued Postpetition Intercompany Transactions; and (III) Waiving Investment and Deposit Requirements (the "Cash Management Motion")**

42.    Pursuant to the Cash Management Motion, the Debtors request (i) authority to continue to use the Debtors' existing (a) cash management system and bank accounts and (b) business forms, and (ii) a waiver of investment and deposit requirements.

**The Debtors' Cash Management System**

43.    In the ordinary course of their business and prior to the Petition Date, the Debtors utilized a cash management system that provides well established mechanisms for the

15

collection, concentration, management and disbursement of funds used in the Debtors' business

operations (the "Cash Management System").  A list of the Debtors' bank accounts (the "Bank

Accounts") is attached to the Cash Management Motion as Exhibit "A".[9]  Through the Cash

Management System, the Debtors are able to monitor their cash position on a daily basis,

monitor the collection and disbursement of funds and maintain control over the administration of

the various Bank Accounts required to effect the collection, disbursement and movement of cash.

44.     As reflected in Exhibit "A" to the Cash Management Motion, the Debtors

maintain several Bank Accounts at TD Bank, N.A. ("TD Bank") and JPMorgan Chase Bank,

N.A. ("JPMorgan").  Generally, the Bank Accounts used in the daily operations of the Debtors'

core business are "zero balance" accounts ("ZBAs") that are either funded to or from the

Debtors' Concentration Account (as defined below).  As ZBAs, these Bank Accounts generally

maintain an overnight balance of $0, either by being swept periodically into the Concentration

Account or by being funded only upon presentment of a check or electronic funds transfer

("EFT") draw request.

45.     The Debtors also maintain a physically secured area (the "Casino Cage")

to support the Debtors' ongoing gaming operations.  The Casino Cage is a centralized enclosure

where the Debtors maintain records of gaming transactions, as well as the majority of the

Debtors' casino bankroll.  Moreover, the Casino Cage is the primary location for receipts and

disbursements related to the Debtors' gaming and casino operations.  To this end, the Casino

Cage performs customer transactions, including, but not limited to, chip redemptions for cash,

---

[9]     The Debtors believe that the list of Bank Accounts attached to the Cash Management Motion as Exhibit
"A" includes a complete list of all of the Bank Accounts.  However, in the event than one or more of the Bank
Accounts may have been inadvertently omitted from Exhibit "A" to the Cash Management Motion, such accounts
are included in the definition of "Bank Accounts."

jackpot payouts, and check cashing.  The Debtors must maintain adequate funds in the Casino

Cage to fund expected levels of cash demand.

46.    The following is a detailed description of the Debtors' Cash Management

System and its associated Bank Accounts.  A diagram illustrating the operation of the Debtors'

Cash Management System is attached to the Cash Management Motion as Exhibit "B".

47.    <u>Receipt of Funds</u>.  In the ordinary course of business, the Debtors collect

receipts for payment of goods and services provided to their customers via check, cash, wire

transfer, and credit card charges.  These receipts are either automatically or manually deposited

into one of six depository accounts (collectively, the "Depository Accounts").  With the

exception of the Dealer Toke Account (as defined below), the Depository Accounts are ZBAs,

and the funds received by such Depository Accounts are transferred nightly into the

Concentration Account in the ordinary course of business.

48.    More specifically, the Depository Accounts consist of:

(a)    *Hotel Depository Account*.  The Debtors maintain an account for
the deposit of amounts received on account of the Debtors' non-
gaming operations[10] (the "Hotel Depository Account").  The Hotel
Depository Account also receives funds obtained from ancillary
hotel operations, such as parking, gift shop sales, retail amenities,
concessions, entertainment offerings and certain other ancillary
activities conducted at the Debtors' resort.

(b)    *Casino Depository Account*.  The Debtors maintain an account for
excess cash received from the Debtors' gaming operations, but not
needed for daily operations in the Casino Cage and in the general
cashiering area (the "Casino Depository Account").

---

[10]    The Debtors' food and beverage revenue includes revenue for banquets, service bars, in-room dining, and
other Debtor-owned food and beverage outlets. Additionally, the Debtors are parties to various agreements with
certain retail, food, and beverage contractors. The revenues derived from such contractors' operations are not
property of the Debtors and, accordingly, are not deposited into the Debtors' Bank Accounts.

MIAMI 1008676 (2K)

(c)    *American Express Depository Account*.  The Debtors maintain an account for all American Express ("AmEx") charges (the "American Express Depository Account").

(d)    *Credit Card Depository Account*.  The Debtors maintain an account for all Visa, MasterCard and other non-AmEx credit card charges (the "Credit Card Depository Account").

(e)    *Customer Wires Account*.  The Debtors maintain an account for customer wire transfers (the "Customer Wires Account"), which is used to receive funds from customers and patrons via wire transfer before they arrive at the Debtors' resort and casino.

(f)    *Dealer Toke Account*.  The Debtors maintain an account to hold gratuities (*i.e.*, tokes) from the Debtors' table game patrons to the Debtors' casino dealers (the "Dealer Toke Account").  In the ordinary course of business, customer gratuities to casino dealers are pooled and deposited into the Casino Cage.  Each night, a check from the Cage Account funds the amount of gratuities received to the Dealer Toke Account.  The Dealer Toke Account, in turn, maintains these funds for a bi-weekly period before transferring them to the Concentration Account.  The Payroll Account (as defined below) then disburses these funds to the Debtors' casino dealers in accordance with payroll procedures.

49.    All check deposits are transported by an armored car service to the local TD Bank where the Debtors maintain the applicable Depository Accounts.  Cash deposits, including excess cash from the Casino Cage, must be taken to the armored car company's money center for verification and processing before the armored car company notifies TD Bank to provide the Debtors with credit for such deposits.  Additionally, all credit card charges from the previous day's business are electronically transmitted daily to the credit card processor. MasterCard, Visa and other non-AmEx charges are processed and the gross funds are sent to the Credit Card Depository Account via automated clearing house direct deposit ("ACH Payment") the next business day.  AmEx charges are processed and the net funds are sent to the American Express Depository Account via ACH Payment after three business days.  Once per month, the

18

processor and credit card interchange fees are deducted from a Depository Account via ACH

Payment.  All funds received via wire transfer from the Debtors' customers and patrons are

directly wired to the applicable Depository Account.

50.    <u>Concentration of Funds</u>.  Each of the Depository Accounts are swept

nightly and consolidated into a single concentration account (the "Concentration Account").  The

Concentration Account aggregates all deposits the Debtors receive in the ordinary course of

business and then supplies cash to the Debtors' Disbursement Accounts (as defined herein) in an

amount necessary to cover the Debtors' disbursements.

51.    <u>Disbursement of Funds</u>.  The Debtors maintain four Bank Accounts with

TD Bank primarily associated with the disbursement of funds in the ordinary course of their

business (collectively, the "Disbursement Accounts").  As ZBAs, these Disbursement Accounts

receive funds from the Concentration Account in the amount necessary to cover checks and EFT

requests presented.

52.    Each Disbursement Account is discussed in turn:

(a)    *Operating Account*.  The Debtors maintain an operating account
(the "Operating Account") that is used to make certain payments to
the Debtors' vendors and trade creditors through the Debtors'
accounts payable department.  Specifically, in the ordinary course
of business, invoices from the Debtors' vendors are approved and
sent to the Debtors' accounts payable department for processing
and payment.  Depending on the amount of an invoice, certain
additional approvals may be required.  Once an invoice is
approved, the Debtors' accounts payable department enters the
invoice for payment and schedules the payment based on the
applicable due date, and a check is issued from the Operating
Account.

(b)    *Payroll Account*.  The Debtors maintain one account for the
payment of payroll and payroll taxes (the "Payroll Account").
Payroll checks are issued from the Payroll Account on a bi-weekly

19

basis to all employees.  Direct deposit and payroll taxes are paid bi-weekly via ACH Payment from the Payroll Account.  Because the Payroll Account is a ZBA, the exact amount funded for such direct deposits and payroll taxes is transferred to the Payroll Account from the Concentration Account.

(c)     *Cage Account*.  The Debtors maintain a Casino Cage account (the "Cage Account") to process customer transactions, such as issuing customer checks in lieu of cash.  The Cage Account is funded automatically upon presentment of a check.  Additionally, as discussed below, a nightly check is written from the Cage Account to the Dealer Toke Account (as defined herein) to deposit the customer gratuities collected daily.

(d)     *Casino Returns Account*.  The Debtors maintain a casino returns account (the "Casino Returns Account") for checks from customers that are returned because of insufficient funds or incorrect data.  The Casino Returns Account does not hold actual cash, but rather accounts for amounts due from customers on account of checks that were not honored by such customers' banks.

53.     <u>Restricted Bank Accounts</u>.  In addition to the above Bank Accounts, the Debtors maintain a restricted bank account (the "Company Funds Account") with JPMorgan.  Pursuant to the First Lien Credit Agreement, the Company Funds Account holds in reserve amounts related to certain disputed Permitted Prior Liens (as defined in the First Lien Credit Agreement), and is not used in the daily operations of the Debtors' core business.  As of the Petition Date, the Company Funds Account has a balance of approximately $3.7 million.

**The Debtors' Existing Business Forms and Books and Records**

54.     As part of their Cash Management System, the Debtors utilize numerous preprinted business forms and digitally generated and bank-certified graphic overlays (the "Business Forms") in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses (collectively, the "Books and Records").  I believe it is critical that the Debtors be permitted to continue to use all

20

correspondence and the Business Forms as such Business Forms were in existence immediately before the Petition Date in order to minimize the expenses to the Debtors' estates and avoid confusion on the part of the Debtors' employees, customers, vendors and suppliers during these Chapter 11 Cases.

**Intercompany Transactions**

55.     The Debtors maintain one consolidated general ledger for all of the Debtor entities, which tracks the influx and outflow of all receipts and disbursements.  Moreover, REG is the Debtors' main operating entity, and as such, the vast majority of the Debtors' business activity, including the receipts and disbursements, takes place at REG.  From time to time, however, in the ordinary course of business, REG may pay invoices or expenses which include amounts allocable to one or more of the other Debtors (the "Intercompany Transactions").  For example, although there are several contracts between Revel AC, Inc. ("Revel") and various third parties, all of the Debtors' Bank Accounts are in the name of REG.  Thus, in certain instances, a third party will invoice Revel, and REG will subsequently pay such amounts.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors and their estates.  I believe it is in the best interest of the Debtors and their estates to continue the Intercompany Transactions in the ordinary course of business.

56.     By preserving business continuity and avoiding the operational and administrative paralysis that changing the Cash Management System, Bank Accounts and business forms would necessarily entail, all parties in interest will be best served and the Debtors will benefit considerably from the relief requested in the Cash Management Motion.

21

C.      **Debtors' Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits (the "Employee Wage Motion")**

57.     Pursuant to the Employee Wage Motion, the Debtors seek authority to pay and/or honor certain obligations owing to the Debtors' employees (as specifically set forth and defined in the Employee Wage Motion, the "Employee Obligations").  The Debtors seek authority to honor the Employee Obligations as such obligations are critical and essential to employee morale and future business needs.

**Overview of the Debtors' Workforce**

58.     The Debtors currently employ approximately 3,140 employees (collectively, the "Employees") including approximately 1,750 full-time employees (collectively, the "Full-Time Employees") and 1,390 part-time employees (collectively, the "Part-Time Employees").  The Debtors pay approximately 2,770 employees (88%) on an hourly basis and approximately 370 employees (12%) on a salaried basis.  Additionally, the Debtors are party to three collective bargaining agreements which cover approximately 100 of the Employees paid on an hourly basis (the "Union Employees").[11]

59.     The Debtors' Employees perform a variety of critical functions, including operation of the Debtors' hotels and casinos, reservations, purchasing and sales, marketing, accounting, management, technical services, resort maintenance and other related tasks.  The Employees' valuable skill sets, institutional knowledge and understanding of the Debtors'

---

[11]     On June 6, 2014, certain of the Debtors' employees voted in favor of unionization.  Although the Debtors and the relevant union have not yet begun negotiations over a collective bargaining agreement, the Debtors estimate that approximately 800 employees will eventually be covered by such agreement, including the Debtors' housekeeping employees, cleaning crew members and food and beverage employees.

MIAMI 1008676 (2K)

operations and customer relations make the Employees essential to the success of these Chapter 11 Cases.

60.     Further, just as the Debtors depend on their Employees to operate the Debtors' business, the Employees depend on the Debtors for their livelihood.  The Employees will be exposed to significant financial difficulties if the Court does not permit the Debtors to pay the Employee Obligations (as defined below) in the normal course of business.

**Employee Wages and Compensation**

61.     In the ordinary course of business, the Debtors pay Employees and other personnel, among other things, wages, salaries, overtime, commissions, reimbursable expenses and certain other forms of compensation described herein (collectively, the "Employee Compensation").[12]

62.     As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $3.8 million on account of accrued wages, salaries, overtime, commissions, gratuity payments and reimbursable expenses earned prior to the Petition Date ("Unpaid Wage Obligations").  Pursuant to the Employee Wage Motion, and as set forth further below, the Debtors seek authority to pay their Employees any Unpaid Wage Obligations, each as described herein and in the Employee Wage Motion, in an aggregate amount not to exceed $12,475 per Employee.  The following summarizes the various types of Employee Compensation offered by the Debtors.

---

[12]     Employee Compensation includes, among other things, certain payments to the members of Revel's board of directors.  The Debtors provide compensation to each member of Revel's board, monthly and in advance, in amounts ranging from approximately $23,000 to $29,000.

MIAMI 1008676 (2K)

63.  <u>Wages</u>.  The Debtors pay the Full-Time Employees on either an hourly or salaried basis.  All Part-Time Employees are paid on an hourly basis.  The Debtors' Employees are paid bi-weekly on Fridays, eight days in arrears.  The Debtors' average bi-weekly gross payroll for their Employees is approximately $3.3 million.

64.  The Debtors' payroll is self-administered and utilizes a software program developed by The Ultimate Software Group ("Ultimate"), a third-party service provider.  The Debtors distribute payroll either directly to the Employees by check or through direct deposits.  Although the Debtors have paid their wage and salary obligations in accordance with their payroll schedule, as of the Petition Date, certain prepetition wage obligations have accrued and remain outstanding.  More specifically, certain amounts may be outstanding on account of unpaid compensation because of (a) the timing of the payroll schedule and the Petition Date, (b) discrepancies existing as to amounts paid and the amounts that should have been paid and (c) some payroll checks being issued prior to the Petition Date that have not yet been presented for payment.  As a result, the Debtors seek authority pursuant to the Employee Wage Motion to continue paying Employee Compensation on a postpetition basis in the ordinary course of business and to honor all of their prepetition wage and salary obligations.

65.  <u>Commission Payments</u>.  In addition to the wage and salary obligations, certain of the Debtors' Employees are entitled to earn commission payments.  In particular, the Debtors pay commissions to two groups of Employees: relationship marketing executives (the "RMEs") and hotel resort salespeople (the "Resort Salespeople").  RMEs are responsible for serving the Debtors' most valuable gaming customers and providing these customers with tailored promotions to generate continued patronage.  There are 15 RMEs who receive

24

commission payments based on a percentage of their customers' estimated spending capacity and the Debtors' potential earnings (the "RME Commissions"), which are paid quarterly one month in arrears. The next quarterly payment of RME Commissions comes due in July, and the Debtors estimate that the amount of RME Commissions earned but unpaid as of the Petition Date is approximately $107,000 in the aggregate.

66. The Resort Salespeople are responsible for resort reservations by large groups for events and functions. Group business is a key segment of the Debtors' business model and a differentiating factor as compared to its more casino-centered competitors. There are five Resort Salespeople who receive commission payments based on a percentage of revenue from group bookings (the "Resort Sales Commissions"), which are paid on a quarterly basis. The Debtors' next quarterly payment of Resort Sales Commissions for the second quarter of 2014 will come due in July. The amount of Resort Sales Commissions earned but unpaid as of the Petition Date is estimated to be in the aggregate amount of approximately $25,000. Pursuant to the Employee Wage Motion, the Debtors seek authority to pay the RME Commissions and the Resort Sales Commissions on a postpetition basis in the ordinary course of business.

67. <u>Gratuity Payments</u>. The Debtors maintain a number of gratuity programs pursuant to which certain Employees receive tips from customers in the ordinary course of business (the "Gratuity Payments"). Customers give Gratuity Payments for two categories of Employees: (a) those who work at the resort and perform food and beverage, valet, bell staff and limousine driving services (the "Resort Staff") and (b) those who work as dealers in the casino (the "Dealers"). The Debtors collect the Gratuity Payments on behalf of the Resort Staff and the Dealers and then distribute an aggregate payment on account of such collected Gratuity

25

Payments pro rata into each applicable Employee's paycheck based on hours and shifts worked by each of the Resort Staff and Dealers.[13]

68.    The Debtors estimate that they distribute approximately $585,000 bi-weekly in Gratuity Payments to the Resort Staff and the Dealers in accordance with the existing payroll processes.  The Debtors believe that because any unremitted Gratuity Payments are held for the benefit of a third-party (i.e., the Resort Staff and the Dealers), they are properly deemed to be held in trust and therefore, such amounts do not constitute property of the Debtors' estates.  Pursuant to the Employee Wage Motion and out of an abundance of caution, however, the Debtors seek authority to remit any unremitted Gratuity Payments and continue collecting and distributing the Gratuity Payments in the ordinary course of business on a postpetition basis.

69.    <u>Reimbursable Expenses</u>.  In the ordinary course of business, the Debtors reimburse certain Employees and board members for approved, reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").[14]  Reimbursable Expenses include business-related travel expenses, including food and lodging.  Employees and board members who travel submit expense reports as the Reimbursable Expenses are incurred, and the Debtors pay Reimbursable Expenses weekly by check.

---

[13]    Gratuity Payments to the Dealers collected on behalf of the Dealers are held in a dedicated bank account as set forth in the Debtors' Motion for Order (I) Authorizing Continued Use of Existing (A) Cash Management System and Bank Accounts and (B) Business Forms; (II) Authorizing Continued Postpetition Intercompany Transactions; and (III) Waiving Investment and Deposit Requirements (the "Cash Management Motion"), filed contemporaneously herewith.

[14]    The Reimbursable Expenses include, among other things, the reasonable and customary business entertainment expenses of the Debtors' Chief Operating Officer.  In addition to such Reimbursable Expenses, the Debtors also provide their Chief Operating Officer, in the ordinary course of the Debtors' business, with a monthly payment of $15,000 for business and travel expenses (the "COO Per Diem"), fully grossed-up for any tax liability incurred with respect to such monthly payments.  As of the Petition Date, the Debtors are current on the COO Per Diem, and request to continue paying the COO Per Diem in the ordinary course of their business.

70.     The Debtors pay approximately $45,000 per month on account of Reimbursable Expenses.  Although the Debtors request that Employees and board members submit reimbursement requests promptly, not all are able to do so and, as a result, it is difficult for the Debtors to precisely estimate the amount of Reimbursable Expenses outstanding as of the Petition Date.  Based on historical practice, the Debtors estimate that, as of the Petition Date, a de minimis amount of Reimbursable Expenses remains unpaid.

71.     The Debtors' Employees and board members incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse such expenses.  Accordingly, to avoid harming Employees and board members who incurred the Reimbursable Expenses, and who may become personally liable for such expenses reasonably incurred at the Debtors' direction, the Debtors request authority to pay the prepetition Reimbursable Expenses and continue reimbursing the Reimbursable Expenses in accordance with prepetition practices and in the ordinary course of their business.

72.     Company Cell Phone Expenses.  Additionally, in the ordinary course of business, the Debtors pay for approved and reasonable cell phone expenses incurred by certain Employees on behalf of the Debtors in the scope of their employment (the "Company Cell Phone Expenses").  Employees are allowed to incur Company Cell Phone Expenses on a discretionary basis determined by the division leader using various criteria.  Approximately 198 Employees have been approved to incur Company Cell Phone Expenses.  For these Employees, the Debtors either (a) provide the Employee with a company cell phone and pay the phone bill directly each month or (b) prepay $75 of the Employee's cellular service bill on the first payday of each month.

MIAMI 1008676 (2K)

73.     The Debtors pay approximately $15,500 per month on account of
Company Cell Phone Expenses.  The Debtors estimate that, as of the Petition Date,
approximately $13,000 in total Company Cell Phone Expenses remain unpaid.

74.     The Debtors request authority to pay the prepetition Company Cell Phone
Expenses and continue reimbursing the Company Cell Phone Expenses in accordance with
prepetition practices and in the ordinary course of their business.

**The Debtors' Payroll Fees**

75.     The majority of the Debtors' Employee compensation is paid by direct
deposit through the electronic transfer of funds from the Debtors' payroll account directly to
each Employee's bank account, with the remaining Employees receiving checks.

76.     Ultimate is responsible for completing the Debtors' payroll tax filings,
including federal, state and local tax filings.  In addition, for each payroll period, Ultimate
processes payment of certain wage attachments and garnishments.  Ultimate is crucial in
providing the Debtors with a payroll system that functions seamlessly.

77.     The Debtors incur approximately $500,000 per year in fees for Ultimate's
services, which fees are paid monthly, one month in arrears.  As of the Petition Date, the Debtors
believe that no amounts remain outstanding to Ultimate on account of prepetition services.  By
this Motion, the Debtors seek authority to continue to use Ultimate in the ordinary course of
business on a postpetition basis.

**Deductions and Payroll Taxes**

78.     During each applicable payroll period, the Debtors routinely deduct
certain amounts from Employees' paychecks, including: garnishments, child support and similar

28

deductions, certain charitable giving, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions, union dues and miscellaneous deductions (collectively, the "Deductions").[15] On average, the Debtors remit to third-party recipients approximately $150,000 per month on account of Deductions. As of the Petition Date, the Debtors estimate that a de minimis amount of Deductions has been collected but not yet remitted to the appropriate third-party recipients (the "Unremitted Deductions").

79. Additionally, the Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state and local income taxes, Social Security and Medicare (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state or local taxing authority. In addition, the Debtors are required by applicable statutory authority to pay from their own funds Social Security and Medicare taxes, and based on a percentage of gross payroll, additional amounts for federal and state unemployment and short-term disability insurance (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). On average, the Debtors remit approximately $1 million per month for Payroll Taxes. As of the Petition Date, the Debtors estimate that approximately $450,000 of Payroll Taxes has accrued and remains unpaid (the "Unremitted Payroll Taxes").[16]

---

[15]    Specifically, included in Deductions are certain benefits paid for entirely through Employee contributions, including a supplemental insurance plan, a flexible spending account plan, and others.

[16]    The Unremitted Payroll Taxes consist primarily of amounts owed to the New Jersey Department of Labor on account of the department's 2011 retroactive increase in the Debtors' tax rates for the prior three years. Pursuant to a payment plan, the Debtors make monthly payments on the Unremitted Payroll Taxes in the amount of approximately $55,000, and seek authority to continue making such payments on the Unremitted Payroll Taxes on a postpetition basis.

MIAMI 1008676 (2K)

80.     The Debtors believe that because the Unremitted Deductions and certain

Unremitted Payroll Taxes are held for payment to third-parties, they are properly deemed to be

held in trust, and thus, do not constitute property of the Debtors' estates.[17]   Out of an abundance

of caution, however, the Debtors seek authority to remit the Unremitted Deductions and

Unremitted Payroll Taxes and to continue collecting and remitting the Deductions and Payroll

Taxes in the ordinary course of business on a postpetition basis.

**Personal Time Off Policies**

81.     Eligible Employees (as defined below) receive paid time off ("PTO") that

covers all vacation, holiday, personal and sick time.  Eligible Employees accrue PTO at different

rates ranging between twenty and thirty-one days per year, based on an Eligible Employee's rank

and title.  The PTO days accrue on a pro rata basis throughout the year, and Eligible Employees

can carry up to a total of fifteen months' worth of accrued but unused PTO at any given time.  As

of the Petition Date, accrued and unused PTO was valued at approximately $1.9 million.  This

amount, however, is not a current cash obligation, as Employees are entitled to be paid for

unused PTO upon departure and after having worked for the Debtors for one year.  The Debtors

seek authority to continue honoring PTO, including PTO taken and not yet paid before the

Petition Date, and to pay earned PTO upon departure of an Employee, if any, when such

obligations become due and owing.

**Employee Benefit Programs**

82.     The Debtors offer their non-union Full-Time Employees who have worked

at least ninety days (collectively, the "Eligible Employees") the opportunity to participate in a

---

[17]     In the ordinary course, the Debtors generally submit the Unremitted Deductions and Unremitted Payroll
Taxes to Ultimate, which then remits the funds to the appropriate third-party recipients.

MIAMI 1008676 (2K)

number of insurance and benefit programs, including, among other things, medical, dental and vision plans, participation in flexible spending accounts, life insurance, short and long-term disability insurance, an Employee assistance program, accident insurance and other fringe benefit plans as described below (collectively, the "Employee Benefits").

83.   <u>Health Benefit Plans</u>.  The Debtors offer Eligible Employees and their eligible dependents (collectively, the "Dependents") the opportunity to participate in a number of health benefit plans, including medical, prescription, dental and vision plans (collectively, the "Health Benefit Plans").

(a)   *Medical and Dental Plans*.  The Debtors maintain self-insured medical and dental plans (the "Medical & Dental Policies") which are administered by Horizon BlueCross BlueShield of New Jersey ("Horizon").  Approximately 830 Eligible Employees participate in one or both of the Medical & Dental Policies.  Each week the Debtors reimburse Horizon the amount of the actual claims arising under the Medical & Dental Policies, which the Debtors estimate on average is approximately $63,500 (not inclusive of administrative fees).  The Debtors believe that they are current on the payment of claims under the Medical & Dental Policies; however, certain prepetition amounts may be outstanding due to claims that may have been submitted, but not yet processed before the Petition Date.

(b)   *Prescription Plan*.  The Debtors maintain a self-insured prescription plan (the "Prescription Policy" and, together with the Medical & Dental Policies, the "Self-Insured Policies") which is administered by Express Scripts Holding Company ("Express Scripts").  Approximately 830 Eligible Employees participate in the Prescription Policy.  Each week the Debtors reimburse Express Scripts the amount of the actual claims arising under the Prescription Policy, which the Debtors estimate on average is approximately $23,000 (not inclusive of administrative fees).  The Debtors believe that they are current on the payment of claims under the Prescription Policy; however, certain prepetition amounts may be outstanding due to claims that may have been submitted, but not yet processed before the Petition Date.

(c)     *Stop-Loss Insurance*.  The Debtors have purchased stop-loss insurance maintained and administered through Everest National Insurance Company ("Everest"), which provides additional insurance for Employee claims above $250,000 asserted against the Self-Insured Policies (the "Stop-Loss Insurance").  The Stop-Loss Insurance is an integral part of the Debtors' risk management under the Self-Insured Policies and loss of the coverage would subject the Debtors to undue risk.  The Debtors pay approximately $26,000 per month to Everest in premiums for the Stop-Loss Insurance.  As of the Petition Date, the Debtors estimate that they owe Everest approximately $25,000 for premiums on account of the Stop-Loss Insurance.

(d)     *Vision Plan*.  Eye-Med Vision administers the Debtors' vision benefits plan for approximately 680 Eligible Employees (the "Vision Plan").  The Vision Plan is almost completely funded by the participating Employees.  The Debtors' average monthly cost to administer the Vision Plan is approximately $5,000.  As of the Petition Date, the Debtors estimate that they owe approximately $5,000 in prepetition obligations to Eye-Med Vision under the Vision Plan.

(e)     *Health Benefit Stipend*.  The Debtors provide a $153.85 stipend (the "Health Benefit Stipend") in each paycheck to approximately 690 Eligible Employees who have elected not to participate in the Debtors' Self-Insured Policies and Vision Plan.  These Eligible Employees can use the Health Benefit Stipend either help pay for the Health Benefit Plans or use as additional cash compensation, up to a maximum of $4,000 per year per Eligible Employee.  In addition, approximately forty-one Eligible Employees have been "grandfathered" in on a previous stipend program, and receive a slightly higher Health Benefit Stipend, but only if they elect to use the Health Benefit Stipend to help pay for the Health Benefit Plans.  The Health Benefit Stipend costs approximately $100,000 every two weeks.  Any accrued but unpaid Health Benefit Stipends as of the Petition Date are reflected in the Debtors' estimate of their Unpaid Wage Obligations.

84.     The Debtors estimate that, as of the Petition Date, they owe approximately

$500,000 on account of the Health Benefit Plans, which is inclusive of certain amounts

(i) reserved for medical claims incurred but not yet reported and (ii) collected from employees

but not yet remitted to the appropriate third-party health providers on behalf of the Employees

32

(collectively, the "Unpaid Health Benefits").  The Debtors request authority to (a) remit the

Unpaid Health Benefits, (b) continue the Health Benefit Plans for Eligible Employees, (c)

continue making the above-described contributions to such Health Benefit Plans and (d) pay any

amounts related thereto, including premiums, claim amounts and administration fees, to the

extent that they remain unpaid as of the Petition Date, in the ordinary course of business.

85.    Flexible Spending Accounts.  The Debtors also offer Eligible Employees

the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to

pay for eligible out-of-pocket health care and dependent care expenses (the "Flexible Spending

Program").  Approximately 31 Eligible Employees participate in the Flexible Spending Program

and the Debtors withhold approximately $2,685 per month from paychecks for those Employees

who chose to make Flexible Spending Program contributions.  As of the Petition Date, the

Debtors estimate that they owe approximately $140,000 on account of the Flexible Spending

Program.  The Debtors seek authority to continue offering the Flexible Spending Program to

certain of their Employees on a postpetition basis in the ordinary course of business and to honor

any prepetition obligations that are related thereto.

86.    Life, Accidental Death and Dismemberment and Long-Term Disability

Insurance.  The Debtors provide Eligible Employees with primary life insurance and accidental

death and dismemberment insurance (the "Life and AD&D Insurance") through Unum Life

Insurance Company of America.  As part of the Life and AD&D Insurance, the Debtors also

maintain an employee assistance program for all Employees.  The program includes counseling

and support services for Eligible Employees and anyone living in their household for emotional

distress, substance abuse and work issues, as well as child care, elder care, and legal, financial

33

and educational service referrals.   The Life and AD&D Insurance costs the Debtors

approximately $17,500 per month.  As of the Petition Date, the Debtors estimate that they owe

approximately $16,500 on account of Life and AD&D Insurance coverage.  The Debtors seek

authority to continue providing Life and AD&D Insurance to the Eligible Employees and to

honor any prepetition obligations that are related thereto.

87.    In addition, Eligible Employees have the option to purchase supplemental

life insurance, accidental death and dismemberment insurance and long-term disability insurance

through Unum Life Insurance Company of America (collectively the "Supplemental Insurance").

The Supplemental Insurance is 100% paid by participating Employees and approximately $7,000

in premiums are withheld from Employees' paychecks each month.  As of the Petition Date, the

Debtors estimate that the amount owed to Unum Life Insurance Company of America on account

of the Supplemental Insurance is approximately $7,000.  The Debtors seek authority to continue

providing Supplemental Insurance to the Eligible Employees on a postpetition basis in the

ordinary course of business.

88.    Fringe Benefits.  The Debtors also provide a variety of fringe benefits (the

"Fringe Benefits") for their Employees.  The Fringe Benefits include:

(a)    *Employee Cafeteria*.  The Debtors operate a cafeteria for their
Employees at no cost to Employees.  Employees are provided one
meal per shift.

(b)    *Parking*.  Employees are provided free parking on the Debtors'
property.

(c)    *Uniform Laundering Services*.  Employees who wear uniforms are
provided free laundering services each day for their uniforms.

(d)    *Discounts*.  Employees and their friends and family are offered
discounts on outside services and a limited number of hotel rooms.

34

89.     The Fringe Benefits are part of the Debtors ongoing operating expenses, and are not considered a separate cash obligation.  The Debtors request authority to continue offering the Fringe Benefits to their Employees on a postpetition basis in the ordinary course of business.

**The 401(k) Retirement Savings Plan**

90.     The Debtors participate in a qualified 401(k) retirement savings plan (the "401(k) Plan") administered by Wells Fargo Retirement Services Saving ("Wells Fargo") for Full-Time and Part-Time Employees (excluding seasonal or on-call Employees) (collectively, the "401(k) Eligible Employees").  The Debtors auto-enroll the 401(k) Eligible Employees after 30 days of employment and, as a result, approximately 2,135 Employees currently participate in the 401(k) Plan.

91.     The 401(k) Plan is fully funded by the Debtors' Employees.  Although the Debtors stopped providing a company match in late 2013, the Debtors previously provided a company match equal to 25% of the Employees' contributions, subject to a maximum of 6% of the respective Employee's salary (the "401 (k) Match Contributions").  The 401(k) Match Contributions were paid to Wells Fargo in one lump sum during the year following the Employees' contributions, with such 401(k) Contributions having a three-year cliff vesting period.  The Debtors paid Wells Fargo the 401(k) Match Contributions for 2013 in April of 2014. The Debtors seek authority to continue the 401(k) Plan on a postpetition basis in the ordinary course of business.

MIAMI 1008676 (2K)

**Union Employees**

92.    The Debtors employ approximately one-hundred (100) Union Employees under three collective bargaining agreements (the "CBAs") covering carpenters, plumbers, fire command personnel and operating engineers (e.g., mechanics and maintenance workers).  The CBAs are effective through May 31, 2015.[18]  The Debtors withhold union dues (the "Union Dues") from Union Employee paychecks and remit them to the unions monthly in arrears, by the 25th of each month.  The estimated amount of unremitted Union Dues owed as of the Petition Date is approximately $12,000.  The Debtors believe that because unremitted Union Dues are held for payment to a third-party (i.e., the unions), they are properly deemed to be held in trust and therefore, such amounts do not constitute property of the Debtors' estates.  Out of an abundance of caution, however, the Debtors seek authority to remit any unremitted Union Dues on a postpetition basis in the ordinary course of business.

93.    In addition, the Debtors are required by the CBAs, and thus pursuant to section 1113 of the Bankruptcy Code, to contribute to union welfare funds, pension funds, apprentice training funds, and annuity funds (the "Union Contributions") monthly in arrears, by the 25th of each month.  The estimated amount of unpaid Union Contributions owed as of the Petition Date is approximately $185,000.  The Debtors request authority to continue to pay Union Contributions on a postpetition basis in the ordinary course of business.

94.    The Debtors' employees are an essential component of a successful conclusion to these Chapter 11 Cases.  Any deterioration in employee morale and welfare at this

---

[18]    The CBAs are with the following unions: Northeast Regional Council of Carpenters Local #255, International Union of Operating Engineers Local 68 and District Council 711 International Union of Painters and Allied Trades.  Union Employees are eligible for paid time off, holidays, jury duty, funeral leave, health benefits, pensions and other benefits according to the practices of the unions.

critical time undoubtedly would have a devastating impact on the Debtors, the value of their

assets and business, ultimately, the Debtors' sale process.  For the foregoing reasons, the Debtors

believe that it is in the best interests of the estate to grant the relief requested by the Employee

Wage Motion.

**D.**     **Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service to the Debtors, (II) Deeming Utility Companies Adequately Assured of Future Payment and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion")**

95.     The Debtors seek entry of an order (a) prohibiting the Utility Providers (as

defined below) from altering, refusing or discontinuing service to the Debtors, (b) deeming the

Utility Providers adequately assured of future payment and (c) establishing procedures for

determining requests for additional adequate assurances of payment.

**The Utility Providers**

96.     In connection with the operation of their businesses and management of

their resort and casino facilities, the Debtors obtain gas, water, sewer, electric, waste removal,

telephone, internet, and other similar utility services.  Approximately 10 utility providers (as

such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers")

provide these services to the Debtors.  A list of the Utility Providers and corresponding accounts

is attached to the Utilities Motion as Exhibit "A" and incorporated herein by reference (the

"Utility Service List").  The Debtors' estimated average monthly utility payment to the Utility

Providers is approximately $1.25 million.[19]

---

[19]     The listing of any entity on Exhibit "A" hereto is not an admission that any listed entity is a utility within the meaning of section 366 of the Bankruptcy Code.  The Debtors reserve the right to assert at any time that any entity listed on Exhibit "A" is not entitled to adequate assurance pursuant to section 366 of the Bankruptcy Code. The Debtors further reserve the right to terminate the services of any Utility Provider at any time and to seek an

37

97.     Uninterrupted utility services are essential to the Debtors' ongoing

operations and, therefore, to the success of the Debtors' reorganization.  The Debtors must be

fully operational twenty-four hours a day in order to meet the needs of their casino and hotel

customers.  Should the Utility Providers refuse or discontinue service, even for a brief period, the

Debtors' business operations would be severely disrupted.  The impact on the Debtors' business

operations, customer relationships, revenue and profits would be extremely harmful and would

jeopardize the Debtors' reorganization efforts.  Consequently, it is critical that utility services

continue uninterrupted.

**The Debtors' Proposed Adequate Assurance**

98.     The Debtors intend to pay postpetition obligations owed to the Utility

Providers in a timely manner.  Contemporaneously herewith, the Debtors have filed a motion

seeking authority to enter into a new debtor-in-possession financing facility (the "Proposed DIP

Facility").  The Debtors believe that the operating revenues and borrowings under the Proposed

DIP Facility will be sufficient to pay such postpetition obligations.

99.     To provide additional assurance of payment, the Debtors propose to

deposit approximately $625,000,[20] which represents an amount equal to two weeks of utility

---

immediate refund of any Utility Deposit (as defined below) without effect to any right of setoff or recoupment or
claim asserted by a Utility Provider against the Debtors.

[20]     The Debtors' proposed adequate assurance payments exclude certain payments (the "Non-Energy
Payments") relating to a central utility plant (the "CUP") under that certain Second Amended and Restated Energy
Sales Agreement ("ESA") dated April 11, 2011 by and between Revel Entertainment Group, LLC and ACR Energy
Partners LLC.   The Non-Energy Payments do not constitute the reasonable value of the energy services provided to
the Debtors under the ESA.  The Debtors will be filing a separate motion (the "CUP Motion") to determine the
reasonable value of the postpetition energy services provided to the Debtors under the ESA.  The CUP Motion will
also determine which obligations related to the CUP should be paid by the Debtors postpetition.

services, calculated based on the historical average over the twelve (12) months[21] before the

Petition Date (the "Adequate Assurance Deposit") into a segregated account.

100.     The Debtors submit that the Adequate Assurance Deposit, in conjunction

with the Debtors' ability to pay for future utility services in the ordinary course of business

(collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to

the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

**The Adequate Assurance Procedures**

101.     If a Utility Provider is not satisfied with the Proposed Adequate

Assurance, any such Utility Provider may make requests for additional or different adequate

assurance of future payment (each a "Request") pursuant to the Adequate Assurance Procedures

(as defined below).

102.     The Adequate Assurance Procedures set forth a streamlined process to

enable Utility Providers to address potential concerns with respect to the Proposed Adequate

Assurance, while at the same time allowing the Debtors to continue their business operations

uninterrupted.  More specifically, the Adequate Assurance Procedures permit a Utility Provider

to object to the Proposed Adequate Assurance by filing and serving a Request upon the Notice

Parties (as defined in the Adequate Assurance Procedures) within a specified period of time.  The

Debtors may then resolve, in their discretion subject to the prior consent of the DIP Agent, any

Request by mutual agreement with the Utility Provider and without further order by the Court.  If

the Request cannot be resolved, the Debtors request the right to seek a hearing with the Court to

resolve the Request.

---

[21]     This twelve (12) month historical average encompasses the entire period during which the Debtors have
been operational.

**Subsequent Modifications**

103.    To the extent that the Debtors subsequently identify additional providers of utility services, the Debtors seek authority to amend the Utility Service List attached to the Utilities Motion to add or remove any Utility Provider.  Moreover, for those Utility Providers that are subsequently added to the Utility Service List attached to the Utilities Motion, the Debtors will serve a copy of this Motion, along with the applicable portion of the amended Utility Service List and any related order on such Utility Provider.  The Debtors request that the terms of the order apply to any such subsequently identified Utility Provider and that any such subsequently added Utility Provider who objects to the Proposed Adequate Assurance file a Request in accordance with the Adequate Assurance Procedures.

104.    The Debtors submit that granting the relief requested in the Utility Motion is both necessary and appropriate to avoid any harm to their business.  The relief requested in the Utility Motion will afford the Debtors an opportunity to preserve the value of their business in pursuit of a successful sale process, without prejudicing the rights of any of the Utility Providers.

**E.     Debtors' Motion for an Order Authorizing the Debtors to Pay Prepetition Claims of Certain Essential Vendors (the "Essential Vendor Motion")**

105.    The Debtors seek entry of an order implementing Claim Payment Procedures (as defined below) and authorizing, but not directing, the Debtors to make Essential Payments to Essential Vendors.

**Essential Vendors**

106.    The preservation and maximization of the going concern value of the Debtors' business, including the preservation of key business relationships, is one of management's primary goals as the Debtors transition into these Chapter 11 Cases.  The success

40

of such transition depends largely on the preservation of the Debtors' reputation and customer

loyalty.  The Debtors must assure their customers, vendors and employees that the Debtors will

continue to provide a high-quality casino entertainment and hospitality experience during these

Chapter 11 Cases.  Without a full supply of food, room amenities, adequate games and slot

machines, among many other things, the Debtors would be unable to provide such an experience,

causing irreparable harm to the Debtors' business.

      107.    To maintain the quality and consistency of their operations, the Debtors

rely on a substantial number of third-party vendors who supply the Debtors with the food

products, material goods, supplies and services—many of whom are the sole suppliers of specific

products or services or for whom it would be impracticable to replace—that are essential to the

Debtors' ability to maintain the high-end experience expected by their core casino clientele (the

"Essential Vendors").  The Debtors and their advisors have completed a thorough analysis of the

Debtors' vendors to identify the Essential Vendors.  In conducting this analysis, the Debtors

reviewed their master vendor files and accounts payable systems to identify those vendors that

provide goods or services essential to the Debtors' operations and that may refuse or be unable to

supply or service the Debtors absent payment of their prepetition claims.  The Debtors also

evaluated the potential disruptions to their operations resulting from an Essential Vendor's

refusal to supply good or services to the Debtors, including the likelihood that the Debtors could

replace or re-source the vendor in a timely manner without significant disruption to their

operations.

      108.    Indeed, a lapse in the Debtors' ability to provide or offer even one such

amenity following the commencement could cause permanent damage to the reputation of their

MIAMI 1008676 (2K)

business and ability to generate value for creditors.  Thus, to preserve the value of the estates,

it is critical that the Debtors are able to maintain their business relationships with and honor

outstanding payment obligations to these Essential Vendors in light of the role they play in the

day-to-day operations and profitability of the Debtors' business.  The Debtors seek to minimize

any adverse business effects of their Chapter 11 Cases to the fullest extent possible by obtaining

authority to pay the Essential Vendors because they are of paramount importance to the Debtors'

business operations.

**Gaming Vendors**

109.    The Debtors' 130,000 square foot casino features more than 110 table

games and approximately 2,300 slot machines (collectively, the "Casino Games").  The revenues

generated by the Casino Games are a core (if not the most important) segment of the Debtors'

business and most profitable enterprise.  Although the Debtors own some of the Casino Games, a

majority of the Debtors' slot machines are covered by capital leases from third-party vendors

(the "Slot Machine Leases").  Specifically, the Debtors currently lease approximately 2,100 slot

machines and pay approximately $1.2 million per month under the Slot Machine Leases.

110.    Similarly, a number of the Debtors' Casino Games are operated under

participation lease agreements, whereby the Debtors lease the gaming systems from vendors on a

"cost-per-day" or "percentage of handle" basis (the "Leased Systems" and, together with the Slot

Machine Leases, the "Casino Leases").  The Leased Systems represent many of the Debtors'

most popular Casino Games and generate a significant portion of their casino revenues.  Further,

some of the Leased Systems are part of wide-area progressive systems whereby they are linked

with other casinos within Atlantic City and allow players across all houses to compete against

42

one another (the "Linked Systems"). The Linked Systems, as well as the software and operating systems upon which they rely, are monitored by a few select vendors according to licensing protocols. All participating Atlantic City casino operators, including the Debtors, are obligated to use these vendors in order to participate in the Linked Systems.

111. In addition to the Casino Games themselves, the Debtors rely upon the lease counterparties to provide, among other things, service and maintenance on the Casino Games and software support for the Casino Games. The Debtors believe that their customers expect and demand that a premium, state-of-the-art casino provide well-functioning games that reflect the latest trends in the gaming industry. Any disruption in the availability of the Casino Games would result in serious harm to the Debtors' revenue, and the goodwill, trust and loyalty of the Debtors' customers. Such harm would be antithetical to the maximization of the value of the Debtors' estates.

112. Moreover, the distribution and service market for the Casino Games is relatively concentrated, as there are a limited number of vendors that are licensed to supply the Casino Games. As a result, delayed or missed payments under the Casino Leases could prevent the Debtors from receiving upgraded machines, cause interruptions in future service, maintenance and support and negatively impact the Debtors' ability to cater to slot machine customers. This would negatively impact a significant revenue stream attributable to the Debtors' gaming operations. Further, a damaged reputation among gaming vendors could increase the cost of obtaining games and services from gaming vendors in the future. In short, timely payment under the Debtors' Casino Leases is critical to avoid irreparable harm to the Debtors' business.

113.    In addition to the actual gaming devices and related software, there are several vendors that supply ancillary goods and services that are equally essential to the operation of the Casino Games.  Such vendors provide the Debtors' casino operations with parts, cards, dice, chips, tiles and ticket-tape for the Casino Games.  Because the New Jersey gaming industry is highly regulated by the New Jersey Casino Control Commission (the "Commission") and other regulatory bodies, all vendors providing these products must pass a rigorous screening and licensing process by the Service Industry License Bureau of the Division of Gaming Enforcement before they are eligible to provide gaming-related goods and services to casinos in New Jersey.  As a result of this selective process, the vast majority of these vendors are single-source suppliers.  If these single-source gaming suppliers refuse to provide goods and services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors' only option would be to convince third-party vendors to obtain the requisite licenses.  This process would take, at a minimum, six to eight weeks, and there is no guarantee that any such replacement vendors would in fact obtain a license.  Given that the Debtors maintain relatively low inventory levels of such ancillary goods, this delay and uncertainty could cause irreparable damage to the Debtors' casino operations.

**Food and Non-Alcoholic Beverages Vendors**

114.    As part of their business, the Debtors own and operate various restaurants and bars, provide catering and room amenity services to their customers and run a twenty-four hour cafeteria for their employees.  In the ordinary course of their operations, the Debtors purchase a variety of consumable goods including, among other items, groceries, meat, dairy products, frozen foods, produce and general merchandise, which are used daily and continuously

44

in the Debtors' food services operations.  Such goods are purchased  from a number of diverse vendors, including agricultural growers, who are able to supply food and non-alcoholic beverage items to the Debtors in a high volume.

115.   Due to the size and complexity of the Debtors' operations, there are necessarily only a limited number of suppliers who can meet the Debtors' demand for these food and beverage products.  Further, there are certain beverage vendors that exclusively supply name brand non-alcoholic beverages to the Debtors' geographic area.  Because food and beverage service is part of the Debtors' daily operations and is a basic and essential service the Debtors' resort and casino customers require, delayed or missed payments to such vendors and the accompanying interruption to the supply of food and beverages to the Debtors would cause substantial harm to the Debtors' business.  More importantly, it would also cause irreparable harm to the Debtors' reputation, customer loyalty and good will.

116.   Moreover, prior to the Petition Date, certain vendors sold food to the Debtors that may be deemed "perishable agricultural commodities," as such term is defined under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a, et seq. ("PACA") or "livestock," as such term is defined under Packers and Stockyards Act of 1921, 7 U.S.C. §§ 181, et seq. ("PASA").   Thus, the Debtors' relationships with such vendors (the "PACA/PASA Claimants") may be subject to PACA and/or PASA.  Notably, PACA and PASA mandate the creation of a statutory trust for the benefit of vendors who supply perishable agricultural commodities, meaning that the Debtors ultimately may be required to pay in full the prepetition claims of such vendors regardless of expected recoveries for prepetition unsecured creditors generally.

45

**Alcoholic Beverage Vendors**

117.    The Debtors (i) own and operate a number of bars and restaurants that serve alcoholic beverages (e.g., beer, wine and spirits), (ii) serve alcoholic beverages at events they cater, (iii) serve alcoholic beverages on the casino floor and (iv) serve alcoholic beverages as part of room amenity services to their hotel customers.  Although the sale of  alcoholic beverages is not itself a core segment of the Debtors' business operations, it is a key component in the Debtors' efforts to attract customers, maintain a positive customer experience and generate revenue.  It is standard industry practice to serve alcoholic beverages, especially providing complementary drinks in the casino areas.  The customers enjoy the service and expect it. Further, the provision of alcoholic beverages generally increases customer spending at the bars, restaurants and, most importantly, the casino, and allows the Debtors to stay competitive with other casinos.

118.    Importantly, there are a limited number of suppliers that can meet the Debtors' extensive alcohol demands.  Similar to the Debtors' supply of non-alcoholic beverages, there are certain beverage vendors that are the exclusive suppliers of various name brand alcoholic beverages in the Debtors' geographic area—particularly, the higher-end products that the Debtors' targeted clientele expect and require.  Due to this limited supply, delayed or missed payments to the Debtors' alcohol vendors could interrupt the Debtors' supply and limit the variety of alcohol available to the Debtors' customers.  The Debtors believe that any such interruption could influence the Debtors' customers to patronize the Debtors' competitors and harm the Debtors' reputation in the highly competitive resort and casino market.  Maintaining

the availability and variety of the Debtors' alcoholic beverages is essential to maximization of the value of the Debtors' business.

**Marketing/Entertainment Vendors**

119.    The Debtors do business with certain Essential Vendors who provide critical marketing and entertainment products and services to the Debtors.  In many instances, these vendors are the only vendors in the area that are able to provide the high level of marketing and entertainment products and services required by the Debtors.  Many of these vendors supply products and services to the Debtors on the basis of informal arrangements, relying on past practice, course of dealing with the Debtors and industry standards to set the trade terms of these transactions.  Although the Debtors have typically enjoyed good working relationships with these marketing and entertainment vendors, the limited number of these vendors provides them with considerable bargaining power in the event of nonpayment by the Debtors and could result in a lapse of such services while the Debtors negotiate new terms or attempt to find such services elsewhere.  At this critical time following the filing of these Chapter 11 Cases, the loss of marketing and entertainment vendors would have a significant negative impact on the Debtors' operations.

**Service Vendors**

120.    The Debtors have a variety of service relationships with Essential Vendors to provide various services in connection with the Debtors' casino and hotel facilities.  These services range from linen supply services to cleaning services.  In many instances, these vendors are the only vendors able to provide the required services to meet the Debtors' operational needs.  Many of these vendors supply services to the Debtors on the basis of informal arrangements,

relying on past practice, course of dealing with the Debtors and industry standards to set the

trade terms of these transactions.  Although the Debtors have typically enjoyed good working

relationships with these service vendors, the limited number of these vendors, provides them

with considerable bargaining power in the event of nonpayment by the Debtors and could result

in a lapse of such services while the Debtors negotiate new terms or attempt to find such services

elsewhere.  At this critical time following the filing of these Chapter 11 Cases, the loss of these

vendors would have a significant negative impact on the Debtors' operations.

**Vendors Paid Through Room Account Charges**

           121.    Typical of resort facilities, the Debtors provide their customers with the

option of charging to their room account any purchases they make at the facilities located in the

Debtors' resort or casino, including stores, restaurants, bars and spa facilities owned by third

parties.  Each month, the Debtors calculate the amount of room charges they hold for purchases

at third-party vendors and repay such vendors after setting off the amount against the rent

payment the respective vendor owes the Debtors.  Room charges for purchases made at third-

party vendors are arguably not part of the Debtors' estates and the Debtors would therefore not

have an equitable interest in such room charges.   Out of an abundance of caution, however, the

Debtors request authority to repay such room charges owing after setting off against rent.  The

Debtors believe that failure to do so could result in refusal by the third party vendors to continue

honoring charges to room accounts (as they are not contractually obligated to do so), which

would be enormously disruptive to the Debtors' customers that are seeking to patronize the

stores, restaurants, bars and spa facilities at the Revel casino.

48

**Additional Essential Vendors**

122.    In the ordinary course of their business, the Debtors also rely on certain

other third-party vendors to supply goods, materials and services that the Debtors cannot operate

without or cannot replace without incurring exorbitant costs.  The Debtors believe that some of

these additional vendors may refuse to continue to provide these essential goods and services

were there missed or delayed payments to such vendors.  In many instances, these additional

vendors represent the sole source providers of such services or are otherwise not replaceable in a

timely and cost effective manner, whether because of substantial integration in the Debtors'

operations or otherwise.  Any discontinuity in the provision of these essential goods and services

may have a severe detrimental impact upon the Debtors' estates.

**Proposed Essential Claim Payment Procedures**

123.    To balance the interests of the Essential Vendors with those of the

Debtors, their estates and creditors, the Debtors propose to establish procedures for the resolution

and payment of prepetition claims of the Essential Vendors (the "Claim Payment Procedures").

The proposed Claim Payment Procedures are designed to facilitate the Debtors' ability to

continue to conduct their business without unnecessary disruption, while protecting the interests

of all affected parties.  Accordingly, the Debtors request that the Court authorize the following

procedures with respect to the payment of prepetition claims of the Essential Vendors who are

currently providing the Debtors with the essential goods and services described above:

(a)    To the extent an Essential Vendor asserts a prepetition claim that the
Debtors, upon advice of counsel, reasonably believe in their business
judgment that (i) it is critical that the Debtors deal with the Essential
Vendor, (ii) the Debtors would create a risk of harm or loss of economic
advantage to the Debtors' estates that is disproportionate to the Essential
Vendor's prepetition claim if the Debtors did not deal with the Essential

49

Vendor; and (iii) the Debtors have no practical or legal alternative to dealing with the Essential Vendor other than payment of the claim, the Debtors are authorized, but not directed, to pay such prepetition claim (such payments, "Essential Payments").  The Debtors shall provide this Court, the United States Trustee, counsel to the First Lien Lenders, counsel to the Second Lien Lenders, counsel to the DIP Agent and any official committee formed in these Chapter 11 Cases, on the later of 30 days after the Petition Date or 10 business days after each such Essential Payment, reports accounting each such claim paid, if any, including the bases on which such claim satisfies the preceding criteria.  Upon motion of any party in interest filed within thirty (30) days of such accounting, the Debtors and the Essential Vendor paid shall be required to show cause why payment of such claim should be deemed by the Court to be properly authorized.

(b)   The payment of any claim according to these Claim Payment Procedures shall be subject to the following conditions:

   (i)   The claimant must waive its right to file or otherwise assert against any or all of the Debtors, their estates, or the Debtors' customers, any claim related to any prepetition amounts allegedly owed to the Essential Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date.

   (ii)   To the extent the Essential Vendor has already obtained or asserted any such claim, it must take all necessary actions to immediately withdraw such claim.

   (iii)   The Essential Vendor must continue doing business with the Debtors in the ordinary course according to terms no less favorable to the Debtors than those in place prior to the Petition Date.

   (iv)   To the extent that an Essential Vendor paid pursuant to the Order refuses to continue doing business with the Debtors in the ordinary course, it must immediately disgorge such payment to the Debtors estates.

124.   The Debtors submit that the relief requested in the Essential Vendor Motion is essential, appropriate and in the best interests of the Debtors, their creditors and all parties in interest.

MIAMI 1008676 (2K)

**F.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Program, (B) Pay Insurance Premiums in the Ordinary Course and (C) Pay All Obligations Associated Therewith; and (II) Preventing Insurance Companies from Giving Any Notice of Termination or Otherwise Modifying any Insurance Policy Without Obtaining Relief from the Automatic Stay (the "Insurance Motion")**

125.    The Debtors seek authorization to (i) maintain insurance coverage levels and self-insured retention levels required under their corporate risk program, including authority to revise, extend, supplement, renew or change insurance coverage as needed and (ii) pay any prepetition and postpetition obligations associated therewith.  In addition, the Debtors respectfully request an order preventing Insurance Carriers (as defined below) from giving any notice of termination or otherwise modifying or cancelling any Insurance Policies without obtaining relief from the automatic stay.

**The Insurance Policies**

126.    The Debtors' Third Party Insurance Policies.  The Debtors maintain twenty-one insurance policies that are administered by several third-party insurance carriers (collectively, the "Insurance Carriers").  Collectively, these policies provide coverage for, among other things: (a) general commercial liability; (b) workers' compensation liability; (c) excess umbrella liability; (d) automobile; (e) aviation; (f) director and officer fiduciary; (g) director and officer excess liability; (h) employment practices liability; and (i) property (collectively, and including any new or similar policies entered into by the Debtors upon expiration, the "Insurance Policies").  A schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit "A" and incorporated herein by reference.  Continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' business, properties and assets.  Moreover, in many

cases, coverage provided by the Insurance Policies is required by the regulations, laws and

contracts that govern the Debtors' commercial activities.

127.    As set forth in Exhibit "A", most of the Debtors' Insurance Policies will

expire between July 1, 2014 through October 3, 2019.  It is critical that the Debtors continue to

carry the necessary insurance coverage to operate their business.  As a result, the Debtors are in

the process of negotiating renewals, extensions and/or entries into new insurance policies with

respect to the expiring Insurance Policies.  The Debtors seek the authority to renew, modify,

extend or enter into new Insurance Policies (collectively, the "New Insurance Policies") on a

postpetition basis in the ordinary course of business.

128.    In certain instances, the Debtors pay premiums for their insurance policies

in full upfront (the "Non-Financed Premiums").  Because it is not economically advantageous for

the Debtors to consistently pay premiums and certain fees associated with the Insurance Policies

in full up front, the Debtors have financed certain of the premiums and set up installment

payment programs with certain of the Insurance Carriers (the "Financing Arrangements") or

through third-party vendors.  Under the Financing Arrangements, the Debtors pay a portion of

the premiums up front (the "Upfront Premium Payments") and the remainder over a nine-month

period (the "Continuing Premium Payments").  The total cost of the Insurance Policies for the

previous 12 months is approximately $7.1 million, $4.5 million of which is paid through

Financing Arrangements.   As of the Petition Date, the outstanding amount owed under the

prepetition Insurance Policies is approximately $1.02 million.

129.    To ensure continued insurance coverage in the ordinary course of the

Debtors' business, the Debtors seek the authority to enter into new Financing Arrangements with

the Insurance Carriers in connection with the New Insurance Policies, including making any

Upfront Premium Payments or Continuing Premium Payments that may come due during the

course of these Chapter 11 Cases.  Alternatively, to the extent that the Debtors do not enter into a

Financing Arrangement with respect to the New Insurance Policies, the Debtors seek to pay any

Non-Financed Premiums associated with the New Insurance Policies on a postpetition basis in

the ordinary course of business.

      130.    <u>The Debtors' Self-Insured Retentions</u>.  The Debtors maintain a self-

insured retention of $350,000 per claim with respect to workers' compensation insurance and a

self-insured retention of $150,000 per claim with respect to general commercial liability

insurance (the "Self-Insured Retentions").  The Debtors maintain a $1.9 million letter of credit as

collateral for the Self-Insured Retentions.

      131.    To ease the Debtors' administrative burden, the Debtors' workers'

compensation insurance is administered by Amerihealth Casualty ("Amerihealth").  The Debtors

pay Amerihealth monthly in arrears (by the 15th of each month) for the paid losses under the

workers' compensation claim (the "WC Paid Losses") up to the self-insured retention amount of

$300,000.  In addition to administering the plan, Amerihealth pays the portion of the workers'

compensation claim in excess of $300,000 per claim, for which the Debtors pay Amerihealth a

premium, as outlined above.  The average amount of the WC Paid Losses each month is between

$50,000 and $60,000; however, in the ordinary course of business, the Debtors reserve additional

funds based on the likely outcome of the pending workers' compensation claims.  As of the

Petition Date, the Debtors have reserved approximately $1.64 million on account of accrued and

unpaid WC Paid Losses.  The Debtors seek authority to pay the WC Paid Losses as such

53

amounts come due on a postpetition basis, including any amounts accrued and unpaid as of the

Petition Date, in the ordinary course of business.

132.    Additionally, the Debtors pay Amerihealth monthly 5% administration

fees (the "WC Administration Fees") based on the amount of the WC Paid Losses during each

month.  The Debtors seek authority to continue paying the associated WC Administration Fee,

including any amounts accrued but unpaid as of the Petition Date, in the ordinary course of

business.  The Debtors' self-insured retention for general commercial liability insurance is also

self-administered.  The Debtors pay directly for the general commercial liability losses as they

are incurred (the "GL Losses") up to the self-insured retention amount of $150,000.  Chubb

Custom Market Inc. ("Chubb") pays the portion of the general commercial liability claim in

excess of $150,000 per claim but less than $1,000,000 per claim, for which the Debtors pay

Chubb a premium, as outlined above.  Additionally, the Debtors have an excess general

commercial liability policy with National Specialty Insurance Company for up to $300,000,000.

133.    The average monthly amount of the GL Losses is approximately $50,000.

As of the Petition Date, the Debtors have reserved approximately $425,000 on account of

accrued and unpaid GL Losses, and estimate that the GL Losses for the month of May will be

approximately $25,000.  The Debtors seek authority to pay the GL Losses as such amounts come

due on a postpetition basis in the ordinary course of business.

134.    The Debtors' Insurance Broker.  In connection with the Insurance Policies,

Marsh USA Inc., a third-party insurance broker (the "Insurance Broker"), assists the Debtors in

obtaining comprehensive insurance coverage in the most cost-effective manner.

54

135.    In connection therewith, the Debtors are liable for certain fees associated with obtaining such coverage.  Specifically, the Insurance Broker earns annual fees of approximately $300,000 (the "Broker Fees") for obtaining certain Insurance Policies and is paid pursuant to the Financing Arrangements.  The Insurance Broker is also compensated through commissions from the insurance provider for procuring certain other types of insurance.  The Broker Fees are paid as part of the Continuing Premium Payments under the Financing Arrangements  The Debtors seek authority to continue utilizing the Insurance Broker in the ordinary course of business and to pay any postpetition Broker Fees in the ordinary course of business.

136.    The Debtors submit that payment of these obligations is a proper exercise of their business judgment and is critically necessary to the Debtors' postpetition sale process and these Chapter 11 Cases.

G.    **Debtors' Motion for Authority to (I) Maintain Certain Customer Programs and (II) Honor or Pay Related Prepetition Obligations in Respect Thereof (the "Customer Program Motion")**

137.    The Debtors request entry of an order authorizing, but not directing, the Debtors, in their business judgment, to (a) honor prepetition obligations under their Customer Programs (as defined below) and (b) continue to pay and administer their Customer Programs on a postpetition basis in the ordinary course of business.

**The Customer Programs**

138.    The Debtors have developed various customer services and programs designed to attract customers, sustain goodwill and loyalty, and enhance their competitiveness in a hyper-competitive industry.  In particular, these services and programs include (a) providing

55

Customer Comps and Discounts, (b) holding Customer Deposits, (c) incurring Progressive

Gaming Obligations, (d) issuing and honoring Gaming Currency, (e) offering Gift Certificates,

and (f) providing and securing Safekeeping and Front Money (each as defined herein, the

"Customer Programs" and the obligations thereunder, the "Customer Obligations").

*(i)     Customer Comps and Discounts*

139.     In the ordinary course of business and commensurate with the practices of

other casino establishments worldwide, the Debtors offer a variety of programs designed to

enhance their customers' experience, reward continued patronage, and drive new and repeat

business, including, among other things, a customer loyalty rewards program, "free slot play"

promotions, giveaways, coupons and gift cards redeemable at the Debtors' resort and casino and

complimentary meals and spa services (collectively, the "Customer Comps and Discounts").

The Customer Comps and Discounts encourage an important regiment of high-spending

customers — and a particular and affluent target audience for the Debtors given the unparalleled

quality of Revel — to frequent the Debtors' resort and casino, thereby driving revenue.

140.     The Debtors believe that, as of the Petition Date, their prepetition

obligations with respect to the Customer Comps and Discounts total approximately $3.4 million.

The Debtors seek authority to honor all prepetition Customer Comps and Discounts as of the

Petition Date and to continue to honor, in their discretion, Customer Comps and Discounts in the

ordinary course of business.

**(a)     Revel Card Program**

141.     The Revel Card program is a customer loyalty rewards program that

allows customers to accumulate "tier points" and "resort dollars," also commonly referred to as

56

"comp points," based on the volume of both their gaming and non-gaming activity. Resort dollars are redeemable for complimentary rooms, food, beverage, free slot play, table play, retail, parking, spa and nightlife. Certain high earning players may also earn non-points based compensation, which the Debtors may award at their discretion, in the form of additional complimentary offers. Comp points have a defined expiration date based on whether a customer remains "active" in earning points.

142.    The Revel Card program places customers into five status tiers — Blu, Gold, Platinum, Black and Radiance — based on the amount of comp points customers accrue during the year. The amount and types of promotional incentives, discretionary compensation and complimentary offers increase and become more attractive as customers earn more comp points and are promoted from the Blu tier — the base tier, to the Radiance tier — the highest and most elite tier. Platinum and Black tier members are eligible to receive, for example, free valet parking, access to players' clubs, free suite upgrades, complimentary day passes to the Debtors' in-house spa, late check-out, access to a dedicated customer service hotline and preferred seating at the Debtors' concert venue.

143.    As customers accumulate comp points, the Debtors accrue the associated expense in the form of non-cash obligations. As of the Petition Date, approximately $1.68 million in costs related to comp points has accrued under the Revel Card program. The Debtors seek authority to honor, in their discretion, their obligations with respect to Revel Card program in the ordinary course of business.

MIAMI 1008676 (2K)

**(b)**      **"Free Slot Play"**

144.    The Debtors mail Revel Card holders monthly "free slot play" offers,

providing customers with a certain amount of credits to play the Debtors' slot machines.  The

amount of "free slot play" offered to each target customer is based on, among other things, the

customer's Average Daily Worth ("ADW") and/or their Revel Card tier level of play.  If a

customer uses the "free slot play" or earns comp points during a qualifying period, the customer

typically will receive an additional "bounceback offer" for additional "free slot play," which is

valid for a specified period of time (ranging from 1 day to 180 days).  "Free slot play" is also

rewarded to customers on select "bonus days" based on amount of play and to participants of

various in-house promotions.  With regards to table players the Debtors may choose to issue a

combination of Resort Dollars, Free Slot Play or Match Play Coupons.  Match Play Coupons

typically require the customer to place a specified bet (i.e., $5, $10, $100) and the Match Play

Coupon when presented for a single bet will double the value of the table player's wager up to

the value of the Match Play Coupon.  The Match Play Coupon has no value by itself.

145.    As customers accumulate "free slot play," the Debtors incur the associated

expense as they are redeemed.  As of the Petition Date, approximately $1.1 million has not yet

been redeemed relating to "free slot play."  Though these incurred costs are non-cash obligations,

the Debtors seek authority to continue to honor, in their discretion, their obligations with respect

to "free slot play" in the ordinary course of business.

**(c)**      **Cash Comp Program**

146.    In order to encourage high-earning customers to continue playing at the

Debtors' casino, the Debtors allow certain customers to receive a credit or a discount on their

losses ("Cash Comp").  Cash Comps are highly discretionary and are only awarded to customers who have certain financial credentials.  The monthly estimate of Cash Comp credits and discounts given to the Debtors' customers is approximately $200,000.  The Debtors believe that, as of the Petition Date, there is approximately $375,000 outstanding with respect to Cash Comp credits and discounts.  The Debtors seek authority to honor their obligations under the Cash Comp program as of the Petition Date, and to continue honoring, in their discretion, their Cash Comp obligations in the ordinary course of business.

### (d)      Promotions and Giveaways

147.    Every month the Debtors hold various promotions or giveaways for cash and non-cash prices (e.g., cash, automobiles, trips, merchandise, free slot play, resort dollars and food) to attract new and existing customers.  As an example, the Debtors currently have a promotion where new or in-active customers can join the Debtors' Loyalty Program and be eligible to spin a wheel on an electronic kiosk to win free slot play or a new automobile.  As of the Petition Date, the Debtors have given away one new automobile under such promotion.  Typically, the Debtors have multiple promotions running simultaneously throughout the month with certain promotions on specific days and others on a weekly or monthly basis.  The Debtors vary their promotions based upon the season and the promotions offered by competitor casinos.

148.    The Debtors estimate they spend approximately $600,000 to $1.5 million per month on giveaways and promotions.  The Debtors believe that, as of the Petition Date, there is approximately $206,000 worth of giveaways that have not yet been collected.

*(ii)    Customer Deposits*

149.    In the ordinary course of their business, customers deposit money with the Debtors in connection with hotel stay and banquet room rentals for large corporations and group travel ("Room Rental Deposits") as well as advance ticket sales for performances held at the Debtors' facility ("Advance Ticket Sales" and together with the Room Rental Deposits, the "Customer Deposits").  Customers providing Room Rental Deposits utilize the Debtors' services, including use of the room and catering costs, as anticipated, and the Room Rental Deposit is offset against the cost of such services.  Under certain circumstances, if the customer cancels the reservation, the Room Rental Deposit is fully refundable.  With respect to the Advance Ticket Sales, customers receive funds under limited circumstances where the event is cancelled or postponed.  The Debtors believe that as of the Petition Date, approximately $3.02 million in refundable Customer Deposits liability has accrued.

150.    Importantly, the Customer Deposits are not part of the Debtors' estates and the Debtors therefore do not have an equitable interest in such deposits.  Authorizing the Debtors to honor their prepetition Customer Deposit obligations will not prejudice in any way the Debtors' estates, creditors or other parties in interest.  Moreover, the repercussions of not authorizing to Debtors to refund the Customer Deposits would be severe and extremely disruptive and damaging to the Debtors' reorganization efforts.  For example, if the Debtors developed a reputation in the gaming industry for not returning their customers' initial down payments for banquet hall and room reservations, the Debtors' customers, fearing the Debtors will not be able to refund their money once they enter the bankruptcy proceedings, may cancel their current reservations or altogether refrain from making future reservations at the Debtors'

60

resort.  Either instance could potentially cripple revenue and immediately dissipate customer

goodwill.

*(iii)    Progressive Gaming Obligations*

151.    The Debtors offer progressive and multi-link progressive gaming

machines and table games to their customers in the ordinary course of business.  Progressive

gaming machines — electronic games that progressively accumulate funds wagered until such

funds are won and paid out — and table games, including games such as "Let It Ride" and

"Spanish 21," accrue value over a period of time based on amount of customer play.  Multi-link

progressive gaming machines accrue value in the same manner, but do so at a more rapid rate on

account of the fact that multiple progressive machines are "linked" together across several

casinos in Atlantic City, referred to as a "pot."  When a customer wins the game in question, the

winnings are paid by the manufacturer of the winning gaming machine.  Then, every two weeks,

the Debtors pay the manufacturers of the multi-link progressive machines a percentage of the

amounts wagered on the gaming machines.

152.    As of the Petition Date, the Debtors have accrued prepetition obligations

related to the progressive and multi-link progressive gaming machines and table games

(collectively, the "Progressive Gaming Obligations") of approximately $130,000.  Maintaining

the progressive and multi-link progressive gaming machines and table games, and honoring the

obligations relating thereto, is vital to the Debtors' slot players, who generate a large percentage

of the Debtors' revenue, and are critical to the general part of the Debtors' casino business.  The

Debtors seek authority to honor prepetition Progressive Gaming Obligations existing as of the

61

Petition Date, and to continue accruing and honoring, in their discretion, Progressive Gaming

Obligations in the ordinary course of business.

### (iv)     *Outstanding Gaming Currency*

153.     As is customary in the casino business, the Debtors routinely issues

gaming chips, slot vouchers and the like to customers for use at gaming tables and slot machines

("Gaming Currency").  Customers possess Gaming Currency while on the Debtors' property, and

some customers, whether advertently or inadvertently, retain Gaming Currency after they leave

the properties ("Outstanding Gaming Currency") — hopefully for later use upon their return.

While it is difficult to ascertain the exact amount, as of the Petition Date, the Debtors estimate

that customers are in possession of approximately $1.3 million in Outstanding Gaming Currency.

### (v)     *Gift Certificates*

154.     In the ordinary course of business, the Debtors, or through third-party

vendors, offer or sell customers gift certificates, vouchers, gift cards and various coupons

(collectively, the "Gift Certificates").  Gift Certificates may be redeemed for hotel stays, dining,

entertainment and retail merchandise at various locations throughout the Debtors' resort and

casino.  The Debtors estimate that, as of the Petition Date, their outstanding Gift Certificate

obligations total approximately $220,000.

### (vi)     *Safekeeping and Front Money*

155.     In the ordinary course of business, the Debtors hold certain customer

winnings in "safekeeping" until the customer claims those winnings ("Safekeeping").  For

example, when a customer lacks proper identification, any winnings of that customer are held by

the Debtors until the customer is able to produce proper identification to claim the winnings.

Winnings not immediately claimed by a customer are held in Safekeeping until the customer

62

claims such winnings.  Such winnings may be paid via wire, check or in person.  Additionally,

the Debtors hold funds in Safekeeping that have been confiscated from "prohibited patrons" (i.e.

patrons who are underage or that are excluded by the State of New Jersey); such funds are

subsequently remitted to the State of New Jersey upon demand.  The Debtors believe that, as of

the Petition Date, approximately $2,300 is held in Safekeeping.

156.    In addition, in the ordinary course of their businesses, the Debtors provide

a service whereby customers may deposit funds with the casino "cage"[22] and later withdraw

those funds while at a gaming table ("Front Money").  If a customer withdraws Front Money at a

gaming table, chips are issued in the amount requested and a counter check is issued and

endorsed by the customer to the Debtors in the amount of the withdrawal.  The amount of Front

Money held by the Debtors can fluctuate dramatically at any given time.  Accordingly, it would

be extremely costly and burdensome, if not impossible, for the Debtors to ascertain the exact

amount of Front Money due and owing to customers as of the Petition Date.  However, the

Debtors estimate that they have approximately $214,000 in Front Money obligations as of the

Petition Date.

157.    The winnings held in Safekeeping and the Front Money deposited into the

casino cage are not part of the Debtors' estate, and therefore the Debtors do not have a property

interest in or ownership rights of such funds.

158.    Accordingly, to preserve the value of their estates, in the exercise of their

proper business judgment, the Debtors must be permitted, in their discretion, to honor existing

commitments under their Customer Programs.

---

[22]    The casino cage is the physical location where chips are exchanged for cash in a casino.

**H.     Debtors' Motion for Entry of Interim and Final Orders Authorizing the
Debtors to Pay Certain Taxes and Fees in the Ordinary Course of Business
(the "Tax Motion")**

159.    The Debtors request entry of interim and final orders authorizing, but not

directing, the Debtors to remit certain taxes and fees owed to the appropriate taxing authorities in

the ordinary course of business, as such payments become due and payable and to the extent

adequate funds are available to make such payments.

**Debtors' Payment of Taxes and Fees**

160.    In the ordinary course of business, the Debtors (i) collect sales, use,

franchise and hotel taxes from their customers; (ii) incur taxes, including gross receipts, gaming,

entertainment and other taxes in operating their business (items (i) and (ii) collectively, the

"Taxes"); (iii) incur fees, assessments and other similar charges necessary to operate their

business (collectively, the "Fees") and (iv) remit such Taxes and Fees to various taxing, licensing

and other governmental authorities (collectively, the "Taxing Authorities").  The Debtors

estimate that the total amount of prepetition Taxes and Fees owing to the various Taxing

Authorities as of the Petition Date is approximately $2.6 million.

161.    The process by which the Debtors remit the Taxes and Fees varies,

depending on the nature of the Tax or Fee at issue and the Taxing Authority to which the

relevant Tax or Fee is to be paid.  There is often a lag-time between the time when the Debtors

incur an obligation to pay the Taxes and Fees and the date when such payments are due.  Various

governmental units may therefore have claims against the Debtors for Taxes or Fees that have

accrued, but are unpaid and not yet due, as of the Petition Date.  The relevant Taxing Authority

may also make retrospective adjustments to determine any payment deficiency or surplus for a

64

particular period resulting in a demand for further payment from or refund to the Debtors.  The

Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Taxing

Authorities as of the Petition Date will not exceed $3.0 million.

### 1.    Sales and Use Taxes

162.    The Debtors incur and collect from customers various state and local sales

Taxes, including hotel occupancy, food and beverage, gross sales and luxury taxes, in connection

with the sale of various products and services to their customers (the "Sales Taxes").  Sales

Taxes are essentially general consumption taxes charged at the point of purchase for certain

goods and services, set by the applicable taxing authority as a percentage of the total purchase

price.  The Debtors estimate that they remit on average approximately $213,000 in New Jersey

Sales Taxes and $253,000 in Atlantic City luxury taxes on a monthly basis to the applicable

Taxing Authorities, paid on the 20th of each month in arrears.

163.    Further, the Debtors purchase various materials and supplies necessary for

the operation of their day-to-day business from in-state and out-of-state vendors that do not

charge the Debtors Sales Tax in connection with such purchases.  As such, the Debtors remit on

average approximately $31,507 in use taxes (the "Use Taxes") per month to certain Taxing

Authorities, which represents an amount equal to the Sales Tax that they would otherwise have

paid had they purchased the goods in-state.  The Debtors pay Use Taxes on the 20th of each

month in arrears.

164.    As of the Petition Date, the Debtors are current with respect to payment of

the Sales and Use Taxes.  However, on June 20th, the Debtors Sales Taxes and Use Taxes in the

amount of $670,885 will come due for the month of May, a portion of which will be attributable to the Sales Taxes and Use Taxes incurred before the Petition Date.

### 2.    Franchise Taxes

165.    The Debtors also pay certain franchise taxes to operate their businesses in their respective taxing jurisdictions (the "Franchise Taxes").  Franchise Taxes may be based on a flat fee, net operating income or the amount or value of capital used in the business.  Typically, the Debtors pay Franchise Taxes on a quarterly basis.  On May 5, 2014, the Debtors remitted $28,567.95 in Delaware Franchise Taxes.

166.    As of the Petition Date, the Debtors are current with respect to payment of the Franchise Taxes.

### 3.    Gaming Taxes and Fees

167.    In the ordinary course of business, the Debtors are required to pay certain gaming-related and miscellaneous Taxes and Fees to federal authorities as well as to the respective state and local taxing authorities and organization in New Jersey (collectively, the "Gaming Taxes and Fees").  These Gaming Taxes and Fees are payable weekly, quarterly or annually, and the amounts due are based upon various criteria, including but not limited to: (i) a percentage of gross revenues received, (ii) the number of gaming devices operated during the applicable period or (iii) the need for withholding from patron winnings.

168.    Such Gaming Taxes and Fees include, without limitation:

- Gross Revenue Taxes:  Each week the Debtors are required to remit to the State of New Jersey a tax equal to 8% of the Debtors' total casino revenue for the previous week;

66

- Withholdings from Patron Winnings:  The Internal Revenue Service (the "IRS") and the State of New Jersey require the Debtors to withhold certain amounts from patron winnings in the ordinary course of business.  Such withholdings are remitted to the IRS on a bi-weekly basis and to the State of New Jersey on a monthly basis;

- Slot Machine License Fees:  In addition to generally applicable gross revenue taxes, the State of New Jersey imposes an annual slot machine fee in the amount of $500 per machine per year, payable annually in June;

- Investment Alternative Taxes:  The New Jersey Casino Control Act requires casino licensees to either (i) pay a tax equal to 2.5% of their gaming revenues or (ii) reinvest 1.25% of their gaming revenues through the Casino Reinvestment Development Authority (the "CRDA") in community and economic development projects in Atlantic City and throughout the State of New Jersey.  The Debtors have chosen option (ii) and remit such amounts to the CRDA quarterly; and

- Additional Miscellaneous Taxes and Fees:  The State of New Jersey and other local authorities impose additional miscellaneous Taxes and Fees on the Debtors' facilities, including boardwalk vehicle permit, casino room taxes, and tourism, parking and occupancy fees.  Additionally, the Debtors from time to time incur fines and stipulated penalties imposed by New Jersey regulatory agencies based on the Debtors' business operations.

169.    The Debtors estimate that they incur approximately $1.1 million in Gaming Taxes and Fees per month.  Because some Gaming Taxes and Fees are based on revenue, it is difficult to determine with certainty the amount of Gaming Taxes and Fees that the Debtors will owe each period.  Nevertheless, the Debtors estimate that, as of the Petition Date, they owe approximately $1.3 million in Gaming Taxes and Fees.  Additionally, because the State of New Jersey requires weekly remittances, the Debtors will have Gaming Taxes and Fees payments due within the first twenty-one days of these Chapter 11 Cases.

**Regulatory Fees**

170.    The Debtors pay various Fees for necessary business and regulatory

licenses, including mercantile, casino and gaming licenses (the "Licensing Fees"), to a number of

local, state and federal regulatory agencies.  The Debtors also pay monthly regulatory Fees to the

New Jersey Division of Gaming Enforcement to cover costs for obtaining gaming licenses for

employees and complying with New Jersey's state and local gaming laws ("DGE Fees").

Further, the state of Delaware requires the Debtors to pay annual reporting fees to remain in

good standing and to continue conducting business or remain incorporated in their respective

states (the "Reporting Fees," and together with the DGE Fees and the Licensing Fees, the

"Regulatory Fees").  The method for calculating the amount of Regulatory Fees due and the

deadlines for paying such amounts vary based on the particular fee in question.

171.    The Debtors estimate that, as of the Petition Date, they owe approximately

$600,000 on account of the Regulatory Fees, approximately $274,000 of which will become due

within the first twenty-one days of the Petition Date.

172.    Accordingly, the Debtors seek authority to continue to pay such Taxes and

Fees in the ordinary course of their business.  The Debtors believe that granting the relief

requested in the Tax Motion is appropriate and in the best interest of the Debtors, their estates

and creditors.

I.    **Debtors' Application for an Order Authorizing and Approving the Retention
of AlixPartners, LLP as Claims and Noticing Agent <u>Nunc</u> <u>Pro</u> <u>Tunc</u> to the
Petition Date (the "AlixPartners Retention")**

173.    The Debtors seek to retain AlixPartners, LLP ("AlixPartners") as their

noticing and claims agent as of the commencement of these Chapter 11 Cases (the "Claims and

68

Noticing Agent"). AlixPartners was one of the three companies that provided proposals to the

Debtors to act as the Claims and Noticing Agent in the Chapter 11 Cases. The Debtors selected

AlixPartners because of its experience and expertise in the chapter 11 case administration and

because the rates that AlixPartners offered the Debtors for its services are competitive and

reasonable given AlixPartners' reputation and expertise.

174.    The Debtors understand that AlixPartners is one of the country's leading

chapter 11 case administrators with vast experience in noticing and claims processing. By

appointing AlixPartners as the noticing and claims agent in the Chapter 11 Cases, parties in

interest will benefit from AlixPartners' significant experience and the efficient and cost-effective

methods it has developed.

175.    Although the Debtors have not yet filed their schedules of assets and

liabilities, they anticipate that there will be large number of entities to be noticed in these

Chapter 11 Cases.

**J.      Debtors' Emergency Motion Pursuant to Section 361, 362, 363 and 364 of the
Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy
Procedure for the Entry of Interim and Final Orders (A) Authorizing the
Debtors to (1) Obtain Postpetition Financing, (2) Use Cash Collateral, and (3)
Provide Adequate Protection to Prepetition Secured Parties, and (B)
Prescribing Form and Manner of Notice of and Scheduling Hearings (the
"DIP Motion")**

176.    Prior to filing these Chapter 11 Cases, the Debtors and certain financial

institutions negotiated the terms of a senior secured priming and superpriority debtor in

possession financing facility (the "DIP Facility"). These arm's-length negotiations culminated in

the DIP Facility. The DIP Facility provides a total commitment of $41,900,000 plus an amount

equal to the aggregate amount necessary to fund roll-up borrowings (the "Roll-Up Borrowings")

69

of amounts outstanding and unpaid under the Tranche A-1 Revolving Credit Facility and

Tranche A-2 Revolving Credit Facility in accordance with the First Lien Credit Agreement and

the DIP Loan Documents (as defined below).  The DIP Facility allows the Debtors to borrow on

an interim basis the aggregate principal amount of $23,500,000 of which $1,900,000 is available

only for issuance of letters of credit plus an amount equal to the aggregate amount necessary to

fund all Roll-Up Borrowings required pending entry of a final order approving the DIP Facility

and in accordance with the DIP Loan Documents.

177.    The terms of the DIP Facility are documented in that certain debtor in

possession credit agreement (as amended, restated, supplemented, or otherwise modified from

time to time in accordance with the orders approving the DIP Motion, the "DIP Credit

Agreement," and together with such orders, and all other agreements, documents and instruments

delivered or executed in connection therewith, as amended, supplemented or otherwise modified

from time to time, including the Budget (as defined below) (collectively, the "DIP Loan

Documents")) by and among the Debtors, Wells Fargo Bank, N.A., as administrative agent (in

such capacity, the "DIP Agent"), and certain lenders party thereto (in such capacity, the "DIP

Lenders").  The DIP Credit Agreement will permit the Debtors to obtain funding for

expenditures in accordance with an approved budget (the "Budget").  The Budget is attached as

Exhibit "B" to the proposed interim order attached to the DIP Motion.

178.    The Debtors believe that they and their estates will suffer immediate and

irreparable harm if the interim relief requested in the DIP Motion is not granted, including

authorizing the Debtors' use of the Secured Lenders' cash collateral securing such lenders'

prepetition secured obligations and authorizing certain borrowings on an interim basis under the

70

DIP Credit Agreement.  The Debtors further believe that the commencement of these Chapter 11

Cases will significantly increase demands on the Debtors' free cash as a result of, among other

things, the costs of administering these Chapter 11 Cases and addressing key constituents'

concerns regarding the Debtors' financial health and ability to continue operations.

179.    Without Court approval of the DIP Facility, the Debtors will not have

sufficient cash to ensure uninterrupted business operations or make timely payments to vendors

and employees that are essential to the Debtors' continued operations.  Failure to pay these

expenses would result in the immediate deterioration of the Debtors' business and going-concern

value.  The Debtors' ability to finance their operations and the availability to the Debtors of

sufficient working capital and liquidity through the DIP Facility is vital to the confidence of the

Debtors' employees, vendors and customers and to the preservation of the going-concern value

of the Debtors' estates.

180.    The Debtors have an immediate need for access to liquidity to, among

other things, fund working capital, general corporate requirements, and day-to-day operations;

maintain business relationships with vendors, entertainers and others; and pay employees,

vendors and other essential third parties – all of which are necessary to preserve and maintain the

Debtors' going-concern value.  Based on these circumstances, the Debtors require the interim

funding provided by the DIP Facility to avoid immediate and irreparable harm to their

operations, business and estates.

### K.    Debtors' Motion for an Order Authorizing Debtors to File Under Seal the Proposed Debtor-in-Possession Financing Fee Letter (the "DIP Seal Motion")

181.    Pursuant to the DIP Seal Motion, the Debtors request entry of an order

authorizing the Debtors to file the Fee Letter (as defined in the DIP Seal Motion) under seal and

71

directing that the Fee Letter remain under seal and confidential and not made available to anyone

without the consent of the Debtors and the agent and arranger under the DIP Facility.  The

Debtors will provide an unredacted copy of the Fee Letter, on a confidential basis, to: (i) the

Court, (ii) the United States Trustee and (iii) upon request, the advisors to any statutory

committee appointed in these Chapter 11 Cases on a strictly confidential and "professionals'

eyes only" basis.  The Debtors believe it is crucial they be able to assure their contractual

counterparties that the confidential and highly sensitive information contained in the Fee Letter

will not face disclosure.

> **L.** **Debtors' Motion for Establishment of Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Professionals and Committee Members (the "Interim Compensation Motion")**

182.    Pursuant to the Interim Compensation Motion, the Debtors request entry

of an order establishing an orderly, regular process for allowance and payment of compensation

and reimbursement of expenses for attorneys and other professionals whose services are

authorized by this Court and who will be required to file applications for allowance of

compensation and reimbursement of expenses pursuant to sections 330 and 331 of the

Bankruptcy Code.  In addition, the Debtors respectfully request entry of an order establishing a

procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any

statutory committee.  The relief requested in the Interim Compensation Motion is

noncontroversial and will aid in the efficient administration of these Chapter 11 Cases.  The

Debtors believe that it is essential that such relief is ultimately granted, and do not believe that

any party will be harmed if such relief is granted on an expedited basis.

MIAMI 1008676 (2K)

### III.    CONCLUSION

183.    The Debtors' ultimate goal in these Chapter 11 Cases is to achieve a sale of their business that maximizes the value of the Debtors' estates for the benefit of all stakeholders.  In the immediate term, however, in order to minimize any loss of value of their business during these Chapter 11 Cases, the Debtors' most pressing objective is to minimize the disruption to the Debtors' operations to the greatest extent possible.  The Debtors believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving this objective and, in turn, their overriding goal in these Chapter 11 Cases, will be substantially increased.

[signature on following page]

73

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of June, 2014.

REVEL AC, INC. (for itself and on behalf of each of its affiliated debtors and debtors in possession)

By:_____
Shaun Martin
Chief Restructuring Officer

74

## Exhibit A

(Corporate Structure)



[1] Block 73, LLC is a non-debtor joint venture formed to acquire and own land.