UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esq.
Raymond M. Patella, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax (609) 348-6834
mviscount@foxrothschild.com
rpatella@foxrothschild.com

**WHITE & CASE LLP**
John K. Cunningham, Esq. (*pro hac vice* pending)
Richard S. Kebrdle, Esq. (*pro hac vice* pending)
Kevin M. McGill, Esq. (*pro hac vice* pending)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700/fax (305) 358-5744
jcunningham@whitecase.com
rkebrdle@whitecase.com
kmcgill@whitecase.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| REVEL AC, INC., et al., | Case No. 14-22654 (GMB) |
| Debtors.[1] | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION PURSUANT TO SECTIONS 361, 362, 363
AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE FOR THE ENTRY OF INTERIM
AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) OBTAIN
POSTPETITION FINANCING, (II) GRANT SENIOR PRIMING LIENS AND
SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS, (III) USE**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856).  The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

## CASH COLLATERAL, AND (IV) PROVIDE ADEQUATE PROTECTION
## TO PREPETITION SECURED PARTIES, AND (B) PRESCRIBING FORM
## AND MANNER OF NOTICE OF AND SCHEDULING HEARINGS

Revel AC, Inc. ("Revel AC" or the "DIP Borrower") and its affiliated debtors and

debtors in possession (collectively, the "Revel Entities" or the "Debtors") in the above-captioned

chapter 11 cases (the "Cases") hereby file this motion (the "Motion") for the entry of an interim

order, substantially in the form attached hereto as <u>Exhibit A</u> (the "Interim DIP Order"), and, as

applicable, a final order (the "Final DIP Order," and together with the Interim DIP Order, the

"DIP Orders") (A) authorizing the Debtors to (i) obtain postpetition secured superpriority

financing pursuant to sections 361, 362 and 364 of title 11 of the United States Code (the

"Bankruptcy Code"), (ii) grant liens and superpriority claims to the DIP Secured Parties (as

defined below) pursuant to section 364 of the Bankruptcy Code, (iii) use cash collateral of the

Prepetition Secured Parties (as defined below) pursuant to section 363 of the Bankruptcy Code,

and (iv) provide adequate protection to the Prepetition Secured Parties pursuant to sections 361,

362 and 363 of the Bankruptcy Code, and (B) prescribing form and manner of notice of, and

scheduling, interim and final hearings pursuant to Rules 4001(b) and (c) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  In support of the Motion, the Debtors submit

the Declaration of Shaun Martin in Support of First Day Motions and Applications (the "Martin

Declaration") and the Declaration of Barak Klein in Support of Debtors' Emergency Motion

Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the

Federal Rules of Bankruptcy Procedure for the Entry of Interim and Final Orders (A)

Authorizing the Debtors to (1) Obtain Postpetition Financing, (2) Use Cash Collateral, and (3)

Provide Adequate Protection to Prepetition Secured Parties, and (B) Prescribing Form of Notice

of and Scheduling Hearings (the "Klein Declaration," and together with the Martin Declaration,

2

the "Declarations")[2] filed contemporaneously herewith and incorporated herein by reference, and

respectfully represent as follows:

## Preliminary Statement

As the Court is aware, shortly after the opening of the Revel Casino Resort in

2012, the Debtors were overcome by a torrent of financial and operational challenges.  The

Debtors filed for bankruptcy in 2013 to address some of those challenges.  Although the Debtors

confirmed a plan of reorganization in those earlier bankruptcy proceedings, time has proven that

further reorganization is necessary as the Debtors continue to be challenged and their liquidity

continues to be strained.

The Debtors have determined that their value would be maximized if substantially

all of their assets, or groupings or subsets thereof, were sold pursuant to a sale process overseen

by the Court.  Accordingly, the Debtors contemporaneously are seeking approval of certain bid

procedures to be employed in connection with an auction of their assets.  The Debtors believe

that the contemplated sale process is beneficial to the estates and their stakeholders, but they lack

sufficient working capital and liquidity to finance their postpetition operations (including the sale

process).  Therefore, in anticipation of these Cases, the Debtors solicited interest in postpetition

financing from numerous parties.  After careful consideration, the Debtors, in the exercise of

their business judgment, believe that it is in the best interests of their estates to obtain financing

from the DIP Lenders – a group of financial institutions led by one of the Debtors' current

lenders under the Prepetition First Lien Credit Agreement – pursuant to the DIP Credit

Agreement and the other DIP Loan Documents (each defined below).  The Prepetition Secured

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order or the DIP Credit Agreement (as defined below).

Parties have or are deemed to have consented to the DIP Facility (as defined below) and the Debtors' use of purported cash collateral.

The relief requested herein is the linchpin of these Cases, and, without it, substantial enterprise value will be lost. The proposed postpetition financing and use of cash collateral should provide the Debtors with sufficient liquidity to fund, among other things, working capital and general corporate requirements for essential, day-to-day operations, to preserve and maintain the value of the Debtors' assets for the benefit of the estates while the Debtors conduct a marketing and sale process for all or substantially all of their assets. The relief requested is therefore necessary, essential and appropriate for the continued operations of the Debtors' businesses and property so as to maximize value for stakeholders and avoid a forced liquidation. Accordingly, the Debtors respectfully request that the Court grant the Motion and enter the DIP Orders.

## Disclosure of Material Terms and "Extraordinary Provisions" Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-4

1.     In accordance with Bankruptcy Rule 4001 and Rule 4001-4 of the District of New Jersey Local Bankruptcy Rules (the "Local Rules"), the following is a concise summary of the relief requested by this Motion:[3]

| | |
|---|---|
| DIP BORROWER: | Revel AC, Inc. |
| DIP GUARANTORS: | Each of the Debtors other than the DIP Borrower and any other entities that become guarantors under the DIP Loan Documents (the "DIP Guarantors," and together with the DIP Borrower, the "DIP Loan Parties"). |
| DIP LENDERS: | Wells Fargo Principal Lending, LLC and such other lenders from time to time party thereto (the "DIP Lenders"). |
| DIP AGENT: | Wells Fargo Bank, N.A., as administrative agent and as collateral agent |

---

[3]     This summary is not intended to limit the terms of the DIP Facility (as defined below), including in respect of any use of Cash Collateral (as defined below), in each case as set forth in the DIP Credit Agreement and the Interim DIP Order and as will be set forth in the Final DIP Order. Reference should be made to the DIP Credit Agreement, the Interim DIP Order, and the Final DIP Order for the full terms thereof.

|  | (in such capacities, respectively, the "DIP Administrative Agent" and "DIP Collateral Agent," and collectively, the "DIP Agent"). |
|---|---|
| <u>DIP ARRANGER</u>: | Wells Fargo Principal Lending, LLC, as sole lead arranger (the "DIP Arranger"). |
| <u>DIP ISSUING BANK</u>: | Wells Fargo Bank, N.A., as letter of credit issuer ("DIP Issuing Bank"). |
| <u>DIP FACILITY</u>: | The "DIP Facility" shall consist of a superpriority, senior secured revolving credit facility in an aggregate principal amount of $41,900,000 <u>plus</u> an amount equal to the aggregate amount necessary to fund all Roll-Up Borrowings (as defined below) required in accordance with the DIP Loan Documents (all financial accommodations and extensions of credit under the DIP Credit Agreement and the DIP Facility, the "DIP Extensions of Credit"). |
| <u>AVAILABILITY</u>: | During the period (the "Interim Period") from the date of entry of the Interim DIP Order through and including the earlier to occur of the date of entry of the Final DIP Order by this Court and Termination Date (as defined below), in the aggregate principal amount of $23,500,000 of which $1,900,000 is available only for issuance of letters of credit and subject to a temporary increase in LC Exposure (as defined in the DIP Credit Agreement) pursuant to section 2.18 of the DIP Credit Agreement <u>plus</u> an amount equal to the aggregate amount necessary to fund all Roll-Up Borrowings required during the Interim Period in accordance with the DIP Loan Documents (the "Interim DIP Availability"). |
|  | Upon the entry of the Final DIP Order and thereafter until the Termination Date, in each case, at any time outstanding, an aggregate principal amount not to exceed $41,900,000 (inclusive of amounts advanced or otherwise extended prior to entry of the Final DIP Order) <u>plus</u> an amount equal to the aggregate amount necessary to fund all Roll-Up Borrowings required upon entry of the Final DIP Order in accordance with the DIP Loan Documents. |
|  | (DIP Credit Agreement §§ 1.01, 2.01, 4.01, 4.02; Interim DIP Order ¶ 2(b)) |
| <u>ROLL-UP BORROWINGS</u>: | The DIP Facility contemplates roll-up borrowings of (a) the principal amounts of "Tranche A-1 Revolving Loans" (as defined in the Prepetition First Lien Credit Agreement) outstanding under the Prepetition First Lien Credit Agreement (the "JPM Roll-Up Borrowing") and (b) the principal amounts of "Tranche A-2 Revolving Loans" (as defined in the Prepetition First Lien Credit Agreement) outstanding under the Prepetition First Lien Credit Agreement (the "WF Roll-Up Borrowing," and, together with the JPM Roll-Up Borrowing, the "Roll-Up Borrowings"). |
|  | Prior to the Final Effective Date, upon each borrowing of a new money loan (an "NM Loan"), the DIP Borrower will simultaneously be deemed to have made a request for a JPM Roll-Up Borrowing (or, after all principal amounts outstanding under the Prepetition First Lien Credit Agreement consisting of "Tranche A-1 Revolving Loans" have been |

repaid pursuant to section 2.21 of the DIP Credit Agreement, a WFB Roll-Up Borrowing) in a principal amount equal to the Roll-Up Ratio (i.e., 2.0:1.0) multiplied by the principal amount of such borrowing of an NM Loan. Additionally, in accordance with the terms of the DIP Credit Agreement, on the date that the Interim DIP Order is entered by the Court, the DIP Borrower will be deemed to request a letter of credit with a face amount not to exceed $1,900,000 to provide a "back to back" letter of credit to support, or replace, an existing letter of credit issued for the account of the DIP Borrower with a face amount of $1,900,000 (the "Existing LC").

Subject to the Final DIP Order, on the Final Order Entry Date, the DIP Borrower shall be deemed to have made a request for Roll-Up Borrowings comprised of loans in a principal amount equal to the aggregate amount (including, without limitation, accrued and unpaid interest) of "Revolving Loans" (as defined in the Prepetition First Lien Credit Agreement) outstanding as of such date.

(DIP Credit Agreement §§ 1.01, 2.21; Interim DIP Order ¶ 2(d))

| | |
|---|---|
| <u>TERMINATION; MATURITY:</u> | The term of the DIP Facility shall commence on the date of entry of the Interim DIP Order and end on the date (such date, the "Termination Date") which is the earlier to occur of (a) the Scheduled Maturity Date (as defined below) or (b) five days after written notice (a "Default Notice") is provided to the Debtors and any statutory committee appointed in the Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee") by the DIP Agent (such five-day period, the "Default Notice Period") that an Event of Default has occurred and is continuing (subject to any applicable cure period in the DIP Loan Documents), in each case subject to the terms and conditions set forth in the DIP Loan Documents. |

The "Scheduled Maturity Date" shall mean the earliest to occur of (a) October 31, 2014, subject to extension to allow for receipt of any Gaming Approvals required in order to allow an Acceptable Chapter 11 Plan to become effective, but in no event later than January 31, 2015, (b) July 31, 2014 if the Court shall not have entered the Final DIP Order by the end of such date, (c) the Plan Effective Date and (d) the date on which the DIP Loan Parties consummate a transaction for the sale or disposition of all or substantially all of their assets, taken as a whole, whether pursuant to an Approved APA or otherwise.

(DIP Agreement §§ 1.01, 2.05, 2.08; Interim DIP Order ¶ 2(a))

| | |
|---|---|
| <u>COMMITMENTS:</u> | Commitments for NM Loans: $41,900,000, consisting of the portion of the DIP Facility to be used for any purpose other than a Roll-Up Borrowing; provided, that, $40,000,000 of such commitments shall be available for borrowings of NM Loans and the other $1,900,000 shall be available for providing a "back to back" letter of credit to support, or replace, the Existing LC. |

Commitments for JPM Roll-Up Borrowing: $10,000,000, consisting of the portion of the DIP Facility to be used to repay all amounts (including, without limitation, accrued and unpaid interest) outstanding under the Prepetition First Lien Credit Agreement consisting of Tranche A-1 Revolving Loans.

Commitments for WFB Roll-Up Borrowing: $73,100,000, consisting of the portion of the DIP Facility to be used to repay all amounts (including, without limitation, accrued and unpaid interest) outstanding under the Prepetition First Lien Credit Agreement consisting of Tranche A-2 Revolving Loans.

(DIP Credit Agreement § 1.01)

USE OF PROCEEDS:    The DIP Borrower will use the proceeds of the DIP Facility to (a) in the case of Roll-Up Borrowings, repay amounts outstanding under the Prepetition First Lien Credit Agreement consisting of Tranche A-1 Revolving Loans and Tranche A-2 Revolving Loans together with any interest, fees, expenses, adequate protection payments or other amounts due and payable in connection therewith, (b) pay reasonable costs, fees and expenses, including fees of the DIP Agent, the Agents, the Advisors, and the DIP Lenders, associated with the transactions contemplated by the DIP Loan Documents, (c) in the case of the Reserved Amounts (as defined in the DIP Credit Agreement), pay for fees, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 330 or 363 of the Bankruptcy Code ("Loan Parties' Professional Fees") and professionals of any statutory committee of unsecured creditors appoints in the Cases (the "Creditors Committee Professional Fees") in accordance with the DIP Budget, (d) pay for fees and expenses related to the transactions contemplated by the DIP Credit Agreement, (e) in the case of the Letters of Credit, to provide "back to back" support, or replace, the Existing LC, and (f) provide ongoing working capital requirements of the Debtors and to pay for fees, costs and expenses relating to the Cases (other than Loan Parties' Professional Fees), each in accordance with the DIP Budget (as defined below) and the DIP Orders.

(DIP Credit Agreement § 3.12; Interim DIP Order ¶ 3)

AGREED BUDGET:    The Debtors have prepared a budget setting forth in reasonable detail the receipts and disbursements of the DIP Loan Parties on a weekly basis from the Petition Date (as defined below) through and including September 21, 2014, which budget is annexed to the Interim DIP Order as Exhibit "B" (such budget, as updated from time to time pursuant to the DIP Loan Documents, the "DIP Budget").

The Debtors are permitted to use DIP Extensions of Credit solely in accordance with the DIP Budget (subject to variances permitted under the DIP Credit Agreement).

(DIP Credit Agreement §§ 1.01, 3.12; Interim DIP Order ¶ 3)

WIND-DOWN BUDGET:   Subject to certain terms and conditions of the Interim DIP Order and subject to the consummation of a Qualifying Sale (as defined below), each of the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims (each as defined below) shall be subject and subordinated to the payment of the "Wind-Down Amounts," meaning the amounts set forth in a budget attached to the Interim DIP Order as Exhibit "C" (such budget, the "Wind-Down Budget"); provided, that, disbursements to be made in connection with wind-down activities shall not be limited to the specific line item in the Wind-Down Budget so long as there remain unused amounts from other line items in the Wind-Down Budget.

The Wind-Down Amounts shall be payable from the proceeds of a sale for cash or by credit bid or some combination thereof of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code (a "Qualifying Sale") after (a) the DIP Obligations have been paid in full and (b) any unpaid components of the Carve-Out have been paid or deposited in a cash reserve.

(Interim DIP Order ¶ 8(ii))

INTEREST RATE:   Interest Rate for Eurodollar Loans:  Adjusted LIBOR Rate + 6.00% per annum.[4]

Default Interest Rate: 2.00% per annum above the then applicable rate.

(DIP Agreement §§ 1.01, 2.07)

FEES:   Administrative Agent Fee:  To the DIP Administrative Agent, for its own account, administrative fees payable in the amounts separately agreed upon between the DIP Borrower and the DIP Agent.

Commitment Fee:  To the DIP Administrative Agent for the account of each DIP Lender, a commitment fee, which shall accrue at 4.00% per annum on the average daily unused amount of the NM Commitment of such DIP Lender during the period from and including the Closing Date to but excluding the Commitment Termination Date.

Letter of Credit Fee:  To (a) the DIP Agent for the account of each DIP Lender, a participation fee with respect to its participations in Letters of Credit ("Letter of Credit Fees"), which shall accrue at 6.00% per annum on the average daily amount of such DIP Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the Commitment Termination Date and the date on which such DIP Lender ceases to have any LC Exposure; provided,

---

[4]   The Adjusted LIBOR Rate is, with respect to any Eurodollar Borrowing for any Interest Period, the higher of (i) (a) an interest rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBOR Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (b) 1 minus the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (ii) 1.00%.  See DIP Credit Agreement § 1.01.

that, during any period that an Event of Default has occurred and is continuing, such participation fee shall be increased by 2.00%, and (b) each DIP Issuing Bank a fronting fee, which shall accrue at a rate equal to 0.25% per annum on the average daily amount of the LC Exposure arising from or related to Letters of Credit issued by it (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the Commitment Termination Date and the date on which there ceases to be any LC Exposure, as well as such DIP Issuing Bank's standard administrative fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.

Upfront Fee: The DIP Borrower agrees to pay to the DIP Administrative Agent for the account of each DIP Lender making NM Loans on the Closing Date an upfront fee pursuant to that certain fee letter, dated as of June 19, 2014, between the DIP Arranger and the DIP Loan Parties (as amended, restated, supplemented or otherwise modified from time to time, the "Fee Letter").

(DIP Credit Agreement §§ 1.01, 2.06)

CARVE-OUT:    "Carve-Out" shall mean, collectively:  (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), plus (b) unpaid fees and expenses of estate professionals and Winter Harbor LLC (collectively, the "Estate Professionals") retained pursuant to sections 327, 328 or 363 of the Bankruptcy Code incurred and accruing after the date the DIP Agent issues a Default Notice, to the extent such fees and expenses are allowed by the Court, in an aggregate amount not in excess of (i) $250,000, with respect to the Debtors' professionals (including Winter Harbor LLC) and (ii) $25,000, with respect to the professionals retained by any Committee (such amount, the "Professionals' Carve-Out Cap").  For fees and expenses incurred by Estate Professionals prior to the date that a Default Notice has been issued, the Debtors shall be permitted to pay fees to the Estate Professionals and reimburse expenses incurred by the Estate Professionals that are allowed by the Court and payable under sections 328, 330 and 331 or 363 of the Bankruptcy Code, any compensation procedures approved by the Court and  permitted under section 2.01(b) of the DIP Credit Agreement, and to the extent consistent with the DIP Budget, and the same shall not reduce the Professionals' Carve-Out Cap.  In the event that the DIP Agent issues a Default Notice, the Estate Professionals shall be able to seek payment of unpaid fees and expenses incurred and accruing on or prior to the date the DIP Agent issues such Default Notice (the "Pre-Default Fees") from the Reserved Amounts in accordance with section 2.01(b) of the DIP Credit Agreement; provided that, such fees and expenses shall in the aggregate not exceed the amount available as the Reserved Amounts as of the date of the issuance of the Default Notice (any Pre-Default Fees in excess of such amount, the "Pre-Default Excess Fees").

To the extent that the NM Commitment has terminated prior to the payment of the fees and expenses of the Estate Professionals that have accrued and remain unpaid as of the date of such termination, all Reserved Amounts shall be funded into a reserve deposit account of the DIP Administrative Agent that is under the sole control of the DIP Administrative Agent (the "Reserved Amounts Account"). The Reserved Amounts contained in the Reserved Amounts Account shall be available to the DIP Borrower to pay the fees and expenses of the Estate Professionals that are accrued and unpaid as of the date of termination of the NM Commitment, approved for payment by the Bankruptcy Court and not in excess of the amounts contained in Schedule 2.01(b) to the DIP Credit Agreement. The Reserved Amounts and the Reserved Amounts Account (and amounts on deposit therein) shall be maintained by the DIP Administrative Agent until, and used for no purpose other than, the payment in full and in cash of the fees and expenses of the Estate Professionals in accordance with the DIP Credit Agreement and the Interim DIP Order, and shall not be available for satisfaction of, or subject to, any other claim against the Debtors' estates or subject to any claim, lien, charge, right to payment or other encumbrance of any kind or nature, and shall not be subject to avoidance or recovery by the Debtors or their estates (including any chapter 11 or chapter 7 trustee appointed in the Cases).

(DIP Credit Agreement § 1.01; Interim DIP Order ¶ 8(i))

506(C) WAIVER:

Subject only to and effective upon the entry of the Final DIP Order, as a further condition of the DIP Facility, any obligation of the DIP Secured Parties to make DIP Extensions of Credit, and the Debtors' authorization to use the Cash Collateral, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Cases) agree not to assert any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP Collateral, the Prepetition First Lien Secured Parties, the Adequate Protection Liens, the Prepetition First Liens or the Prepetition Collateral; provided that, in the event that White & Case LLP, Winter Harbor LLC, or Fox Rothschild LLP have accrued and unpaid Pre-Default Excess Fees, such professionals shall be permitted to seek allowance of such Pre-Default Excess Fees under section 506(c) of the Bankruptcy Code in an aggregate amount not to exceed $750,000, provided further that, (a) nothing herein shall affect any standards that such professionals must meet with respect to a claim under Section 506(c) of the Bankruptcy Code, including, but not limited to, that such professionals shall bear the burden of proof, and (b) all defenses remain available to the parties that would be affected by the requested relief.

(Interim DIP Order ¶ 9)

DIP CLAIMS AND LIENS; PRIORITY:

The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute (without the need to file a proof of claim) an allowed joint and several superpriority claim against each of

the DIP Loan Parties of the DIP Agent for the benefit of the DIP Secured Parties with priority over any and all other obligations, liabilities, and indebtedness of the DIP Loan Parties, whether now existing or hereafter arising or incurred, of any kind whatsoever, including the proceeds of Avoidance Actions following entry of the Final DIP Order (but not the Avoidance Actions themselves), and including any and all administrative expenses or other claims of the DIP Loan Parties of the kind specified in or arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 552(b), 726, 1113, 1114, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, whether now in existence or hereafter incurred by the DIP Loan Parties, and shall at all times be senior to the rights of any DIP Loan Party, any DIP Loan Party's estate, and any successor trustee, estate representative, or any creditor, in any of the Cases or any Successor Case, subject only to the Carve-Out (the "DIP Superpriority Claim").

The DIP Agent for the benefit of the DIP Secured Parties shall be granted security interests in and liens on the DIP Collateral, which security interests and liens shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to the Interim DIP Order, any Final DIP Order and the other DIP Loan Documents, the "DIP Liens").

The DIP Liens shall, in each case, subject to the Carve-Out, constitute: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first-priority liens on, and security interests in, all DIP Collateral that is not subject to a valid, perfected, and non-avoidable lien in existence on the Petition Date; and (b) pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable senior priming liens on, and security interests in (the "Priming Liens"), all DIP Collateral, which Priming Liens shall be junior only to any Prepetition Liens that were granted as security for the obligations in connection with the Tranche A-1 Revolving Loans, and, prior to entry of the Final Order, any valid, perfected, enforceable and non-avoidable third party liens (including, for the avoidance of doubt, any construction liens and property tax liens, but excluding any liens that were granted as security for the obligations in connection with the Prepetition Tranche A-2 Revolving Credit Facility, the Prepetition Tranche B Term Loan Facility, or the Prepetition Second Lien Term Loan (each as defined below) in existence at the time of the commencement of the Cases or perfected subsequent thereto pursuant to section 546(b) of the Bankruptcy Code held by a third party that were senior to the Prepetition First Lien Facilities (as defined below) (such liens, the "Senior Third Party Liens"), and shall be senior to all other liens granted as of the Petition Date and any liens granted after the Petition Date to provide adequate protection in respect of any of the liens granted as of the Petition Date.

For the avoidance of doubt, the Priming Lines will be senior to all Senior Third Party Liens upon entry of the Final DIP Order.

(DIP Credit Agreement §§ 1.01, 2.20(b), 2.22, 3.26; Interim DIP Order ¶ 2(f), (h))

DIP COLLATERAL:     "DIP Collateral" shall mean all now owned or hereafter acquired assets and property in which the Debtors and their estates have an interest, whether real or personal, tangible or intangible, or otherwise, whenever acquired, and any and all proceeds therefrom, including, without limitation: (a) all Prepetition Collateral, and (b), in addition, all other cash, accounts, deposit accounts, securities accounts, investment property, vehicles, documents, chattel paper, instruments, general intangibles, fixtures, letter of credit rights, accounts receivable, tax refunds, investment property, inventory, goods, plant and equipment, equipment, software, licenses, customer lists, customer records, real property, leaseholds, all intercompany claims, any and all proceeds arising from insurance policies, all claims and causes of action of each Debtor and any and all proceeds therefrom (including the proceeds of any Avoidance Actions following entry of the Final DIP Order), all intellectual property, the equity interests in each direct and indirect subsidiary of the DIP Borrower and the equity interests in Block 73, LLC owned by NB Acquisition, LLC in each case in which the Debtors and their estates have an interest, whenever acquired, and any and all proceeds therefrom; provided, that "DIP Collateral" shall exclude any property over which the creation or granting of such claim would violate any applicable Gaming Laws.   For the avoidance of doubt, "DIP Collateral" shall include (a) any asset purchase or other similar agreement for the sale or disposition of assets of the Debtors executed by any Debtor after the Petition Date, and any rights of any Debtor thereunder, including any right to receive proceeds of any deposit provided pursuant thereto (other than any Debtor's rights, claims or causes of action under, or in respect of, any such asset purchase or other similar agreement for the sale or disposition of the Debtors' assets under which any of the DIP Secured Parties or any of their affiliates are purchasers (pursuant to a cash or credit bid) or any proceeds thereof) and (b) the Reserve Account (as defined in the Prepetition First Lien Credit Agreement).

(DIP Credit Agreement § 1.01; Interim DIP Order ¶ 2(e))

ADEQUATE
PROTECTION;
PRIORITY:     Solely to the extent of, and in an aggregate amount equal to, any diminution in value of their respective interests in the Prepetition Collateral (excluding Cash Collateral (as defined below)), from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not resulting from, among other things, the use, sale or lease by the Debtors, depreciation, physical deterioration, or other decline in value, of the Prepetition Collateral (excluding Cash Collateral), the priming of the Prepetition Liens by the DIP Liens, and the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, or otherwise   (collectively, "Diminution in

Value"), the Prepetition Secured Parties shall have pursuant to sections 361 and 364(d) of the Bankruptcy Code, replacement security interests in and liens upon (the "Adequate Protection Liens") all of the DIP Collateral.   As adequate protection for the use of such Prepetition Secured Parties' Prepetition Collateral that is Cash Collateral, the Prepetition Secured Parties shall have, pursuant to section 363(e) of the Bankruptcy Code, dollar for dollar replacement security interests in and liens upon (the "Cash Collateral Adequate Protection Liens") all of the DIP Collateral. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition Secured Parties shall be junior and subordinated to the DIP Liens and any Senior Third Party Liens. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition First Lien Secured Parties shall be senior and prior to the Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition Second Lien Secured Parties (as defined below) and the Prepetition Liens. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition Second Lien Secured Parties shall be senior to any Prepetition Second Liens and shall be junior and subordinated to the Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition First Lien Secured Parties, the Prepetition First Liens, the DIP Liens and any Senior Third Party Liens. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens shall in all cases be subject to the Carve-Out and the Wind-Down Amounts.

To the extent that the Adequate Protection Liens do not make the Prepetition Secured Parties whole for any Diminution in Value and to the extent that the Cash Collateral Adequate Protection Liens do make the Prepetition Secured Parties whole for the use of Cash Collateral, the Prepetition Secured Parties shall have, respectively, subject in each case to the payment of the Carve-Out, allowed joint and several superpriority administrative expense claims against each of the DIP Loan Parties (the "Adequate Protection Superpriority Claims") as provided for in section 507(b) of the Bankruptcy Code, payable from and having recourse to all DIP Collateral, which (a) in the case of the Adequate Protection Superpriority Claim granted to the Prepetition First Lien Secured Parties (the "First Lien Adequate Protection Superpriority Claim") shall be junior and subordinated to the DIP Superpriority Claim, and (b) in the case of the Adequate Protection Superpriority Claim granted to the Prepetition Second Lien Secured Parties shall be junior and subordinated to the DIP Superpriority Claim and the First Lien Adequate Protection Superpriority Claim. For the avoidance of doubt, the Prepetition Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of any Adequate Protection Superpriority Claims unless and until the DIP Obligations and (without duplication) the DIP Superpriority Claim have indefeasibly been paid in full in cash.

Additionally, subject only to the Carve-Out and any Wind-Down Amounts, upon entry of the Interim DIP Order and, thereafter, when due, the Debtors shall make payments of: (a) (i) all accrued and unpaid interest on the First Lien Prepetition Obligations (as defined below) in

13

respect of the Prepetition Tranche A-1 Revolving Credit Facility and the Prepetition Tranche A-2 Revolving Credit Facility owing by the Debtors under the Prepetition First Lien Financing Documents (each as defined below) at the non-default rates set forth in the Prepetition First Lien Financing Documents, and (ii) all accrued and unpaid interest on the First Lien Prepetition Obligations in respect of the Prepetition Tranche B Term Loan Facility (as defined below) owing by the Debtors under the Prepetition First Lien Financing Documents, to be paid in kind by capitalizing such interest and adding it to the aggregate principal amount of the First Lien Prepetition Obligations in respect of the Prepetition Tranche B Term Loan Facility, at the non-default rates set forth in, and pursuant to the terms of, the Prepetition First Lien Credit Financing Documents, to the fullest extent permitted by law; (b) all other accrued and unpaid fees and disbursements (including all reasonable and documented out-of-pocket legal and advisory fees and expenses) owing to the Prepetition First Lien Agent or the Prepetition First Lien Secured Parties under the Prepetition Revolving Credit Facilities pursuant to the First Lien Financing Documents; and (c) all letter of credit and other fees owing by the Debtors under the Prepetition First Lien Financing Documents in respect of the Prepetition Revolving Credit Facilities, at the non-default rate provided for therein.

(Interim DIP Order ¶ 4)

CREDIT-BIDDING:
Subject to the terms and conditions set forth in the DIP Loan Documents, upon entry of the Final DIP Order, the DIP Agent and the Prepetition First Lien Agent shall each have the  unqualified right to credit-bid up to the amount of the DIP Obligations and the First Lien Prepetition Obligations, respectively, in connection with any sale of all or substantially all of the Debtors' assets and property, including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code, included as part of any Chapter 11 plan, or conducted by a Chapter 7 trustee under section 725 of the Bankruptcy Code.

(Interim DIP Order ¶ 4(e))

FINANCIAL REPORTING:
The Debtors shall deliver to the DIP Agent, among other things: (a) on the last business day of each calendar week, (i) a rolling 13-week cash flow forecast of cash receipts and cash disbursements for the immediately following consecutive 13 weeks and (ii) a variance report; (b) not later than 30 days after the end of each calendar month, the unaudited consolidated balance sheets of the DIP Borrower and its consolidated subsidiaries as at the end of such month and the related unaudited consolidated statements of income and of cash flows for such month and the portion of the fiscal year through the end of such month; (c) within one business day after it is generated by any DIP Loan Party, a daily report of the cash receipts, cash disbursements and ending cash balances (excluding Cage Cash) of the DIP Loan Parties; and (d) on the first business day following the end of each calendar week, a flash revenue report for such calendar week.

(DIP Credit Agreement § 5.01)

COVENANTS:

Affirmative Covenants.  Include, without limitation: (a) delivery of financial statements, cash flow forecasts, variance reports, and notices of Events of Default; (b) preservation of organizational existence; (c) maintenance of properties, licenses, insurance, and corporate books and records; (d) payment of taxes; (e) compliance with laws; (f) adherence to milestones (as described forth below); and (g) compliance with the DIP Budget (subject to permitted variances)..

(DIP Agreement §§ 5.01-5.18)

Negative Covenants.  Include, without limitation,  limitations on: (a) liens; (b) investments; (c) loans and advances; (d) indebtedness; (e) sales of assets; (f) modifications of material documents; (g) affiliate transactions; (h) sale and leaseback transactions; (i) negative pledge clauses; (j) dividend distributions; (k) restrictions on subsidiaries; (l) issuance of capital stock; (m) zoning contract changes; (n) development of the Tower II Air Parcel; (o) hedging agreements; (p) suffering or permitting the use of DIP Extensions of Credit or of the DIP Collateral, or any portion of the Carve-Out, to be used for certain investigations of the DIP Secured Parties and Prepetition Secured Parties in excess of the Investigation Budget of up to $50,000; (q) filing or supporting the confirmation of a chapter 11 plan or liquidation other than an Acceptable Chapter 11 Plan; and (r) entry into material contractual obligations without the consent of the required DIP Lenders (which consent shall not be unreasonably withheld).

(DIP Agreement §§ 6.01-6.22)

CLAIMS
ACKNOWLEDGMENTS;
CHALLENGE PERIOD:

The Interim DIP Order includes certain findings, agreements, terms, provisions and acknowledgments with respect to the Prepetition Obligations (as defined below) (the "Claims Acknowledgments").  Upon entry of the Interim DIP Order, the Claims Acknowledgments will be immediately and irrevocably binding on all persons and entities. However, a Committee (or any other party with standing to do so) may, among other things, (a) object to or challenge any of the Claims Acknowledgments, including in relation to (i) the validity, extent, perfection or priority of the Prepetition Liens on the Prepetition Collateral, or (ii) the validity, allowability, priority, status or amount of the Prepetition Obligations, or (b) bring suit against any of the Prepetition Secured Parties in connection with or related to the matters covered by the Claims Acknowledgments; provided, that unless any Committee (or any other party with standing to do so) commences an adversary proceeding or contested matter (as applicable) raising such objection or challenge by the date that is the earlier to occur of (i) 90 days after the Petition Date or (ii) confirmation of a plan of reorganization or liquidation in any of the Chapter 11 Cases (the period described in the immediately preceding clauses (i) and (ii) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the "Challenge Period Termination Date"), upon the

Challenge Period Termination Date, any and all such challenges and objections by any Committee (or any other party with standing), any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest shall be deemed to be forever waived and barred, and the Prepetition Obligations shall be deemed to be allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code for all purposes in connection with the Cases, and the Claims Acknowledgments shall be binding on all creditors, interest holders and parties in interest.   To the extent any such objection or complaint is filed, the Claims Acknowledgments shall nonetheless remain binding and preclusive except to the extent expressly challenged in such objection or complaint.

(Interim Order ¶¶ F, 7)

| | |
|---|---|
| <u>MILESTONES</u>: | The DIP Credit Agreement requires the Debtors to meet certain milestones, including, without limitation: (a) entry of the Final DIP Order on or before July 24, 2014; (b) filing of a bid procedures motion, in form and substance reasonably satisfactory to the DIP Agent, the DIP Issuing Bank and the required DIP Lenders within 3 days of the Petition Date; (c) on or prior to July 11, 2014, the Court shall enter the Bidding Procedures Order, which shall, among other things, establish the deadline (i) for parties to deliver to the DIP Borrower letters of intent to bid under the Bidding Procedures Order on or prior to 30 days following the Petition Date, and (ii) for parties to submit binding, irrevocable bids under the Bidding Procedures Order on or prior to 45 days following the Petition Date (the "Bid Deadline"); (d) within 2 days following the Bid Deadline, the DIP Borrower shall have received at least one bid that is satisfactory to the required DIP Lenders; (e) restructuring or other resolution of the obligations under the agreements with the CUP Holder regarding the CUP on terms reasonably satisfactory to the Required Lenders on or before the date of the Sale Hearing (as defined below); (f) within 5 days of the Bid Deadline, an auction shall be conducted; (g) within 60 days of the Petition Date, the Court shall hold a hearing to approve the sale to the winning bidder pursuant to the Approved APA (the "Sale Hearing"); (h) within 65 days of the Petition Date, the Court shall enter an order, in form and substance reasonably satisfactory to the DIP Agent, the DIP Issuing Bank and the required DIP Lenders, approving the sale; and (i) on or prior to October 14, 2014, such sale shall have been consummated. |

(DIP Agreement §§ 5.18, 8.01, Schedule 8.01)

| | |
|---|---|
| <u>EVENTS OF DEFAULT</u>: | Include, without limitation: (a) non-payment of principal, interest and fees; (b) defaults in due observance of covenants; (c) false or misleading representations and warranties; (d) failure to pay certain indebtedness; (e) incurrence of certain administrative expenses; (f) the revocation or suspension of certain licenses or permits; (g) a change of control; (h) events of default relating to effect and validity of liens and loan documents; (i) appointment of a bankruptcy trustee; (j) responsible officer or examiner with enlarged powers; (k) conversion or dismissal of the Cases; (l) loss of the Debtors' exclusive right to file a plan of |

reorganization; (m) entry of certain orders or motions affecting the DIP Orders; (n) entry of an order granting superpriority claims to other creditors; (o) certain relief from automatic stay; (p) other than pursuant to an Approved APA or an Acceptable Chapter 11 Plan liquidation of a DIP Loan Party's business or bankruptcy sale of all or substantially all of the collateral; (q) the occurrence of a regulatory event that may prohibit implementation of a sale of the DIP Collateral; (r) a chapter 11 plan other than an Acceptable Chapter 11 Plan is filed by the Debtors without the consent of the DIP Agent and the required DIP Lenders; (s) failure to meet any of the specified sale transaction and plan milestones; (t) an order confirming an Acceptable Chapter 11 Plan is (i) not in form and substance reasonably satisfactory to the required DIP Lenders, (ii) not entered by the Bankruptcy Court on or before 11:59 p.m., New York City time on September 30, 2014, or such later date to which the required DIP Lenders have consented in writing or (iii) amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the required DIP Lenders; and (u) failure of the Plan Effective Date to occur on or before October 31, 2014.

(DIP Agreement §§ 1.01, 8.01)

| CONDITIONS PRECEDENT: | Include, without limitation: (a) delivery to the DIP Agent of an executed counterpart of each of the DIP Credit Agreement and the Fee Letter; (b) receipt by the DIP Agent and the DIP Lenders of the DIP Budget, which shall be in form and substance reasonably satisfactory to them; (c) payment of fees and amounts due and payable to the DIP Arranger, the DIP Agent, the DIP Issuing Bank and the DIP Lenders, including, to the extent invoiced at least one business day prior to the Closing Date, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the DIP Borrower under the DIP Loan Documents; (d) receipt by the DIP Secured Parties of documentation and other information needed to enable compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act; (e) the absence of any order, judgment or decree of any Governmental Authority that purports to restrain the DIP Lenders from making the DIP Extensions of Credit; (f) no Gaming Authority shall purport to issue an order or decree disapproving of the transactions contemplated by the DIP Loan Documents; (g) entry of the Interim DIP Order in form and substance reasonably satisfactory to the DIP Agent, the DIP Issuing Bank and the DIP Lenders; (h) the Petition Date with respect to each of the Debtors shall have occurred, and the first day orders sought by the Debtors have been entered by this Court; and (i) the DIP Administrative Agent's receipt of an officer's certificate from a financial officer of the DIP Borrower. |

Additionally, conditions precedent to the making of NM Loans and issuing of Letters of Credit in an aggregate amount in excess of Interim DIP Availability include, without limitation: (a) entry of the Final DIP Order by no later than July 24, 2014 (or such later date agreed to by the required DIP Lenders in their sole discretion) and at the time of any such extension of credit the Final DIP Order shall be in full force and

effect, and shall not have been vacated, reversed, modified or amended in any respect without the prior written consent of the DIP Administrative Agent and the required DIP Lenders; (b) if either DIP Order is the subject of a pending appeal in any respect, none of, among other things, the making of such DIP Extensions of Credit or the granting of the DIP Liens and DIP Superpriority Claims shall be the subject of a presently effective stay, and (c) the Closing Date shall have occurred.

(DIP Credit Agreement § 4.01-4.03; Interim DIP Order ¶ 2(c))

2.    The relief requested includes a few of the provisions designated "extraordinary" under the Local Rules. The Debtors have included the following descriptions of provisions that would potentially be designated "extraordinary" under the Local Rules and believe that there are compelling circumstances and substantial cause warranting approval of each of the provisions identified, as discussed below:

- *Rollups* (as described in Appendix § II.A.2 to the Local Rules): DIP Credit Agreement § 2.21; Interim DIP Order ¶ 2 (d). As described above, the DIP Orders and other DIP Loan Documents contemplate a "creeping" roll-up of the Tranche A-1 Revolving Loans and the Tranche A-2 Revolving Loans to commence upon entry of the Interim DIP Order, with the remainder of the Tranche A-1 Revolving Loans and the Tranche A-2 Revolving Loans to be rolled-up upon entry of the Final DIP Order.

- *Waivers* (as described in Appendix § II.A.4 to the Local Rules): DIP Credit Agreement § 8.01; Interim DIP Order ¶¶ 21, 22. The DIP Loan Documents include provisions that affect the Debtors' ability to, among other things: (a) seek authority to obtain financing pursuant to section 364(c) or 364(d), other than from the DIP Lenders, or as may be otherwise expressly permitted under the DIP Loan Documents, unless the Debtors use the proceeds of such postpetition loans or other financial accommodations to pay in full in cash all DIP Obligations; (b) seek certain relief to the extent such relief would impair or restrict the rights of the DIP Agent or the DIP Lenders; (c) sell DIP Collateral outside of the ordinary course of business without the consent of the DIP Agent and the requisite DIP Lenders; (d) pursue claims and causes of action against, among others, the DIP Agent, the DIP Secured Parties, the Prepetition First Lien Agent, and the Prepetition First Lien Parties based upon, among other things, the DIP Facility, the DIP Loan Documents, the DIP Collateral, the DIP Liens, the DIP Superpriority Claim, the Prepetition Financing Documents, the Prepetition Collateral, the Cash Collateral, and the Prepetition Liens; (e) oppose, during the Default Notice Period, the modification of the automatic stay imposed by section 362(a) of the

Bankruptcy Code that is contemplated to automatically occur upon the Termination Date, except to contest the occurrence and/or continuance of an Event of Default; and (f) have an emergency hearing before the Court during the Default Notice Period for any purpose other than to contest whether an Event of Default has occurred and/or is continuing.

- *Section 506(c) Waivers* (as described in Appendix § II.A.5 to the Local Rules):  Interim DIP Order ¶¶ 9, 25(f).  The Interim DIP Order provides that, subject to and effective only upon entry of the Final DIP Order, the Debtors' rights under section 506(c) of the Bankruptcy Code will be modified, as described above.  Notably, the Interim DIP Order allows White & Case LLP, Winter Harbor LLC, and Fox Rothschild LLP to seek allowance of any Pre-Default Excess Fees under section 506(c) of the Bankruptcy Code in an aggregate amount not to exceed $750,000.  The Interim DIP Order also provides that neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

- *Liens on Avoidance Actions* (as described in Appendix § II.A.6 to the Local Rules):  Interim Order ¶ 2(e).  The DIP Collateral includes all claims and causes of action of each Debtor and any and all proceeds therefrom (including the proceeds of any Avoidance Actions following entry of the Final DIP Order).

- *Carve-outs* (as described in Appendix § II.A.7 to the Local Rules):  Interim DIP Order ¶ 8(i).  The Interim DIP Order provides for the Carve-Out, as described above. Although the Carve-Out contemplates distinct maximum payments in respect of Debtors' professionals and professionals retained by any Committee, those maximum amounts were determined by the Debtors and the DIP Lenders, in consultation with their advisors, to constitute reasonable allocations of the Professionals' Carve-Out Cap.

- *Termination Default; Remedies* (as described in Appendix § II.A.8 to the Local Rules):  DIP Credit Agreement § 8.01; Interim DIP Order ¶¶ 2(a), 3, 15.  The DIP Credit Agreement provides that it is an Event of Default if, among other things: (a) any of the Debtors files a motion or other pleading seeking dismissal of any Case under section 1112 of the Bankruptcy Code or otherwise without the consent of the DIP Agent and the required DIP Lenders; (b) a trustee or examiner with enlarged powers relating to the operation of the business of any Debtor is appointed (provided that the appointment of a chief restructuring officer in any of the Cases shall not constitute an Event of Default); (c) there is a Change of Control; (d) a Chapter 11 Plan other than an Acceptable Chapter 11 Plan is filed by the Debtors without the consent of the DIP Agent and the required DIP Lenders; (e) a Debtor files a motion or the Court enters an order authorizing a Debtor to use cash proceeds of any DIP Collateral or obtain

any other financing under section 364 of the Bankruptcy Code, in each case, without the prior written consent of the DIP Agent, the DIP Issuing Bank and the required DIP Lenders for authority (unless, in any case, the motion seeks or the order provides for the payment in full of the DIP Obligations); (f) any Debtor, without the consent of the DIP Administrative Agent and the required DIP Lenders, files an application for approval and/or allowance of any superpriority claim (other than the Carve-Out) or any claim that is *pari passu* with or senior to the claims of the DIP Secured Parties; and (g) the Court enters an order creating or permitting the granting of a lien on the DIP Collateral (other than Permitted Liens). The term of the DIP Facility ends on the Termination Date, which is the earlier to occur of (a) the Scheduled Maturity Date or (b) five days after the DIP Agent properly delivers a Default Notice that an Event of Default has occurred and is continuing (subject to any applicable cure period in the DIP Loan Documents). During the Default Notice Period, all commitments of the DIP Lenders to provide any DIP Extensions of Credit will be suspended and the Debtors shall have no right to request or use any proceeds of any DIP Extensions of Credit or DIP Collateral or to use Cash Collateral; provided, however, that the Debtors may use such proceeds or Cash Collateral towards the satisfaction of the Carve-Out, to pay accrued items as set forth in the DIP Budget, and as otherwise necessary to maintain the operations of the business and the value of the DIP Collateral in accordance with the DIP Budget.

## **Background**

### A.    **Overview**

3.    The Debtors own and operate a state of the art gaming and resort facility unlike any other in Atlantic City, New Jersey. The Debtors' facility consists of 6.2 million square feet, located on approximately 20 acres with 820 feet of boardwalk frontage, and features the tallest building in Atlantic City, the Revel hotel, a sleek 47-story, 710-foot high tower. The Debtors' 130,000 square foot casino features 110 table games and approximately 2,300 slot machines. The Debtors employ approximately 3,140 employees to operate the Revel facility. Additionally, the Debtors' retail, food and beverage partners employ hundreds of employees who also work in the Debtors' facility.

4.      On June 19, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these Cases.  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      To date, no official committee or examiner has been appointed by the Office of the United States Trustee in these Cases.

6.      Additional background facts on the Debtors, including an overview of the Debtors' business, information on the Debtors' debt structure and information on the events leading up to the Cases are contained in the Martin Declaration.

B.      **Prepetition Financing and Liquidity Needs**

7.      As of the Petition Date, the Debtors have approximately $9 million in cash on hand and have outstanding funded debt in excess of $447.75 million, consisting of the First Lien Prepetition Obligations (as defined below) and Second Lien Prepetition Obligations (as defined below).

1.      **Prepetition First Lien Credit Agreement**

8.      Pursuant to the terms and conditions set forth in (a) the Amended and Restated First-Lien Credit Agreement dated as of November 8, 2013 (as the same has been amended, supplemented, modified, extended, renewed, restated and/or replaced, the "Prepetition First Lien Credit Agreement"), by and among Revel AC, as borrower, the other Debtors, as guarantors (collectively, the "Subsidiary Guarantors"), the lenders party thereto (the "Prepetition First Lien Lenders"), and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the Prepetition First Lien Lenders (the "Prepetition First Lien Agent") and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition First Lien Lenders or the Prepetition First Lien Agent in connection with the

Prepetition First Lien Credit Agreement, including, without limitation, the Intercreditor

Agreement, dated as of May 21, 2013 (as the same has been amended, supplemented, modified,

extended, renewed, restated and/or replaced, the "Intercreditor Agreement") to which the

Prepetition Agents are parties, all security agreements, notes, guarantees, mortgages, Uniform

Commercial Code financing statements and all other related agreements, documents and

instruments (all the foregoing, together with the Prepetition First Lien Credit Agreement, as all

of the same have been supplemented, modified, extended, renewed, restated and/or replaced,

collectively, the "Prepetition First Lien Financing Documents"), the Prepetition First Lien

Lenders: (x) agreed to make revolving loans to Revel AC in the aggregate principal committed

amount of up to $25 million (the "Prepetition Tranche A-1 Revolving Credit Facility"); (y)

agreed to make revolving loans to Revel AC in the aggregate principal committed amount of up

to $75 million (the "Prepetition Tranche A-2 Revolving Credit Facility," and together with the

Prepetition Tranche A-1 Revolving Credit Facility, the "Prepetition Revolving Credit

Facilities"); and (z) agreed to extend to Revel AC a term loan, in an aggregate outstanding

principal amount of $50 million (the "Prepetition Tranche B Term Loan Facility," and together

with the Prepetition Revolving Credit Facilities, the "Prepetition First Lien Facilities," and the

other obligations arising under the Prepetition First Lien Credit Agreement and any other

Prepetition First Lien Financing Document, including in respect of the Prepetition First Lien

Facilities, the "First Lien Prepetition Obligations").  In Article VII of the Prepetition First Lien

Credit Agreement, the Subsidiary Guarantors agreed, jointly and severally, as primary obligors

and not as sureties, to guarantee each Secured Party (as defined in the Prepetition First Lien

Credit Agreement) the prompt payment in full when due of the applicable Guaranteed

Obligations (as defined in the Prepetition First Lien Credit Agreement).  The First Lien

Prepetition Obligations mature in June 2015.

        9.     Pursuant to certain Security Documents (as defined in the Prepetition First

Lien Credit Agreement), each Debtor granted to the Prepetition First Lien Agent for the benefit

of the Prepetition First Lien Agent, the Prepetition First Lien Lenders and the other Secured

Parties (as defined in the Prepetition First Lien Credit Agreement) (collectively, the "Prepetition

First Lien Secured Parties") as security for the First Lien Prepetition Obligations, a first-priority

security interest in and continuing lien (the "Prepetition First Liens") on certain Pledged

Collateral (as defined in the Prepetition First Lien Credit Agreement, the "Prepetition

Collateral").

        10.     As of the Petition Date, the Debtors were indebted and liable to the

Prepetition First Lien Agent and other Prepetition First Lien Secured Parties under the

Prepetition First Lien Financing Documents in an aggregate principal amount in excess of

$137,732,719.15 with respect to the Prepetition First Lien Facilities, including

(a) $10,000,000.00 with respect to the Prepetition Tranche A-1 Revolving Credit Facility,

(b) $75,000,000 with respect to the Prepetition Tranche A-2 Revolving Credit Facility (of which

$73,100,000 is with respect to outstanding revolving loans and $1,900,000 is with respect to the

issued and undrawn Existing LC), and (c) $52,753,739.15 with respect to the Prepetition Tranche

B Term Loan Facility (including interest paid-in-kind and capitalized prior to the Petition Date).

## 2.  Prepetition Second Lien Credit Agreement

        11.     Pursuant to the terms and conditions set forth in (a) the Second-Lien

Credit Agreement, dated as May 21, 2013 (as the same has been amended, supplemented,

modified, extended, renewed, restated and/or replaced, the "Prepetition Second Lien Credit

Agreement"), by and among Revel AC, the Subsidiary Guarantors, the lenders party thereto (the

"Prepetition Second Lien Lenders," and together with the Prepetition First Lien Lenders, the

"Prepetition Lenders"), and Wilmington Trust, National Association, as administrative agent and

collateral agent for the Prepetition Second Lien Lenders (the "Prepetition Second Lien Agent,"

and together with the Prepetition First Lien Agent, the "Prepetition Agents") and (b) all other

agreements, documents and instruments executed and/or delivered with, to or in favor or for the

benefit of the Prepetition Second Lien Lenders or the Prepetition Second Lien Agent in

connection with the Prepetition Second Lien Credit Agreement, including, without limitation, the

Intercreditor Agreement, all security agreements, notes, guarantees, mortgages, Uniform

Commercial Code financing statements and all other related agreements, documents and

instruments, including any fee letters, executed and/or delivered in connection therewith or

related thereto (all the foregoing, together with the Prepetition Second Lien Credit Agreement, as

all of the same have been supplemented, modified, extended, renewed, restated and/or replaced

at any time prior to the Petition Date, collectively, the "Prepetition Second Lien Financing

Documents," together with the Prepetition First Lien Financing Documents, the "Prepetition

Financing Documents"), the Prepetition Second Lien Lenders agreed to extend to Revel AC a

loan, in an aggregate outstanding principal amount of $275 million (the "Prepetition Second Lien

Term Loan," and the obligations arising under the Prepetition Second Lien Credit Agreement

and any Prepetition Second Lien Financing Document, including in respect of the Prepetition

Second Lien Term Loan, the "Second Lien Prepetition Obligations," and together with the First

Lien Prepetition Obligations, the "Prepetition Obligations").   In Article VII of the Prepetition

Second Lien Credit Agreement, the Subsidiary Guarantors agreed, jointly and severally, as

primary obligors and not as sureties, to guarantee each Secured Party (as defined in the

Prepetition Second Lien Credit Agreement) the prompt payment in full when due of the

applicable Guaranteed Obligations (as defined in the Prepetition Second Lien Credit Agreement).

The Second Lien Prepetition Obligations mature in May 2018 and are secured by the Prepetition

Collateral.

12.     Pursuant to certain Security Documents (as defined in the Prepetition

Second Lien Credit Agreement), each Debtor granted to the Prepetition Second Lien Agent for

the benefit of the Prepetition Second Lien Agent, the Prepetition Second Lien Lenders and the

other Secured Parties (as defined in the Prepetition Second Lien Credit Agreement) (collectively,

the "Prepetition Second Lien Secured Parties" and together with the Prepetition First Lien

Secured Parties, the "Prepetition Secured Parties") as security for the Second Lien Prepetition

Obligations (as defined below), a second-priority security interest in and continuing lien (the

"Prepetition Second Liens," and together with the Prepetition First Liens, the "Prepetition

Liens") on the Prepetition Collateral.

13.     As of the Petition Date, the Second Lien Prepetition Obligations total

approximately $310,000,000 (including interest paid-in-kind and capitalized prior to the Petition

Date).

### 3.  Intercreditor Agreement

14.     The relative rights to, and priority of the security interests in, the

Prepetition Collateral (x) between and among the Prepetition First Lien Secured Parties, and

(y) between and among the Prepetition First Lien Secured Parties, on the one hand, and the

Prepetition Second Lien Secured Parties on the other, are set forth in that Intercreditor

Agreement dated as of May 21, 2013 (as amended, modified, or supplemented from time to time,

the "Intercreditor Agreement") and in Section 10.19 of the Prepetition First Lien Credit

Agreement.

15.     Pursuant to these agreements, the Prepetition First Lien Secured Parties under the Prepetition Tranche B Term Loan Facility and the Prepetition Second Lien Agent, on behalf of itself and the Prepetition Second Lien Lenders, are generally (subject to certain conditions) deemed to consent to postpetition financings and uses of cash collateral authorized by the Prepetition First Lien Secured Parties under the Prepetition Revolving Credit Facilities and the Prepetition First Lien Agent, respectively.  The Prepetition First Lien Secured Parties under the Prepetition Tranche B Term Loan Facility and the Prepetition Second Lien Agent are generally (subject to certain conditions) only permitted to seek or request adequate protection (in the form of additional collateral and payment of reasonable, documented and out-of-pocket legal fees, costs and expenses for one counsel) if the Prepetition First Lien Agent receives adequate protection in the form of additional collateral and they themselves do not receive subordinated liens on such additional collateral.

### C.     The Debtors' Efforts to Obtain Postpetition Financing

16.     As described in further detail in the Declarations, in November 2013 the Debtors and the Prepetition Lenders agreed to the execution of the Prepetition First Lien Credit Agreement and certain amendments to the Prepetition Second Lien Credit Agreement, providing the Debtors with approximately $75 million of additional liquidity.  In connection with these amendments, however, the Prepetition Lenders imposed a number of restrictive covenants on the Debtors which restricted the Debtors' ability to fully access the additional liquidity.  Importantly, the Prepetition First Lien Lenders also required, as a condition to the Prepetition First Lien Credit Agreement, that the Debtors execute and deliver that certain letter agreement dated as of November 8, 2013 (the "Letter Agreement") by and between Revel AC and the Prepetition First Lien Agent, whereby the Debtors were required to immediately begin a strategic process.

17.     Pursuant to the Letter Agreement, the Debtors were required to engage an investment banker of nationally recognized standing to assist the Debtors in pursuing a sale, merger, equity investment or other similar transaction.  Accordingly, the Debtors retained Moelis & Company ("Moelis") as their investment banker, after which Moelis immediately began a robust marketing process related to such potential transactions.  During the marketing process the Debtors received expressions of interest that are promising indications of the value of the Debtors' assets.

18.     While it was marketing strategic transactions, Moelis also solicited alternate proposals from sources of potential financing.  Moelis contacted and communicated with over ten (10) potential lenders (in addition to certain of the Debtors' Prepetition Lenders) to inquire whether such lenders would be interested in providing the Debtors with financing.  None of these potential lenders were willing to make a proposal to provide financing because (i) the Prepetition Secured Parties are secured by the Prepetition Liens on substantially all of the Debtors' assets, (ii) they were unwilling to pay the First Lien Prepetition Obligations in full, and (iii) they were unwilling to engage in litigation with the Prepetition Lenders in respect of postpetition financing that would prime the Prepetition Liens.

19.     The Debtors, with the assistance of Moelis and certain of their other advisors, carefully reviewed the DIP Lenders' proposal and, after extensive negotiations with the DIP Lenders, ultimately determined that the DIP Lenders' proposal was in the best interests of the Debtors and their estates, customers, employees and creditors.

## Jurisdiction

20.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

21.     By this Motion, the Debtors respectfully request entry of the Interim DIP

Order and a Final DIP Order pursuant to which the Court:

(a)     authorizes, pursuant to sections 364(c)(1), (2), (3) and (d)(1) of the Bankruptcy
Code, the DIP Borrower (i) to obtain post-petition financing consisting of the
DIP Facility with Wells Fargo Bank, N.A., as DIP Agent, and Wells Fargo
Principal Lending LLC and such other lenders from time to time party thereto,
pursuant to the Debtor-in-Possession Credit Agreement attached to the Interim
DIP Order as Exhibit "A" (as amended, supplemented or otherwise modified
from time to time, the "DIP Credit Agreement," and together with the Interim
DIP Order, the Final DIP Order, and all other agreements, documents and
instruments delivered or executed in connection therewith, as amended,
supplemented or otherwise modified from time to time, including the DIP
Budget, collectively, the "DIP Loan Documents") and (ii) to obtain cash
advances and other extensions of credit during the Interim Period, in the
aggregate principal amount of $23,500,000 of which $1,900,000 is available
only for issuance of letters of credit plus an amount equal to the aggregate
amount necessary to fund all Roll-Up Borrowings required in the Interim
Period in accordance with the DIP Loan Documents and upon entry of the
Final DIP Order and thereafter until the Termination Date, in each case at any
time outstanding, an aggregate principal amount not to exceed $41,900,000
plus an amount equal to the aggregate amount necessary to fund all Roll-Up
Borrowings required upon entry of the Final DIP Order in accordance with the
DIP Loan Documents;

(b)     authorizes each of the Debtors other than the DIP Borrower to jointly and
severally guarantee on a secured basis the DIP Borrower's obligations in
respect of the DIP Facility;

(c)     authorizes each of the DIP Loan Parties to execute the DIP Credit Agreement
and the other DIP Loan Documents to which it is a party and to perform such
other and further acts as may be necessary or appropriate in connection
therewith;

(d)     authorizes the Debtors to use the DIP Extensions of Credit solely in accordance
with the DIP Budget (subject to variances permitted under the DIP Credit
Agreement) and as otherwise provided in the DIP Orders and in the other DIP

Loan Documents, including to refinance certain indebtedness outstanding under the Prepetition First Lien Credit Agreement;

(e)     authorizes the Debtors to grant to the DIP Agent for the benefit of the DIP Lenders, the DIP Issuing Bank and the other secured parties under the DIP Loan Documents (collectively, the "DIP Secured Parties"), in respect of the DIP Obligations: (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim; (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, first-priority liens on, and security interests in, all DIP Collateral that is not subject to a valid, perfected, and non-avoidable lien in existence on the Petition Date; (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on, and security interests in, certain DIP Collateral; and (iv) pursuant to section 364(d)(1) of the Bankruptcy Code, the Priming Liens;

(f)     authorizes the Debtors to pay the principal, interest, fees, expenses, disbursements and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

(g)     authorizes the Debtors to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties purport to have an interest;

(h)     authorizes the Debtors to grant, as of the Petition Date, adequate protection to the Prepetition Secured Parties, solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of their respective interests in any Prepetition Collateral, and to make payments of interest, fees and expenses to the Prepetition First Lien Agent and the Prepetition First Lien Lenders, in each case, as set forth more fully in the DIP Loan Documents and subject to the Carve-Out;

(i)     modifies the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, this Interim DIP Order and the other DIP Loan Documents;

(j)     schedules an interim hearing to consider entry of the Interim DIP Order granting the relief requested in this Motion on an interim basis;

(k)     schedules a final hearing (the "Final Hearing") to consider entry of the Final DIP Order granting the relief requested in this Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by this Motion;

(l)     approves the Final DIP Order granting the relief requested in this Motion on a final basis; and

(m)     waives any applicable stay (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure) and providing for the immediate effectiveness of each of the DIP Orders.

**Basis for Relief**

A.    **The Debtors' Entry into the DIP Facility Is Authorized Under Section 364 of the Bankruptcy Code**

22.    Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for a chapter 11 debtor in possession.  See In re Defender Drug Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), aff'd, 145 B.R. 312 (B.A.P. 9th Cir. 1992). Section 364 of the Bankruptcy Code provides in pertinent part that:

> (c)    If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A)    the [debtor in possession] is unable to obtain such credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c)-(d)(1).

23.    Generally, courts apply a three-part test to determine whether a debtor in possession may obtain credit under section 364(c) of the Bankruptcy Code.  Under such test, a debtor may incur postpetition financing pursuant if it demonstrates that (a) it cannot obtain credit

unencumbered or without superpriority status, (b) the postpetition financing is necessary to

preserve the assets of the estates, and (c) the terms of the postpetition financing is fair,

reasonable and adequate given the circumstances of the debtor and the proposed lenders.  See In

re Crouse Grp., Inc., 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); see also In re Aqua Assocs.,

123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

24.     In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor

in possession to incur superpriority senior secured debtor or "priming" liens if (a) the debtor is

unable to obtain financing from another source and (b) the interests of the secured creditors

whose liens are being primed by the postpetition financing are adequately protected.  11 U.S.C. §

364(d)(1); see also Aqua Assocs., 123 B.R. at 196.  Importantly, consent by the secured creditors

to priming obviates the need to show adequate protection.  See Anchor Sav. Bank FSB v. Sky

Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien,

those [undersecured] creditors relieved the debtor of having to demonstrate that they were

adequately protected.").  Accordingly, the Debtors may extend "priming" liens under the DIP

Facility if they are unable to obtain unsecured or junior secured credit and either (i) the

preexisting secured creditors have consented or (ii) the preexisting secured creditors' interests in

the Prepetition Collateral are adequately protected.

25.     Against this statutory backdrop, courts will evaluate the facts and

circumstances of a debtor's case and accord significant weight to the necessity for obtaining the

financing.  See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990).

Debtors in possession are generally permitted to exercise their basic business judgment

consistent with their fiduciary duties when evaluating the necessity of proposed protections for a

party extending credit under section 364 of the Bankruptcy Code.  Id. at 38.

**1.  The Debtors Are Unable to Obtain Unsecured or Junior Secured Credit**

26.     To show that the credit required is not obtainable on an unsecured basis,

the Debtors need only demonstrate "by a good faith effort that credit was not available" without

the protections afforded to potential lenders by sections 364(c) or (d) of the Bankruptcy Code.

Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th

Cir. 1986); see also Anchor Sav. Bank, 99 B.R. at 120 n.4 (noting that the debtor satisfied the

requirement of section 364(d) of the Bankruptcy Code by "approach[ing] all lenders reasonably

likely to be willing to make a junior or unsecured loan"); Ames, 115 B.R. at 37-40 (debtor in

possession must show that it has made a reasonable effort to seek other sources of financing

under sections 364(a) and (b) of the Bankruptcy Code).  Thus, "[t]he statute imposes no duty to

seek credit from every possible lender before concluding that such credit is unavailable."

Snowshoe, 789 F.2d at 1088; see also In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga.

1998) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct

such an exhaustive search for financing" where the debtor "suffers some financial stress and has

little or no unencumbered property"), aff'd sub nom., Anchor Sav. Bank, 99 B.R. at 117.

27.     As discussed above and in the Declarations, certain of the Debtors' assets

are purportedly subject to the Prepetition Liens and/or Senior Third Party Liens.  Because of the

Debtors' prepetition debt, obtaining the financing needed as unsecured debt on an administrative

priority basis, or as debt which would be secured solely by liens junior to the Prepetition Liens

and Senior Third Party Liens was not a viable option.  Notwithstanding the Debtors' and

Moelis's efforts, no entity offered the Debtors financing on an unsecured or junior secured basis.

Prior to entry of the Final DIP Order, the DIP Liens will be subject to the Senior Third Party

Liens; however, the DIP Lenders have insisted, and the Debtors have agreed, that the DIP Liens

shall prime and be senior to the Senior Third Party Liens upon entry of the Final DIP Order.

### 2. The Prepetition Secured Parties' Interests in the Prepetition Collateral Are Adequately Protected

28.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (i.e., a priming lien). See 11 U.S.C. § 364(d).  Such relief may be granted so long as there is adequate protection of the secured creditor's interests in the property on which the senior lien is supposed to be granted.  See id.; see also Aqua, 123 B.R. at 196.  Although the Bankruptcy Code does not explicitly define "adequate protection," examples of adequate protection are identified in section 361 of the Bankruptcy Code and include, but are not limited to: (1) "periodic cash payments" to the extent that such use "results in a decrease in value of such entity's interest in the property;" (2) "additional or replacement lien[s] to the extent that such . . . use [of cash collateral] . . . results in a decrease in the value of such entity's interest in such property;" and (3) "granting such other relief . . . will result in the realization by the entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.

29.     Bankruptcy courts have broad flexibility under section 361 of the Bankruptcy Code in deciding what constitutes adequate protection:

> This section specifies the means by which adequate protection may be provided.  It does not require the court to provide it.  To do so would place the court in an administrative role.  Instead, the trustee or debtor in possession will provide or propose a protection method.  If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate.  The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); see also Resolution Trust Corp. v.

Swedeland Dev. Group, Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994)

("[A] determination of whether there is adequate protection is made on a case by case basis.").

30.     The principal purpose of adequate protection is to safeguard the interest of

the secured creditor in the particular collateral against diminution in the value of such interest.

See id. at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the

creditor receives the value for which he bargained prebankruptcy.") (quoting MBank Dallas,

N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987)); accord In re

DeSardi, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to

assure that the lender's economic position is not worsened because of the bankruptcy case.").

Here, appropriate and sufficient safeguards are in place to protect the Prepetition Secured Parties

from a diminution in the value of their interests in the Prepetition Collateral.

a.      *The Prepetition Secured Parties Will Receive Replacement Liens
and Superpriority Claims*

31.     The Interim DIP Order provides adequate protection to the Prepetition

Agents, on behalf of themselves and the Prepetition Lenders, in the form of Adequate Protection

Liens and Cash Collateral Adequate Protection Liens upon all of the DIP Collateral and

Adequate Protection Superpriority Claims pursuant to section 507(b) of the Bankruptcy Code.

These forms of adequate protection are commonplace.  See, e.g., O'Connor, 808 F.2d at 1396-98

(allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times

as much); Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.),

759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor

would likely constitute adequate protection for the secured creditor); In re Stein, 19 B.R. 458,

459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock and equipment resulted

in an increase rather than a decrease in collateral, and debtors were granted authority to use cash collateral to meet operating expenses during chapter 11 proceedings).

32.    Notably, the Prepetition Secured Parties will receive Adequate Protection Liens upon all of the DIP Collateral solely to the extent of, and in an aggregate amount equal to, any Diminution in Value.   As adequate protection for the use of such Prepetition Secured Parties' Prepetition Collateral that is Cash Collateral, the Prepetition Secured Parties will receive Cash Collateral Adequate Protection Liens upon all of the DIP Collateral. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition Secured Parties shall be junior and subordinated to the DIP Liens and any Senior Third Party Liens. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition First Lien Secured Parties shall be senior and prior to the Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition Second Lien Secured Parties (as defined below) and the Prepetition Liens. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition Second Lien Secured Parties shall be senior to any Prepetition Second Liens and shall be junior and subordinated to the Adequate Protection Liens and the Cash Collateral Adequate Protection Liens of the Prepetition First Lien Secured Parties, the Prepetition First Liens, the DIP Liens and any Senior Third Party Liens. The Adequate Protection Liens and the Cash Collateral Adequate Protection Liens shall in all cases be subject to the Carve-Out and the Wind-Down Amounts.

b.    *Budgetary Constraints Adequately Protect the Interests of the Prepetition Secured Parties*

33.    One of several forms of adequate protection afforded to the Prepetition Secured Parties is that the DIP Facility will only be used in accordance with the provisions of the DIP Loan Documents, including the DIP Budget (subject to Permitted Variances) and the

Debtors' right to carry forward any unutilized amounts, as set forth more fully in the DIP Loan

Documents).

34.     As described in the Declarations, the Debtors believe, after diligent

consideration of all known circumstances, and in their reasonable business judgment, that the

DIP Budget is achievable and will allow the Debtors to operate in chapter 11 without the accrual

of unpaid liabilities.  The DIP Budget provides for expenditures to finance the Debtors'

operations.  Courts have routinely held that adequate protection may be demonstrated by a

showing that the going concern value of a debtor, or the value of a lender's collateral, is

preserved by the debtor's continuing operations and use of cash collateral.  See, e.g., In re JKJ

Chevrolet, Inc., 117 F.3d 1413, 1413 (4th Cir. 1997) (allowing use of cash collateral to operate

automobile dealership as long as continued operations maintained the value of the business);

Snowshoe, 789 F.2d at 1087-89 (allowing use of cash collateral to operate ski resorts where

trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased

operations); In re 499 W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y.

1992) (finding secured creditor's interest in collateral adequately protected when cash collateral

was applied to normal operating and maintenance expenditures on collateral property); In re

Constable Plaza Assocs., L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use

cash collateral to operate and maintain office building, thereby protecting secured lender's

collateral).

35.     The Prepetition Secured Parties are the primary beneficiaries of the

proposed cash expenditures, which are necessary to preserve and maintain the value of the

purported Prepetition Collateral.  Moreover, the contemplated cash expenditures in the manner

and for the purposes proposed will maintain the overall value of the Debtors' ongoing enterprise

and enhance the chances of a successful outcome for these Cases.  If the Debtors are precluded

from making expenditures necessary to maintain and preserve their assets in the ordinary course,

including in support of a potential sale process, or if the Debtors are forced to effect a "fire-sale"

liquidation of their assets, the Prepetition Secured Parties, and indeed all creditors — secured and

unsecured — will be harmed.  See, e.g., Aqua Assocs., 123 B.R. at 196 ("The important

question, in determination of whether the protection to a creditor's secured interest is adequate, is

whether that interest, whatever it is, is being unjustifiably jeopardized.") (citing In re Grant

Broad. of Philadelphia, Inc., 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 819

(E.D. Pa. 1987), and In re Alyucan Interstate Corp., 12 B.R. 803, 809-12 (Bankr. D. Utah 1981)).

In sum, the Prepetition Secured Parties are adequately protected by the proposed budgetary

constraints on the use of cash.

      *c.*    *The DIP Loan Documents Provide for Payments to Prepetition First Lien Secured Parties*

    36.    The DIP Loan Documents provide for the payment of: (i) (x) all accrued

and unpaid interest on the First Lien Prepetition Obligations in respect of the Prepetition

Revolving Credit Facilities owing by the Debtors under the Prepetition First Lien Financing

Documents at the non-default rates set forth in the Prepetition First Lien Financing Documents,

and (y) all accrued and unpaid interest on the First Lien Prepetition Obligations in respect of the

Prepetition Tranche B Term Loan Facility owing by the Debtors under the Prepetition First Lien

Financing Documents, to be paid in kind by capitalizing such interest and adding it to the

aggregate principal amount of the First Lien Prepetition Obligations in respect of the Prepetition

Tranche B Term Loan Facility, at the non-default rates set forth in, and pursuant to the terms of,

the Prepetition First Lien Credit Financing Documents, to the fullest extent permitted by law, to

the fullest extent permitted by law; (ii) all other accrued and unpaid fees and disbursements

(including all reasonable and documented out-of-pocket legal and advisory fees and expenses)

owing to the Prepetition First Lien Agent or the Prepetition First Lien Secured Parties under the

Prepetition First Lien Revolving Credit Facilities pursuant to the Prepetition First Lien Financing

Documents; and (iii) all letter of credit and other fees owing by the Debtors under the Prepetition

First Lien Financing Documents in respect of the Prepetition Revolving Credit Facilities, at the

non-default rate provided for therein.  Periodic cash payments are a generally accepted form of

adequate protection.  See generally 11 U.S.C. § 361(1); In re Adelphia Comm'cns Corp., 368

B.R. 140, 279-80 (Bankr. S.D.N.Y. 2007) (permitting payment of expenses and fees to

oversecured lenders as adequate protection).

> d.    *The Prepetition Secured Parties Have, Or Are Deemed to Have,*
> *Consented*

37.    Consent may take the place of adequate protection under section 364(d)(1)

of the Bankruptcy Code.  The Prepetition First Lien Secured Parties under the Prepetition

Revolving Credit Facilities have agreed to permit (and the Prepetition Second Lien Secured

Parties and the Prepetition First Lien Secured Parties under the Prepetition Tranche B Term Loan

Facility are deemed to permit pursuant to the Intercreditor Agreement and applicable provisions

in the Prepetition First Lien Credit Agreement, respectively) the Debtors to enter into the DIP

Loan Documents and use the Cash Collateral on the terms set forth in the DIP Orders.

### 3.    The DIP Facility Is Fair, Reasonable, and in the Estates' Best Interests

38.    The Debtors believe that the terms and conditions of the DIP Facility are

fair and reasonable.  The DIP Facility is necessary to support the Debtors' ongoing operations

pending approval and consummation of a sale will signal the Debtors' continued strength.

Furthermore, as is more fully explained in the Klein Declaration, the Debtors undertook an effort

to obtain the best available terms for postpetition financing.  Based upon these efforts, the

interest rates and fees are the best available to the Debtors under the circumstances.  The Debtors

believe that the proposed DIP Facility is the best financing available and well within the exercise

of sound business judgment.

       39.     Bankruptcy courts consistently defer to a debtor's business judgment on

most business decisions, including the decision to borrow money, unless such decision is

arbitrary and capricious.  See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans

World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan,

receivables facility and asset-based facility were approved because they "reflect[ed] sound and

prudent business judgment . . . [were] reasonable under the circumstances and in the best

interests [of the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D.

Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling

operations, it has found it necessary to obtain loans to make these endeavors possible.").  In fact,

"[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of

the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for

private control of administration of the estate, and threaten the court's ability to control a case

impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.

1985); see also Simasko Prod., 47 B.R. at 449 ("Business judgments should be left to the board

room and not to this Court." (quoting In re Lifeguard Indus. Inc., 37 B.R. 3, 17 (Bankr. S.D.

Ohio 1983)).  Consistent with this authority, the Debtors respectfully submit that the Court

should approve the Debtors' decision to accept and enter into the DIP Facility.

       40.     Moreover, the Debtors made a concerted good faith effort to obtain credit

on the most favorable terms available.  Specifically, the Debtors sought postpetition financing

from interested parties, including the Prepetition Secured Parties, none of whom would agree to

provide financing, much less on terms better than those offered by the DIP Lenders. The DIP

Facility was ultimately determined to provide the requisite liquidity on the most advantageous

terms. The Debtors carefully evaluated the proposed financing structure from the DIP Lenders,

engaged in negotiations with the DIP Secured Parties regarding the proposed terms, and

eventually agreed to their proposal as the proposal best suited to the Debtors' needs. The terms

and conditions of the DIP Facility were negotiated by the parties (and their legal and financial

advisors) in good faith and at arms' length and, as outlined above, were instituted for the purpose

of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and to

preserve the going concern status of the Debtors as well as the value of the Prepetition Collateral.

Accordingly, the DIP Secured Parties should be provided with the benefit and protection of

section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are

later modified, vacated, stayed or terminated by subsequent order of this or any other Court, the

DIP Secured Parties will be fully protected with respect to any amounts previously disbursed.

### 4.    Rolling-Up of Certain First Lien Prepetition Obligations Is Appropriate

41.    Approximately $83.1 million of the availability under the DIP Facility will

be used to pay in full the amounts outstanding under the Prepetition Tranche A-1 Revolving

Credit Facility and the Prepetition Tranche A-2 Revolving Credit Facility. Although identified

by the Local Rules as "extraordinary," roll-ups – including "creeping" roll-ups such as

contemplated by this Motion – are not prohibited by the Bankruptcy Code and have become

increasingly common in bankruptcy cases. See, e.g., In re Revel AC, Inc., No. 13-16253 (Bankr.

D.N.J. Apr. 22, 2013) (authorizing approximately $250 million DIP that included creeping roll-

up of approximately $192 million prepetition debt); In re Newark Grp., Inc., No. 10-27694

(Bankr. D. N.J. June 10, 2010) (authorizing DIP financing consisting of (a) $50 million

revolving loan (used to pay in full $42.1 million outstanding under the existing prepetition credit

facility) and (b) $110 million term loan (used to pay in full $73.6 million outstanding under separate prepetition credit facility)); In re MACH Gen, LLC, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included creeping roll-up of approximately $144 million prepetition debt); In re Source Interlink Cos. Inc., No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing approximately $139 million DIP that included roll-up of approximately $110 million prepetition debt); In re Dayton Superior Corp., No. 09-11351 (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included full roll-up of approximately $102 million prepetition debt); In re Pac. Energy Res., Ltd., No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (authorizing approximately $183 million DIP that included full roll-up of approximately $143 million prepetition debt); In re Foamex Int'l Inc., No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing approximately $95 million DIP that included full roll-up of approximately $39 million prepetition debt); In re Hilex Poly Co. LLC, No. 08-10890 (Bankr. D. Del. May 7, 2008) (authorizing approximately $140 million DIP that included full roll-up of approximately $51 million prepetition debt); In re Holley Performance Prods. Inc., No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing approximately $60 million DIP that included full roll-up of approximately $30 million prepetition debt); In re NEC Holdings Corp., No. 10-11890 (Bankr. D. Del. Jun. 11, 2010) (authorizing approximately $139 million DIP that included roll-up of approximately $110 million prepetition debt); In re Norwood Promotional Prods. Holdings Inc., No. 09-11547 (Bankr. D. Del. May 7, 2009) (authorizing approximately $30 million DIP that included roll-up of approximately $12 million prepetition debt); In re Ritz Camera Centers Inc., No. 09-10617 (Bankr. D. Del. Feb. 25, 2009) (authorizing approximately $85 million DIP that included roll-up of approximately $55 million prepetition debt); In re Mervyn's Holdings LLC, No. 08-11586 (Bankr. D. Del. Jul. 31, 2008) (authorizing

approximately $465 million DIP that included roll-up of approximately $329 million prepetition

debt).

42.     There are several reasons why the Court should authorize the roll-up here.

Critically, the DIP Lenders are unwilling to extend postpetition financing to the Debtors unless

there is a roll-up of the obligations arising under the Prepetition Tranche A-1 Revolving Credit

Facility and the Prepetition Tranche A-2 Revolving Credit Facility.  Thus, without rolling-up the

First Lien Prepetition Obligations, the Debtors would be unable to finance these Cases and their

marketing and sale efforts.  Also, the Prepetition Financing Documents were executed,

authorized and approved, and the Prepetition Obligations automatically perfected, pursuant to the

confirmation order entered in the 2013 Cases.

43.     Moreover, in the event of a timely and successful challenge to the validity,

enforceability, extent, perfection, priority, or amount of any Prepetition Secured Parties' claims

or Prepetition Liens, or the determination that any obligations due and owing to the Prepetition

Secured Parties were undersecured as of the Petition Date, in each case, in accordance with the

terms of the Interim DIP Order, the order expressly provides, in accordance with the Local

Rules, that the Court may, after notice and a hearing, reverse any repayment or "roll-up" of such

prepetition amounts.  See Local Rule 4001-4, Appendix 2.A.2.  Accordingly, the Debtors submit

that the roll-up contemplated herein is appropriate under the circumstances.

**5.     The Scope of the Carve-Out Is Appropriate**

44.     The DIP Facility subjects the security interests and administrative expense

claims of the DIP Lenders, as well as the Adequate Protection Liens and the Cash Collateral

Adequate Protection Liens, to the Carve-Out.  Similar carve-outs for professional fees have been

found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can

retain assistance from counsel. See Ames, 115 B.R. at 40.  The DIP Facility does not directly or

indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by

restricting the services for which professionals may be paid in these Cases. See Ames, 115 B.R. at 38

(observing that courts insist on carve-outs for professionals representing parties-in-interest because

"[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely

prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the

course of these Cases by ensuring that assets remain for the payment of professional fees of the

Debtors and the Committee, if any, notwithstanding the grant of superpriority and administrative

liens and claims under the DIP Facility. The Carve-Out also provides for payment of fees required to

be paid to the Clerk of the Court and to the office of the United States Trustee and does not impair

the ability of any party to object to any fees, expenses, reimbursement or compensation to be paid to

estate professionals from the Carve-Out. Accordingly, the Debtors submit that the proposed

Carve-Out comports with the standard set forth in the Local Rules.

**B.** **The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized**

45. The Court should authorize the Debtors' use of Cash Collateral, whether

existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash

collateral into cash. It is essential to the continued operation of the Debtors that they obtain

authority to use Cash Collateral to fund payroll and other operating needs, including the costs of

administration of these Cases. Currently, the Debtors have little or no available cash or assets

readily convertible into cash that are not likely subject to the Prepetition Secured Parties'

asserted liens and security interests.

46. If the Debtors are permitted to use Cash Collateral to fund ongoing

business operations and administration of these Cases, the Debtors will preserve the value of the

Debtors' assets as a going concern. Thus, the Debtors can continue to run their business

successfully, but only if they are allowed to use Cash Collateral in the course of the day to day

operations.  Without such use, the detrimental result to the value of the estates will be rapid and

ultimately disastrous, given the nature of the Debtors' business.  Access to Cash Collateral is

crucial to the Debtors' ability to avoid immediate and irreparable harm to the value of the estates

and the creditors, and ongoing business both before and after the Final Hearing.

47.    Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a

debtor's proposed use of cash collateral, and provides, in pertinent part:

> [t]he trustee [or debtor in possession] may not use, sell, or lease
> cash collateral . . . unless –   (A) each entity that has an interest in
> such cash collateral consents; or (B) the court, after notice and a
> hearing, authorizes such use, sale, or lease in accordance with the
> provisions of this section.

11 U.S.C. § 363(c)(2).  Section 105(a) of the Bankruptcy Code also allows that "[t]he court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of [the Bankruptcy Code]."  Id. § 105(a).

48.    The Debtors respectfully submit that the proposed use of Cash Collateral,

in conjunction with the DIP Facility, is necessary for the Debtors to have sufficient liquidity to

preserve their assets and property (including the Prepetition Collateral) during the Cases and will

avoid immediate and irreparable harm to the Debtors' estates and creditors, including the

Prepetition Lenders.  Such use prejudices no one; it affirmatively and directly benefits the estates

and creditors by enhancing the prospects of a successful outcome of the Cases including through

a potential value-maximizing sale to a third party.

49.    The Prepetition First Lien Secured Parties under the Prepetition Revolving

Credit Facilities have agreed to permit (and the Prepetition Second Lien Secured Parties and the

Prepetition First Lien Secured Parties under the Prepetition Tranche B Term Loan Facility are

deemed to permit pursuant to the Intercreditor Agreement and the intercreditor provisions in the

Prepetition First Lien Credit Agreement, respectively) the Debtors to use the Prepetition

Collateral, including the Cash Collateral, in accordance with, and subject to, the terms of the

Interim DIP Order and the DIP Budget (subject to variances permitted under the DIP Credit

Agreement) during the Interim Period.

       50.    Further, section 363(e) of the Bankruptcy Code provides that "on request

of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee

[or debtor in possession], the court, with or without a hearing, shall prohibit or condition such

use, sale, or lease as is necessary to provide adequate protection of such interest." Id. § 363(e).

As described above, the Prepetition Secured Parties' interests in the Prepetition Collateral will be

adequately protected in a number of ways notwithstanding the Debtors' entry into the DIP Loan

Documents.   In the same ways, the Prepetition Secured Parties would be adequately protected

from the Debtors' use of Cash Collateral.

    **C.**    **The Automatic Stay Should Be Modified So That the Terms and Provisions
of the Interim DIP Order and Final DIP Order Can Be Implemented and
Effectuated**

       51.    The Interim DIP Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code are modified to the extent necessary to implement and

effectuate the terms and provisions of the DIP Facility, the Interim DIP Order and the other DIP

Loan Documents.  Stay modification provisions of this sort are ordinary and usual features of

postpetition financing facilities and, in the Debtors' judgment, are reasonable under the present

circumstances.  Accordingly, the Court should modify the automatic stay to the extent

contemplated herein.

    **The Need for Emergency Relief Pending a Final Hearing**

       52.    While the Bankruptcy Rules contemplate that financings motion should

not be approved on a final basis earlier than fourteen (14) days after service, bankruptcy courts

may conduct preliminary expedited hearings on financing motions and, prior to the expiration of

that fourteen (14) day deadline, may authorize the use of only that amount of cash collateral or

the obtaining of that amount of credit, as the case may be, as is necessary to avoid immediate and

irreparable harm to an estate pending a final hearing.  See Fed. R. Bankr. P. 4001(b)(2); Fed R.

Bankr. P. 4001(c)(2); Local Rule 4001-4.

        53.     The Debtors submit that emergency relief pursuant to the Interim DIP

Order is necessary in order to avoid immediate and irreparable harm to their estates. The Debtors

expect to engage in significant commerce with many guests and visitors expected to come to the

Revel Casino Resort in the coming weeks.   The Debtors need access to sufficient liquidity and

working capital in order to continue operations pending entry of the Final DIP Order.   Without

access to such liquidity, the Debtors will not be able to operate and significant revenue and going

concern value that could benefit the Debtors' estate will be lost.  Likewise, it would be a

violation of applicable gaming rules and regulations if the Debtors do not have access to

sufficient liquidity.  Accordingly, the Debtors respectfully request entry of the Interim DIP

Order, which is necessary to enable the Debtors to maintain ongoing operations pending a sale of

substantially all of the Debtors' assets in these Cases.

### Request for a Final Hearing

        54.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

respectfully request that the Court set a date for the Final Hearing, no later than thirty (30) days

from entry of the Interim DIP Order and approve the provisions for notice of the Final Hearing

and the objection procedures that are set forth in the Interim DIP Order.

### Waiver of Stay

        55.     The Debtors further request a waiver of any stay of the effectiveness of

any of the DIP Orders, to the extent such an order is entered.  Pursuant to Bankruptcy Rule

6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth above, the relief requested herein is critically important to prevent irreparable damage to the Debtors' operations.  Accordingly, the Debtors submit that cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### **Waiver of Memorandum of Law**

56.     In accordance with Local Rule 9013-2, no brief is being filed in support of this Motion because the legal principles involved are not novel or in dispute and are adequately set forth in the Motion.

### **Notice**

57.     The Debtors are in the process of providing notice of this Motion, by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or their respective counsel as indicated below: (a) the Office of the United States Trustee for the District of New Jersey; (b) the DIP Agent; (c) counsel to the Prepetition First Lien Lenders; (d) JPMorgan Chase Bank, N.A., as Prepetition First Lien Agent; (e) counsel to the Prepetition Second Lien Lenders; (f) Wilmington Trust, National Association, as Prepetition Second Lien Agent; (g) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis (including counsel if known); (h) all parties requesting notices pursuant to Bankruptcy Rule 2002; (i) the Office of the Attorney General for the State of New Jersey; (j) the New Jersey Division of Gaming Enforcement; (k) the New Jersey Casino Control Commission; (l) the Office of the Governor for the State of New Jersey; (m) the United States Attorneys' Office for the District of New Jersey; (n) the United States Attorney General; (o) the Internal Revenue Service; (p) the Securities and Exchange Commission; (q) holders of Permitted Liens (as defined in the

Prepetition First Lien Credit Agreement); (r) the applicable state and local taxing authorities; and (s) U.S. Bank National Association, as Rights Agent and Collateral Agent, in connection with that certain Second Lien Note Claim Contingent Payment Rights Agreement, dated May 21, 2013.  The Debtors submit that no other or further notice need be provided.

       58.     No previous motion for the relief sought herein has been made to this or any other court.

**<u>Reservation of Rights</u>**

       59.     As of the date hereof, the Debtors have not completed their analysis to determine the validity, enforceability or priority of the Prepetition Obligations or the Prepetition Liens.  Accordingly, the request for relief herein should not be construed as a binding admission or acknowledgement by the Debtors as to the validity, enforceability, perfection or priority of any of the Prepetition Liens or the Prepetition Obligations.

## Conclusion

WHEREFORE, the Debtors respectfully request entry of orders (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  June 19, 2014
          Atlantic City, New Jersey

FOX ROTHSCHILD LLP

By: /s/ Michael J. Viscount, Jr.
    Michael J. Viscount, Jr., Esq.
    Raymond M. Patella, Esq.
    1301 Atlantic Avenue, Suite 400
    Atlantic City, NJ 08401
    (609) 348-4515/fax (609) 348-6834
    mviscount@foxrothschild.com
    rpatella@foxrothschild.com

        – and –

    John K. Cunningham, Esq.
    (*pro hac vice* pending)
    Richard S. Kebrdle, Esq.
    (*pro hac vice* pending)
    Kevin M. McGill, Esq.
    (*pro hac vice* pending)
    WHITE & CASE LLP
    Southeast Financial Center
    200 South Biscayne Boulevard, Suite 4900
    Miami, Florida 33131
    (305) 371-2700/fax (305) 358-5744
    jcunningham@whitecase.com
    rkebrdle@whitecase.com
    kmcgill@whitecase.com

**<u>Exhibit A</u>**

(Proposed Interim Order)