<div style="border:1px solid;">

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esq.
Raymond M. Patella, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax 609-348-6834
mviscount@foxrothschild.com
rpatella@foxrothschild.com

**WHITE & CASE LLP**
John K. Cunningham, Esq. (*pro hac vice* pending)
Richard S. Kebrdle, Esq. (*pro hac vice* pending)
Kevin M. McGill, Esq. (*pro hac vice* pending)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700/fax (305) 358-5744
jcunningham@whitecase.com
rkebrdle@whitecase.com
kmcgill@whitecase.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| REVEL AC, INC., et al., | Case No. 14-22654 (GMB) |
| Debtors.[1] | Joint Administration Requested |

**DECLARATION OF BARAK KLEIN IN SUPPORT OF DEBTORS' EMERGENCY MOTION PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR THE ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856). The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

**DEBTORS TO (I) OBTAIN POSTPETITION FINANCING, (II) GRANT SENIOR PRIMING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS, (III) USE CASH COLLATERAL AND (IV) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (B) PRESCRIBING FORM AND MANNER OF NOTICE OF AND SCHEDULING HEARINGS**

I, Barak Klein, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge:

1. I am a Managing Director at Moelis & Company, LLC ("Moelis"), the proposed investment banker for Revel AC, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Moelis was engaged by the Debtors as of March 1, 2014, to serve as the Debtors' investment banker and, in part, to assist the Debtors in evaluating financial considerations with respect to their restructuring efforts. Over the course of the last several months, as well as during a previous engagement during 2013, Moelis has become familiar with the Debtors' business, finances, capital structure and operations.

2. I have more than sixteen (16) years of investment banking and asset management experience. I have led complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities.

3. Prior to Moelis, I was a member of the CR Intrinsic-General Distressed Group of SAC Capital Advisors, where my primary responsibilities included investing in work-out and special situations. I have also served as a senior vice president at Jefferies Asset Management and, prior to that role, I served as a vice president in the Restructuring & Recapitalization Group at Jefferies & Company. I began my career in the Financial Restructuring Group at Houlihan, Lokey, Howard & Zukin.

4. I submit this declaration in support of the Debtors' Emergency Motion Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure for the Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing, (II) Grant Senior Priming Liens and Superiority Claims to Postpetition Lenders, (III) Use Cash Collateral and (IV) Provide Adequate Protection to Prepetition Secured Parties, and (B) Prescribing Form and Manner of Notice of and Scheduling Hearings (the "DIP Motion"), including the exhibits thereto.[2]

5. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I would testify thereto. Certain of the disclosures set forth herein relate to matters within the knowledge of other employees of Moelis and are based on information provided by them.

## The DIP Negotiations

6. As set forth in the Declaration of Shaun Martin in Support of First Day Motions and Applications (the "Martin Declaration"), prior to the commencement of these Chapter 11 Cases, the Debtors' operations were funded, in large part, with the proceeds of that certain amended and restated first lien credit agreement dated November 8, 2013 (as amended from time to time, the "Prepetition First Lien Credit Agreement") by and among Revel AC, Inc., as borrower, the remaining Debtors, as guarantors, certain lenders party thereto, as lenders (in such capacity, the "Prepetition First Lien Lenders"), and JPMorgan Chase Bank, N.A., as administrative and collateral agent (in such capacity, the "Prepetition First Lien Agent"). I am informed, moreover, that the obligations under the Prepetition First Lien Credit Agreement (the

---

[2] Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the DIP Motion.

3

"First Lien Prepetition Obligations") are secured by a first priority security interest (the "First Priority Lien") in, with certain limited exceptions, substantially all of the Debtors' assets (the "Prepetition Collateral").

7. As described in more detail in the Martin Declaration, the combination of factors that led the Debtors to file prepackaged chapter 11 cases in early 2013 (the "2013 Cases") continued to have a pronounced negative impact on the Debtors' profitability following the Debtors' emergence from the 2013 Cases. Despite the extensive reduction in debt and interest expense realized as a result of the Debtors' 2013 Cases and the substantial operational improvements implemented upon emergence from chapter 11, the Debtors continued to incur significant operating losses through the rest of 2013 with further losses projected throughout 2014. As a result, pursuant to the terms of certain additional financing the Debtors received from their lenders in November 2013, the Debtors determined to pursue a strategic transaction to sell the business. After consulting generally with their significant stakeholders, the Debtors immediately began a well constructed marketing process in November 2013.

8. The Debtors further believe that a meaningful continuation of their prepetition marketing efforts during these Chapter 11 Cases, followed by a public auction before this Court, will lead to a sale of substantially all of the Debtors' assets (the "Sale") that provides maximum value for such assets as a going concern.

9. During such postpetition marketing and sale period, the Debtors require the use of "cash collateral," as such term is defined in section 363 of the Bankruptcy Code, in which the Prepetition Secured Parties purport to have an interest (the "Cash Collateral"), and the proceeds of the proposed DIP facility (the "DIP Facility") in order to, among other things, provide ongoing working capital requirements to the Debtors, pay for fees, costs and expenses

associated with these Chapter 11 Cases, and maintain and preserve the value of the Debtors' business (including the Prepetition Collateral), pending the Sale of the Debtors' assets. The availability to the Debtors of sufficient working capital and liquidity to finance their operations is vital to their ability to maintain such operations and is necessary for the preservation of the going concern value of their estates as a whole, pending the contemplated Sale of the Debtors' assets.

10. In that regard, certain of the Prepetition First Lien Lenders (such lenders, the "DIP Lenders") provided the Debtors with a proposal (the "Proposal") for DIP financing that contemplated the DIP Facility that provides a total commitment of $41.9 million plus an amount equal to the aggregate amount necessary to fund roll-up borrowings and will be used to provide incremental liquidity to fund these Chapter 11 Cases.

11. The Debtors also directed Moelis to contact and obtain alternate proposals from various sources of potential DIP financing. Moelis contacted and communicated with more than ten (10) potential DIP lenders (in addition to certain of the Debtors' other Prepetition Lenders) to inquire whether such lenders would provide the Debtors with DIP financing. Ultimately, none of these potential DIP lenders were willing to make a proposal to provide the Debtors with DIP financing because, among other reasons, the existence of various secured obligations, including the First Lien Prepetition Obligations, the holders of which would not consent to a "priming" DIP facility. Furthermore, none of the potential DIP lenders were willing to repay such secured obligations in full, nor were any of the potential DIP lenders prepared to engage in litigation over a priming DIP facility.

12. The Debtors, with the assistance of Moelis and their other advisors, carefully reviewed the Proposal and, after the negotiations described below, ultimately

5

determined that the Proposal was in the best interests of the Debtors and their estates, customers, employees and creditors.

13. The terms and conditions of the DIP Facility and the Debtors' use of Cash Collateral, each as described in the DIP Motion, were negotiated at arms' length by well represented, independent parties in good faith. The DIP Facility and the Debtors' use of Cash Collateral are necessary to maintain sufficient liquidity and preserve the Debtors' assets over the course of these Chapter 11 Cases. At this point, the DIP Facility is the only financing opportunity available to the Debtors that will provide the liquidity necessary to bridge to an auction.

14. I also note that, as a condition to closing the DIP Facility, the Debtors are required to repay the certain portions of the First Lien Prepetition Obligations with the proceeds of the borrowings under the DIP Facility. Without this condition, the Debtors would have been unable to secure the DIP Facility. The DIP Facility is needed to preserve the going concern value of the Debtors' estates during these Chapter 11 Cases. Further, I note that the rights of parties in interest to challenge the First Priority Lien securing those portions of the First Lien Prepetition Obligations being rolled into the DIP Facility are not being eliminated because, as I understand it, the proposed orders approving the DIP Facility preserve the rights of certain parties to object, challenge and pursue investigations in connection with or related to the validity or extent of First Lien Prepetition Obligations or the First Priority Lien, or the actions or inactions of any of the Prepetition First Lien Lenders arising out of or related to the First Lien Prepetition Obligations or the First Priority Lien.

MIAMI 1014888

## Conclusion

15. The DIP Facility and Prepetition Lenders' consent to the Debtors' use of Cash Collateral are the product of hard fought, good faith negotiations. I believe that the relief requested in the DIP Motion is necessary and essential under these circumstances to keep the Debtors operating, and based on the Debtors' short term cash flow projections should provide the Debtors with sufficient liquidity to pay their current and ongoing operating expenses, including, among other things, postpetition wages and salaries, vendor obligations and other operational costs (such as rent and utilities) until an auction can occur in the time permitted under the DIP Facility. The Debtors were unable to obtain financing on more favorable terms from sources other than the DIP Lenders, and without such financing the Debtors' ability to consummate the Sale of their assets as a going concern will be jeopardized, materially harming the value of the Debtors' estates and all of the parties with an interest in the Debtors' estates and/or the continuity of the Debtors' business.

I declare under penalty of perjury that the forgoing is true and correct.

Executed on June 19, 2014.

_____
Barak Klein