# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| REVEL AC, INC., et al., | Case No. 14-22654 (GMB) |
| Debtors.[1] | Jointly Administered |

## DISCLOSURE STATEMENT RELATING TO THE JOINT CHAPTER 11 PLAN FOR REVEL AC, INC. AND ITS AFFILIATED DEBTORS

> THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN.  VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

Dated:  June 19, 2014

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esq.
Raymond M. Patella, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax (609) 348-6834
mviscount@foxrothschild.com
rpatella@foxrothschild.com

**WHITE & CASE LLP**
John K. Cunningham, Esq. (*pro hac vice* pending)
Richard S. Kebrdle, Esq. (*pro hac vice* pending)
Kevin M. McGill, Esq. (*pro hac vice* pending)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700/fax (305) 358-5744
jcunningham@whitecase.com
rkebrdle@whitecase.com
kmcgill@whitecase.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856).  The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN | 2 |
| III. | EXPLANATION OF CHAPTER 11 | 4 |
| | A. Overview of Chapter 11 | 4 |
| | B. Chapter 11 Plan | 5 |
| | C. Confirmation of a Chapter 11 Plan | 5 |
| IV. | OVERVIEW OF THE PLAN | 6 |
| | A. Summary of the Terms of the Plan | 6 |
| | B. Summary of Distributions Under the Plan | 8 |
| V. | GENERAL INFORMATION | 11 |
| | A. The Development of the Revel Casino Resort | 11 |
| | B. Revel's Challenges and the 2013 Restructuring | 12 |
| | C. Capital and Debt Structure Following 2013 Cases | 14 |
| |    1. First Lien Secured Financing | 14 |
| |    2. Second Lien Secured Financing | 15 |
| |    3. Equity | 15 |
| | D. Events Precipitating the Commencement of these Chapter 11 Cases | 15 |
| | E. Management | 17 |
| VI. | SELECTED FINANCIAL INFORMATION | 18 |
| VII. | THE CHAPTER 11 CASES | 18 |
| | A. Filing of the Petitions and Debtor in Possession Status | 18 |
| | B. First Day Pleadings and Orders | 18 |
| | C. Appointment of Chief Restructuring Officer | 19 |
| | D. Employment of Professionals for the Debtors | 19 |
| | E. Appointment of the Committee. | 19 |
| | F. Continued Operations. | 19 |
| | G. Exclusivity | 19 |
| | H. Claims Bar Date. | 19 |
| VIII. | POTENTIAL LITIGATION | 20 |
| | A. Avoidance Actions. | 20 |
| | B. Other Estate Causes of Action. | 20 |
| | C. Retention of Litigation Claims | 20 |
| | D. Pending Litigation. | 20 |
| IX. | THE CHAPTER 11 PLAN | 21 |
| | A. Plan Treatment of Claims and Equity Interests. | 21 |
| |    1. Class 1 – Priority Claims | 21 |
| |    2. Class 2 – Non-Lender Secured Claims | 21 |

|  | 3. | Class 3 – First Lien Lender Claims | 21 |
|  | 4. | Class 4 – Second Lien Lender Claims | 21 |
|  | 5. | Class 5 – Unsecured Claims | 22 |
|  | 6. | Class 6 – Revel Equity Interests | 22 |
|  | 7. | Class 7 – Other Equity Interests | 22 |
| B. | | Consummation of the Sale | 22 |
| C. | | Sources of Cash for Plan Distributions | 22 |
| D. | | Plan Trust | 22 |
|  | 1. | Execution of the Plan Trust Agreement | 22 |
|  | 2. | Purpose of Plan Trust | 23 |
|  | 3. | Vesting of Assets in the Plan Trust; Dissolution of the Debtor | 23 |
|  | 4. | Governance of Plan Trust | 23 |
|  | 5. | Role of the Plan Trustee | 23 |
|  | 6. | Cash | 24 |
|  | 7. | Compensation of the Plan Trustee | 24 |
|  | 8. | Retention of Professionals by the Plan Trustee | 24 |
|  | 9. | Noncertificated Plan Trust Interests | 24 |
|  | 10. | Dissolution of the Plan Trust | 24 |
|  | 11. | Securities Exempt | 24 |

**X. CONFIRMATION AND CONSUMMATION PROCEDURES** 25

| A. | | Overview | 25 |
| B. | | Confirmation of the Plan | 26 |
|  | 1. | Elements of Section 1129 of the Bankruptcy Code | 26 |
|  | 2. | Acceptance | 28 |
|  | 3. | Best Interests of Creditors Test | 28 |
|  | 4. | Feasibility | 29 |
| C. | | Cramdown | 29 |
|  | 1. | No Unfair Discrimination | 29 |
|  | 2. | Fair and Equitable Test | 29 |
| D. | | Effect of Confirmation | 30 |

**XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** 30

| A. | | U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims | 32 |
|  | 1. | General Tax Considerations for Holders of Allowed Claims | 32 |
|  | 2. | Additional Tax Considerations for Holders of Allowed Class 3 – First Lien Lender Claims, Class 4 – Second Lien Lender Claims and Class 5 – Unsecured Claims | 34 |
|  | 3. | Additional Tax Considerations for Holders of Allowed Class 6 – Revel Equity Interests | 35 |
| B. | | U.S. Federal Income Tax Consequences to Holders of Contested Claims | 35 |
| C. | | Tax Treatment of the Plan Trust | 35 |

XII.    REGULATORY ENVIRONMENT ..................................................................37

    A.    General Governmental and Gaming Regulations ..................................37
    B.    Relationship of Gaming Laws to Chapter 11 Cases and the Plan.........38
    C.    Licensing of the Debtors and Individuals Involved Therewith .............38
    D.    Findings of Qualification and Suitability Determinations ....................39
    E.    Violations of Gaming Laws ..................................................................41
    F.    Reporting and Record-Keeping Requirements of Gaming Authorities................41
    G.    Review and Approval by Gaming Authorities of Certain Transactions ...............42
    H.    License for Sale of Alcoholic Beverages..............................................42

XIII.    RISK FACTORS .......................................................................................42

    A.    Certain Bankruptcy Considerations ......................................................42
        1.    Parties in Interest May Object to the Plan's Classification of Claims
              and Equity Interests...................................................................42
        2.    Failure to Satisfy Vote Requirements ........................................43
        3.    The Debtors May Not Be Able Secure Confirmation or
              Consummation of the Plan..........................................................43
        4.    Actual Plan Distributions May Be Less than Estimated for the
              Purposes of this Disclosure Statement ........................................44
    B.    Risks Related to the Sale.......................................................................44
    C.    Certain Tax Considerations...................................................................44

XIV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN ....................................................................................................45

XV.    CONCLUSION..........................................................................................45

## EXHIBITS

Chapter 11 Plan…………………………………………………..…………………Exhibit "A"

Disclosure Statement Order ………………………………………………………...Exhibit "B"

Selected Financial Information…………………………………………………….....Exhibit "C"

## SCHEDULES

List of Defined Terms…………..……………………………………………….....Schedule 1

Chapter 7 Liquidation Analysis…..………………………………………………..Schedule 2

Schedule of Rejected Executory Contracts and Unexpired Leases………..…………..Schedule 3

Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases……..Schedule 4

# I.

## <u>INTRODUCTION</u>

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (<u>see</u> Section 1.1 (Definitions) of the Plan).  For ease of reference, all defined terms used in the Disclosure Statement that are not defined in the Plan are listed on Schedule 1 to this Disclosure Statement with reference to the page numbers where the terms are defined.   Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.**

BY ORDER DATED _____ ___, 2014 (THE "DISCLOSURE STATEMENT ORDER"), THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY (THE "BANKRUPTCY COURT") APPROVED THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") RELATING TO THE JOINT CHAPTER 11 PLAN FOR REVEL AC, INC. AND ITS AFFILAITED DEBTORS (THE "PLAN").

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A", FILED BY REVEL AC, INC. AND ITS AFFILIATED DEBTORS (THE "COMPANY" OR THE "DEBTORS").  OTHER THAN CLASS 1 – PRIORITY CLAIMS, CLASS 2 – NON-LENDER SECURED CLAIMS AND CLASS 7 – OTHER EQUITY INTERESTS, EACH OF WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND CLASS 6 – REVEL EQUITY INTERESTS, WHICH IS NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND IS THEREFORE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS AND EQUITY INTERESTS, OTHER THAN THOSE IN CLASS 1 – PRIORITY CLAIMS, CLASS 2 – NON-LENDER SECURED CLAIMS, CLASS 6 – REVEL EQUITY INTERESTS AND CLASS 7 – OTHER EQUITY INTERESTS.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS.  ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY **4:00 P.M., PREVAILING EASTERN TIME, ON _____ ____, 2014 (THE "VOTING DEADLINE").**  FOR THE AVOIDANCE OF DOUBT, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO CLAIMS AFTER THE VOTING DEADLINE. MOREOVER, FOR THE AVOIDANCE OF DOUBT, IT IS POSSIBLE THAT HOLDERS OF CLAIMS, INCLUDING UNSECURED CLAIMS, THAT DO NOT APPEAR ON THE DEBTORS' SCHEDULES AND ARE NOT ALLOWED CLAIMS, WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIMS UNTIL THE EXPIRATION OF THE TIME PERIOD WITHIN WHICH CLAIM OBJECTIONS MUST BE FILED AS

REFERENCED IN "THE CHAPTER 11 PLAN – PROCEDURES FOR RESOLVING AND
TREATING CONTESTED CLAIMS."

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN,
PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF
DISTRIBUTIONS UNDER THE PLAN."

## II.

## <u>NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN</u>

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is
impaired under the Plan, to make an informed decision in exercising your right to accept or reject
the Plan.  <u>See</u> "Confirmation and Consummation Procedures."

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION
THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.
PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE
STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE
PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE
STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE
STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE
NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE
CORRECT AT ANY TIME AFTER THE DATE HEREOF.  DELIVERY OF THIS
DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT
THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN SINCE
THAT DATE.  THE DEBTORS HAVE NO DUTY TO, AND EXPRESSLY DISCLAIM
ANY OBLIGATION TO, UPDATE OR ALTER ANY FORWARD-LOOKING
STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE
EVENTS OR OTHERWISE, UNLESS OTHERWISE ORDERED TO DO SO BY THE
BANKRUPTCY COURT.   IN THE EVENT OF ANY CONFLICT BETWEEN THE
DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE
TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE
WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE
3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE
SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE
STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE
SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC
PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS
CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE
PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS
SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT
OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT,
INCLUDING ANY PROJECTED FINANCIAL INFORMATION, VALUATION,
ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING
STATEMENTS, ARE BASED, AT LEAST IN PART, ON ESTIMATES AND
ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS
WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  MOREOVER, THE DEBTORS
RESERVE ALL OF THEIR RESPECTIVE RIGHTS TO ASSERT THAT THE
VALUATION AND ALLOCATION OF VALUE MAY BE DIFFERENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER
ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL
NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR
LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE
IN SETTLEMENT NEGOTIATIONS.  THE DISCLOSURE STATEMENT SHALL NOT
BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE
CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR
OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST,
OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN
THESE CHAPTER 11 CASES.

On _____ __, 2014, after notice and a hearing, the Bankruptcy Court entered the
Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the
Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a
hypothetical, reasonable investor typical of holders of the solicited classes of Claims against the
Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan.
APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT
DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF
THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR
COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this
Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to
accept or reject the Plan may be made except pursuant to this Disclosure Statement and section
1125 of the Bankruptcy Code.  Except for the Debtors and certain of the Professional Persons the
Debtors have retained, no person has been authorized to use or promulgate any information
concerning the Debtors, their businesses, or the Plan other than the information contained in this
Disclosure Statement and if given or made, such information may not be relied upon as having
been authorized by the Debtors.  You should not rely on any information relating to the Debtors,
their businesses, or the Plan other than that contained in this Disclosure Statement and the
exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached exhibits,
please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan
on the enclosed ballot (the "Ballot") and return the same to the address set forth on the Ballot, in
the enclosed, postage prepaid, return envelope so that it will be actually received by
AlixPartners, LLP (the "Solicitation Agent" or "Claims Agent," as applicable) no later than the

Voting Deadline.  All votes to accept or reject the Plan must be cast by using the appropriate ballot.  Votes which are cast in any other manner will not be counted.  **All ballots must be actually received by the Solicitation Agent no later than _____ __, 2014 at __:__ _.m., prevailing Eastern Time.  For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit "B".**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") for _____ _____, 2014 at __: _.m., prevailing Eastern Time, before the Honorable _____, United States Bankruptcy Judge of the United States Bankruptcy Court for the District of New Jersey.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____ _____, 2014 at __: _.m., in the manner described in the Disclosure Statement Order attached hereto as Exhibit "B".**

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

## EXPLANATION OF CHAPTER 11

A.    <u>Overview of Chapter 11</u>

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders and other parties in interest.  The Debtors commenced these chapter 11 cases, captioned <u>In re Revel AC, Inc.</u>, Case No. 14-22654 (GMB) (the "Chapter 11 Cases"), with the filing of voluntary petitions (the "Petitions") for relief under chapter 11 of the Bankruptcy Code on June 19, 2014 (the "Petition Date").

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the petition is filed.  Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In the Chapter 11 Cases, the Debtors have remained in possession of their property and have continued to operate their business as debtors in possession.  <u>See</u> "The Chapter 11 Case – Continued Operations."

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, among other things, for an

automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor's estate. Unless a trustee is appointed, only a debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"), and the debtor will have 180 days to solicit acceptance of such plan (the "Solicitation Period" and, collectively with the Filing Period, the "Exclusive Periods"). However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Exclusive Periods upon a showing of "cause." The Filing Period and Solicitation Period may not be extended beyond 18 months and 20 months, respectively, from a debtor's petition date. In these Chapter 11 Cases, the Debtors filed the Plan within the applicable Filing Period and, accordingly, no other creditor or party in interest may file a plan during the Exclusive Periods.

## B.    Chapter 11 Plan

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, the plan becomes binding on a debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of impaired claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

## C.    Confirmation of a Chapter 11 Plan

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See "Confirmation and Consummation Procedures – Confirmation of the Plan." **The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan. See "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.  See "Confirmation and Consummation Procedures."  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  Class 1 – Priority Claims, Class 2 – Non-Lender Secured Claims and Class 7 – Other Equity Interests are unimpaired under the Plan and are not entitled to vote on the Plan.  Class 6 – Revel Equity Interests will not receive a distribution under the Plan and is deemed to reject the Plan.  Class 3 – First Lien Lender Claims, Class 4 – Second Lien Lender Claims and Class 5 – Unsecured Claims are entitled to vote on the Plan.

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.  See "Confirmation and Consummation Procedures – Cramdown."  **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.**

IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in the Chapter 11 Cases.

A.    **Summary of the Terms of the Plan**

The Plan implements and is built around the following key elements:

- On the Effective Date and to the extent not already consummated pursuant to section 363 of the Bankruptcy Code, the transactions required to be consummated under the Asset Purchase Agreement and any documents entered into in connection therewith shall be incorporated into, and shall be deemed part of, the Plan and shall be entitled to all of the rights, benefits and protections of the Bankruptcy Code with respect thereto, including, without limitation, those set forth in Section 15.9 of the Plan, and the proceeds of the Sale of substantially all of the Debtors' Assets will be used to fund distributions under the Plan.

- On the Effective Date, the authority, power and incumbency of the Debtors shall terminate, and vest in the Plan Trustee, and all Assets of the Debtors not sold to the Buyer, including, without limitation, the Sale Consideration and the

Avoidance Actions and Causes of Action of the Debtors, shall become assets of the Plan Trust.

- The Plan Trustee shall, among other things, (i) be authorized to take all steps necessary to wind down the affairs of the Debtors, (ii) have the power and authority to hold, manage, sell and distribute the assets of the Plan Trust to the holders of Allowed Claims, (iii) hold the assets of the Plan Trust for the benefit of the holders of Allowed Claims, (iv) have the power and authority to hold, manage, sell and distribute Cash or non-Cash  assets of the Plan Trust obtained through the exercise of its power and authority, (v) have the power and authority to prosecute and resolve, in the name of the Debtors and/or the name of the Plan Trustee, the Estate's Avoidance Actions and Causes of Action, (vi) administer the Non-Lender Secured Reserve and release amounts therefrom to the holders of Claims as Plan Distributions as appropriate when Contested Non-Lender Secured Claims become Allowed, Disallowed or are otherwise resoled by settlement, (vii) have the power and authority to perform such other functions as are provided in the Plan and (viii) have the power and authority to administer the closure of the Chapter 11 Cases.

- On the Effective Date, the Oversight Committee shall be formed, consisting of three members selected by the Debtors (after consultation with the First Lien Lenders, the Steering Committee and the Committee), and shall oversee the implementation and administration of the Plan Trust and the Plan.

- Allowed Priority Claims and Allowed Non-Lender Secured Claims are unimpaired under the Plan, and holders of such claims shall be paid in full.

- Allowed First Lien Lender Claims are impaired under the Plan, and, subject to and in accordance with the First Lien Intercreditor Rights, holders of such claims shall receive their Pro Rata Share of the Available Proceeds which constitute proceeds of the First Lien Collateral until the Allowed First Lien Lender Claims are paid in full and in Cash.

- Allowed Second Lien Lender Claims are impaired under the Plan, and, subject to the prior payment in full and in Cash of all Allowed First Lien Lender Claims and in accordance with the Second Lien Intercreditor Rights, holders of such claims shall receive their Pro Rata Share of the Available Proceeds which constitute proceeds of the Second Lien Collateral until the Allowed Second Lien Lender Claims are paid in full and in Cash.

- Allowed Unsecured Claims are impaired under the Plan, and, subject to the prior payment in full and in Cash of all Allowed Non-Lender Secured Claims and Allowed Lender Claims, holders of such claims shall receive their Pro Rata Share of the Available Proceeds.

- Allowed Equity Interests in Revel are impaired under the Plan, and holders of such Equity Interests shall neither receive nor retain any property under the Plan on account of such Equity Interests.

- Allowed Equity Interests in any Debtor other than Revel are unimpaired under the Plan, and all of the legal, equitable and contractual rights to which the holders of such Equity Interests are entitled in respect of such Equity Interests shall be fully reinstated and retained on and after the Effective Date.

## B.    Summary of Distributions Under the Plan

The following is a summary of the distributions under the Plan.  It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A".  In addition, for a more detailed description of the terms and provisions of the Plan, see "The Chapter 11 Plan" section of this Disclosure Statement.

The claim amounts set forth below are based on information contained in the Debtors' Schedules and filed proofs of claim, and reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding disputed Claims.  The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to unclassified and classified Claims and Equity Interests under the Plan:

### Administrative and Tax Claims

| Claims[1] | Treatment |
|---|---|
| DIP Claims<br>Estimated Allowed Claims: $___ | The DIP Claims shall be Allowed Administrative Claims on the Effective Date and shall be paid in full in Cash on the Effective Date.  On the Effective Date, in accordance with the terms of the DIP Documents, any outstanding letters of credit under the DIP Documents shall terminate or be collateralized.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Administrative Claims<br>Estimated Allowed Claims: $___ | On the Plan Distribution Date, each holder of an Allowed Administrative Claim, shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Plan Trustee and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; provided, further, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business at any time prior to the occurrence of the |

---

[1]    DIP Claims, Administrative Claims and Tax Claims are treated in accordance with section 1129(a)(9) of the Bankruptcy Code.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, such Claims are not designated as classes of Claims for the purposes of the Plan.

|  | Effective Date.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
|---|---|
| Tax Claims<br>Estimated Allowed Claims: $___ | At the election of the Plan Trustee, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (a) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (c) such other treatment as may be agreed upon in writing by such holder; <u>provided</u>, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim or that is less favorable than the treatment provided to the most favored nonpriority Unsecured Claims under the Plan.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

## Claims and Equity Interests

| Classes | Treatment |
|---|---|
| Class 1 – Priority Claims<br>Estimated Allowed Claims: $___<br><br>Unimpaired | Each holder of an Allowed Priority Claim against the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, except as provided in sections 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Priority Claim shall be paid on the Plan Distribution Date in full and in Cash.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 2 – Non-Lender Secured Claims<br>Estimated Allowed Claims: $___<br><br>Unimpaired | Each holder of an Allowed Non-Lender Secured Claim against the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Non-Lender Secured Claim in respect of such Claim shall be fully reinstated and retained, except as provided in sections 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Non-Lender Secured Claim shall be paid on the Plan Distribution Date in full and in Cash.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 3 – First Lien Lender Claims<br>Estimated Allowed Claims: $___ | Subject to and in accordance with the First Lien Intercreditor Rights, each holder of an Allowed |

| | |
|---|---|
| Impaired | First Lien Lender Claim against the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed First Lien Lender Claim, its Pro Rata Share of the Available Proceeds which constitute proceeds of the First Lien Collateral until such Allowed First Lien Lender Claim is paid in full and in Cash. **Estimated Recovery: ___% of Allowed Claim** |
| Class 4 – Second Lien Lender Claims Estimated Allowed Claims: $___ Impaired | Subject to the prior payment in full and in Cash of all Allowed First Lien Lender Claims and in accordance with the Second Lien Intercreditor Rights, each holder of an Allowed Second Lien Lender Claim against the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed Second Lien Lender Claim, its Pro Rata Share of the Available Proceeds which constitute proceeds of the Second Lien Collateral until such Allowed Second Lien Lender Claim is paid in full and in Cash. **Estimated Recovery: ___% of Allowed Claim** |
| Class 5 – Unsecured Claims Estimated Allowed Claims: $___ Impaired | Subject to the prior payment in full and in Cash of all Allowed Non-Lender Secured Claims and Allowed Lender Claims, each holder of an Allowed Unsecured Claim against the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed Unsecured Claim, its Pro Rata Share of the Available Proceeds. **Estimated Recovery: ___% of Allowed Claim** |
| Class 6 – Revel Equity Interests Estimated Allowed Equity Interests: N/A Impaired | On the Effective Date, all Equity Interests in Revel shall be cancelled, and each holder of an Equity Interest in Revel shall neither receive nor retain any property under the Plan on account such interest. **Estimated Recovery: None** |
| Class 7 – Other Equity Interests Estimated Allowed Equity Interests: N/A Unimpaired | On the Effective Date, each holder of an Allowed Equity Interest in any Debtor other than Revel AC, Inc. shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles such holder in respect of such Equity Interest shall be fully reinstated and retained on and after the Effective Date. **Estimated Recovery: Not applicable.** |

# V.

# GENERAL INFORMATION

The chart below depicts the corporate structure of Revel AC, Inc. and its subsidiaries as of the date of this Disclosure Statement.  The description in "General Information" of the Debtors and their business does not give effect to any changes in the corporate structure of the Debtors in connection with or under the Plan.



## A.    The Development of the Revel Casino Resort

The Debtors own and operate a casino and resort facility (the "Revel Casino Resort"), which was conceived and constructed to be a unique and luxurious Atlantic City entertainment offering.  The Revel Casino Resort was intended to, and does, offer a distinct array of unique, premium amenities intended to attract gaming, group business and resort customers.

With Morgan Stanley as the initial financier, construction of the Revel Casino Resort began in 2007.  After several years of delays and in the wake of the financial crisis, however, Morgan Stanley abandoned the project and wrote down 98% the approximately $1.25 billion that had been invested in the property.  On February 17, 2011, Morgan Stanley sold Revel Entertainment Group, LLC ("REG"), NB Acquisition, LLC ("NB Acquisition") and Revel Atlantic City, LLC ("Revel Atlantic City") to an investor group headed by Kevin DeSanctis, then chief executive officer of Revel and the project's developer, for approximately $30 million (the "Acquisition").  The lead debtor in these Chapter 11 Cases, Revel, along with Revel AC, LLC

were created to complete the Acquisition. Thereafter, the Company and its new owners raised approximately $1.15 billion in initial financing from a group of lenders led by JPMorgan Chase Bank, N.A. ("JPMorgan") to finish development of the project.

From the Acquisition through April 2, 2012, the Company focused on completing construction of the Revel Casino Resort, which is a state of the art gaming and resort facility unlike any other in Atlantic City. The facility spans 6.2 million square feet and is located on approximately 20 acres, with 820 feet of boardwalk frontage. The Revel Casino Resort features the tallest building in Atlantic City, a sleek 47-story, 710-foot high tower. Revel's 130,000 square foot casino features more than 110 table games and approximately 2,300 slot machines.

The Revel Casino Resort's amenities currently include 1,399 rooms, outdoor facilities, retail boutiques and a wide variety of entertainment amenities, including 11 dining venues (among them three signature restaurants), two nightclubs, a dayclub, five indoor/outdoor pools, a 5,500 seat theater, 160,000 square feet of customizable conference space and a spa. The resort's outdoor amenities include a 2-acre landscaped rooftop deck with outdoor pools, cabanas, fire pits and a "pine grove" (known as the Sky Garden) with over 30,000 live trees and plants.

Construction of the Revel Casino Resort provided over 2,000 construction jobs in New Jersey and, even prior to building operations, the Debtors extended job offers to approximately 800 Atlantic City residents. New Jersey's Economic Development Authority recognized the Company's important contribution to the struggling local economy when, on February 11, 2011, it awarded the Company a $261.4 million Economic Redevelopment and Growth Grant (the "ERG Grant").

The Revel Casino Resort opened for business on April 2, 2012, a week after the New Jersey Casino Control Commission granted Revel AC, Inc. a gaming license. The Debtors employ approximately 3,140 employees to operate the Revel Casino Resort. Additionally, the Debtors' retail, food and beverage partners employ hundreds of employees who also work in the Revel Casino Resort.

## B.    Revel's Challenges and the 2013 Restructuring

The Atlantic City casino business is highly seasonal; the May-September time frame is critical to success. Thus, the Revel Casino Resort opened in April 2012 with high hopes, expecting that the facility's differentiated service offerings would be able to surmount the sluggish macroeconomic conditions plaguing Atlantic City resort and casino market. Unfortunately, its debt burden, when combined with the challenges facing the Atlantic City casino market and certain issues unique to the Revel Casino Resort, impeded success from the beginning.

First, the general contractor hired to manage the construction of the Revel Casino Resort made a series of significant budgeting errors that were not disclosed until right before the April 2012 opening. The Revel Casino Resort, long believed to be coming along on (if not well under) budget, was in fact significantly over budget. As a result, among other things, the Company spent over $100 million in construction costs more than had been expected. Thus, the Company

was forced to secure additional funding to complete the project and finance operations that would not have been necessary had the general contractor stayed on budget.[2]

Second, the Company was unable to raise the additional funds needed to construct a dedicated central utility plant (the "CUP") to provide the energy required by the Revel Casino Resort. Accordingly, REG contracted with a third party, ACR Energy Partners, LLC ("ACR"),[3] to build and operate the CUP on certain real property leased from the Company. To build the CUP, ACR contributed its own capital and raised approximately $118.6 million of 11.67% bonds to finance 75% of the construction costs. In turn, REG agreed to purchase hot and chilled water, electric and other power exclusively from ACR for at least 20 years pursuant to that certain Second Amended and Restated Energy Sales Agreement dated April 11, 2011 (the "ESA"). Under this arrangement, the Company is forced not only to pay for the actual utilities services provided by ACR, but also for (i) the operation and maintenance of the CUP, (ii) the cost of servicing ACR's bond debt, and (iii) a guaranteed return of 15% (increasing to 18% at year 6) to ACR for its equity investment. Thus, pursuant to the ESA, the Company is required to pay fixed costs of over $2 million per month over and above its variable monthly energy costs.

Third, while the resort and convention center segments performed reasonably well in the first year of the Revel Casino Resort's operations, the casino segment struggled to attract the traditional Atlantic City patron who does not stay overnight. Among other things, the property lacked a player's club and affordable food and beverage options, which are important to attract that critical segment of the customer base. Additionally, the casino segment experienced start-up issues in the marketing and technology areas.

Finally, the devastation of Hurricane Sandy exacerbated the situation. The Revel Casino Resort was forced to close for six days, from October 28 to November 3, 2012, after Governor Chris Christie declared a state of emergency in Atlantic County and ordered a mandatory evacuation. The lost revenue from the closure, along with the prolonged impact on travel to Atlantic City and the financial hardship experienced by residents in the area, significantly impacted the Company's earnings.

Collectively, these challenges had a severe negative impact on the Company's liquidity, forcing the Company to seek additional financing. Accordingly, first in August, 2012 and later in December of 2012, the Company incurred additional secured financing of approximately $250 million, hoping such amount would bridge operations over to the 2013 summer season and profitability. Unfortunately, by early 2013 the Company again lacked sufficient liquidity to continue operations or service its outstanding debt obligations.

Given the extent of the Company's then outstanding debt obligations, the ongoing struggles of the Revel Casino Resort and the fact that the liquidity provided by the 2012 loans was rapidly decreasing, in early 2013 the Company's lenders were not amenable to further advances of credit in the absence of a comprehensive balance sheet restructuring. The Company thus began restructuring discussions with their stakeholders in early February 2013, which

---

[2]     Revel is currently engaged in litigation with the general contractor that is responsible for these problems.

[3]     ACR is a wholly owned subsidiary of Energenic, LLC, which is a joint venture between South Jersey Industries and DCO Energy LLC.

discussions led to the execution of a restructuring support agreement and the successful solicitation of votes approving a prepackaged plan of reorganization (the "2013 Plan").

The Company filed cases (the "2013 Cases") under chapter 11 of the Bankruptcy Code thereby commencing chapter 11 cases (the "2013 Cases") on March 25, 2013.[4] Less than two months later, on May 15, 2013, the 2013 Plan was confirmed and became effective on May 21, 2013.[5]

Under the 2013 Plan, (i) the Company reduced its funded debt by more than 82%, from approximately $1.5 billion to approximately $270 million on the effective date of the 2013 Plan, (ii) the Company reduced annual interest expense by over 68%, from approximately $100 million to approximately $30 million, (iii) holders of approximately $923 million of then outstanding first lien debt exchanged such debt for 100% of the equity in the reorganized company, (iv) certain holders of then outstanding first lien debt provided exit facilities consisting of a $75 million revolver, pursuant to the Original First Lien Credit Agreement (as defined below), and a $260 million term loan, pursuant to the Second Lien Credit Agreement (as defined below), (v) all unsecured claims and certain secured claims were unimpaired and (vi) the Debtors rights to the ERG Grant were preserved, subject to certain contingent payment rights granted under the 2013 Plan.

## C.    Capital and Debt Structure Following 2013 Cases

### 1.    First Lien Secured Financing

On May 21, 2013, the Debtors entered into that certain first lien credit agreement (the "Original First Lien Credit Agreement") by and among Revel AC, Inc., as borrower, the remaining Debtors, as guarantors, certain lenders party thereto, as lenders, and JPMorgan Chase Bank, N.A., as administrative and collateral agent (in such capacity, the "First Lien Agent"). The Original First Lien Credit Agreement provided for a $75 million revolving commitment with an interest rate of LIBOR plus 6.00% payable in cash and a maturity date of May 21, 2017. The obligations under the Original First Lien Credit Agreement were secured by a first priority security interest in substantially all of the Debtors' assets, other than certain excluded property and subject to certain permitted liens.

The Original First Lien Credit Agreement was amended on November 8, 2013, when the Debtors entered into that certain amended and restated first lien credit agreement (as amended from time to time, the "First Lien Credit Agreement") by and between Revel AC, Inc., as borrower, the remaining Debtors, as guarantors, certain lenders party thereto, as lenders (in such capacity, the "First Lien Lenders"), and the First Lien Agent. Pursuant to the First Lien Credit Agreement, the amount of the revolving commitment was increased from $75 million to $100 million, and converted into two tranches consisting of (i) tranche A-1, having a principal amount of $25 million and an interest rate of LIBOR plus 6.00% payable in cash, and (ii) tranche A-2, having a principal amount of $75 million and an interest rate of LIBOR plus 6.50% payable in cash. The First Lien Credit Agreement also included a new tranche B term loan facility having a

---

[4]    SI LLC was not a debtor in the 2013 Cases.

[5]    The 2013 Cases were closed on March 31, 2014.

principal amount of $50 million with an interest rate of LIBOR plus 9.00% payable in kind in the form of an increase of the outstanding principal amount.  The obligations under the First Lien Credit Agreement mature on June 30, 2015 and are secured by a first priority security interest in substantially all of the Debtors' assets, other than certain excluded property and subject to certain permitted liens.

As of the Petition Date, the amounts outstanding under the First Lien Credit Agreement total approximately $137 million in the aggregate.

### 2.      Second Lien Secured Financing

On May 21, 2013 the Debtors entered into that certain second lien credit agreement (as amended from time to time, the "Second Lien Credit Agreement") by and among Revel AC, Inc., as borrower, the remaining Debtors, as guarantors, certain lenders party thereto, as lenders (in such capacity, the "Second Lien Lenders" and, together with the First Lien Lenders, the "Secured Lenders"), and Wilmington Trust, N.A., as administrative and collateral agent (the "Second Lien Agent").  The Second Lien Credit Agreement provides for a senior secured second lien term loan facility in an aggregate principal amount of $275 million with an annual interest rate of either (i) 12.5%, if paid in cash, or (ii) 14.5%, if paid-in-kind.  The obligations under the Second Lien Credit Agreement mature on May 21, 2018 and are secured by a second-priority security interest in substantially all of the Debtors' assets, other than certain excluded property and subject to certain permitted liens.

As of the Petition Date, the amounts outstanding under the Second Lien Credit Agreement total approximately $310 million in the aggregate.

### 3.      Equity

Revel AC, Inc. is a privately held Delaware company with one class of common stock and approximately 8 million issued and outstanding shares.  Each of the remaining Debtors is a Delaware or New Jersey limited liability company wholly owned, directly or indirectly, by Revel.  NB Acquisition also owns 50% of the equity in Block 73, LLC, a New Jersey limited liability company.

### D.      Events Precipitating the Commencement of these Chapter 11 Cases

Despite the significant debt reduction realized after the 2013 Cases, the Debtors still projected operating losses through 2013.  Accordingly, the Debtors immediately began a series of aggressive changes designed to stem their continued losses and progress towards profitability.  The Debtors believed that profitability depended upon reduced operational costs and a shifting of their primary focus from sophisticated, high-end, leisure related services towards the Debtors' gaming operations.

First, in addition to transitioning to a new management team and board of directors following the 2013 Cases, the Debtors made significant changes to their employee composition.  They reduced employee headcount by approximately 18% and transitioned towards a workforce with more flexible scheduling opportunities.  Such changes provided the Debtors significant cost

savings, and helped position the Debtors' new management team to tackle the operational challenges facing the Debtors.

Second, to address certain perceived weaknesses in their marketing efforts, the Debtors brought in a marketing consultant to evaluate such efforts. Although the Debtors previously lacked an online marketing presence and had no sales through wholesalers, such as online hotel reservation websites, they have since made substantial improvements in those areas over the past year. As a result the Debtors have almost doubled occupancy rates over the past year.

Third, the Debtors recognized that their nightlife and entertainment booking segment needed improvements, as evidenced by such segment's approximately $14 million in losses during calendar year 2012. In response, the Debtors terminated their engagement with their previous talent buyer and established an in-house talent buying program to handle the Debtors' entertainment operations. This change reduced costs and dramatically improved the Debtors' performance in their nightlife and entertainment segment.

Fourth, the Debtors brought in The Fine Point Group ("Fine Point"), a casino and gaming consultant, to analyze the Debtors' casino operations and suggest ways to accelerate growth. With Fine Point's assistance, the Debtors aggressively marketed the Revel Casino Resort during the summer of 2013, including marketing strategies such as the "You Can't Lose" promotion during July 2013 and the "Gamblers Wanted" taglines. These efforts aided the Debtors in generating increased revenue and market share and substantially improved the Debtors' customer database, an important competitive driver in the casino industry.

Finally, and perhaps most importantly, the Debtors implemented significant modifications to the Revel Casino Resort designed to improve their casino operations. These changes included, among other things, (i) installing filtration systems on the casino floor to service designated smoking areas, (ii) investing in signage for the casino, (iii) adding a new beach front day club unique to the Atlantic City market, (iv) removing an underperforming poker room from the casino, (v) adding an upscale player's lounge to the casino, (vi) increasing the availability and variety of affordable food options and (vii) improving the casino's rewards program. Collectively, these changes have led to steady growth in the Debtors' casino revenue and increase in market share.

The Debtors hoped that these substantial and comprehensive improvements would lead to a successful summer season that would leave the Debtors well on their way towards profitability and long term stability. Unfortunately, despite the reduction in operating losses realized by these changes, the Debtors continued to suffer under the weight of the burdensome ESA obligations and experienced certain severance, litigation and other non-ordinary expenses following the 2013 Cases. As a result, the Debtors were again faced with limited liquidity by late 2013 and the Debtors were forced to seek additional financing from the Secured Lenders.

Following extensive arms' length negotiations, in November 2013 the Debtors and the Secured Lenders agreed to the execution of the First Lien Credit Agreement and certain amendments to the Second Lien Credit Agreement, providing the Debtors with approximately

$75 million of additional liquidity.[6]  However, the Secured Lenders imposed a number of restrictive covenants on the Debtors in connection with these amendments which restricted the Debtors' ability to fully access the additional liquidity.  Importantly, the First Lien Lenders also required, as a condition to the First Lien Credit Agreement, that the Debtors execute and deliver that certain letter agreement dated as of November 8, 2013 (the "Letter Agreement") by and between Revel and the First Lien Agent, whereby the Debtors were required to immediately begin a strategic process.

Pursuant to the Letter Agreement, the Debtors were required to engage an investment banker of nationally recognized standing by no later than five days following the execution of the First Lien Credit Agreement so that such banker could assist the Debtors in pursuing a sale, merger, equity investment or other similar transaction.  Accordingly, the Debtors retained Moelis & Company ("Moelis") as their investment banker, after which Moelis immediately began marketing the company.

For several months and as Moelis's marketing process continued, the Debtors' management, together with Moelis and the Debtors' other advisors, facilitated due diligence with potential buyers and engaged in negotiations with parties that submitted letters of interest.  Although the Debtors made substantial progress with certain parties, including engaging in prolonged negotiations over an asset purchase agreement and postpetition financing with one such party, the Debtors were unable to reach a deal with any of these potential buyers prior to the Petition Date.

While the Debtors' prepetition marketing process did not result in a prepetition sale or stalking horse purchaser, the Debtors believe that the expressions of interest received and negotiations conducted during such process are promising indications of the value of the Debtors' assets.   The Debtors further believe that renewed marketing efforts pursuant to court-approved bid procedures during these Chapter 11 Cases, followed by a public auction before this Court, will lead to a sale of substantially all of the Debtors' assets that will maximize the value of the Debtors' assets.

## E.   Management

As of the Petition Date, the Debtors' officers were:

***Scott Kreeger, President and Chief Operating Officer of Revel AC, Inc.***  Mr. Kreeger has been with Revel since October 2013.  Before joining Revel AC, Inc., Mr. Kreeger served as Senior Vice President of Corporation Operations CMO/CIO at Fertitta Entertainment, where he was responsible for all technology initiatives and operations.   Mr. Kreeger has also held a number of management positions at Station Casinos, including President of Native American Gaming in which position he oversaw the company's tribal gaming initiatives as well as the luxury resort division.

---

[6]      The Debtors' Secured Lenders executed a number of additional amendments to provide the Debtors continued access to the availability under the First Lien Credit Agreement and allow for continued funding of operating losses.

***Theresa Glebocki, Senior Vice President and Chief Financial Officer of Revel AC, Inc.***
Ms. Glebocki joined Revel AC, Inc. in 2007 as Vice President of Finance and led the pre-opening processing, including development of internal control procedures, operations and accounting processes, financial modeling and software and product acquisition.   Since July 2013, she has served as Revel AC, Inc.'s Chief Financial Officer.  Prior to joining Revel AC, Inc., Ms. Glebocki served as Vice President of Finance of Trump Plaza Associates from 2000 to 2007 after having held various financial positions at Trump Entertainment since 1991.

***Loretta Pickus, Senior Vice President and General Counsel of Revel AC, Inc.***  Ms. Pickus has held her current title since July 2013.  She has over twenty-five (25) years of executive experience in the casino entertainment industry and has broad expertise in strategic corporate planning, administration of legal affairs and governmental compliance.  Before joining Revel AC, Inc., Ms. Pickus served as Vice President of Trump Entertainment Resorts, where she was Chief Legal Officer of Trump Taj Mahal Casino Resorts.

## VI.

## SELECTED FINANCIAL INFORMATION

Consolidated, unaudited annual financial information for the Debtors is attached hereto as Exhibit "C".

## VII.

## THE CHAPTER 11 CASES

### A.   Filing of the Petitions and Debtor in Possession Status

On June 19, 2014, the Debtors filed the Petitions.  Pursuant to sections 1101, 1107 and 1108 of the Bankruptcy Code, the Debtors have continued to operate their businesses and remain in possession of their property as "debtors in possession."

### B.   First Day Pleadings and Orders

On or about the Petition Date, the Debtors filed the following motions with the Bankruptcy Court: motion establishing procedures for utility companies to request adequate assurance of payment; motion authorizing payment of employee wages; motion authorizing continued use of cash management system, bank accounts and business forms and waiving investment and deposit requirements; motion authorizing payment of prepetition trust fund taxes; motion authorizing payment of insurance premiums in the ordinary course and maintaining insurance program; motion authorizing continued customer programs; motion authorizing payment of certain critical vendors; motion approving debtor-in-possession financing; and a motion approving interim compensation procedures.  A hearing was held in the Bankruptcy Court on June 20, 2014 on the above-referenced motions and orders granting such motions were entered by the Bankruptcy Court on or about June [__], 2014.

18

C.      **Appointment of Chief Restructuring Officer.**

Shaun Martin of Winter Harbor, LLC ("Winter Harbor"), was appointed as the Chief Restructuring Officer of the Debtors, and Winter Harbor was retained by order of the Bankruptcy Court to assist Mr. Martin in providing restructuring services.

D.      **Employment of Professionals for the Debtors**

Pursuant to employment applications filed with the Bankruptcy Court and subsequent orders entered by the Bankruptcy Court, the Debtors have employed the following professionals to assist them with the administration of the Chapter 11 Cases: (i) White & Case LLP as co-counsel; (ii) Fox Rothschild LLP as co-counsel; (iii) Moelis as investment banker; and (iv) AlixPartners, LLP, as Solicitation Agent and Claims Agent.  All professionals retained by the Debtors have been, or will be, paid their allowed fees and expenses incurred on behalf of the Debtors pursuant to orders entered by the Bankruptcy Court.

E.      **Appointment of the Committee.**

On [__], the Office of the United States Trustee appointed the Committee consisting of [____].  The Committee employed the law firm of [___] to serve as its general bankruptcy counsel, [____], to serve as its bankruptcy co-counsel and [___] as its financial advisors and consultants.

F.      **Continued Operations.**

Since the Petition Date, the Debtors have continued to operate their business as debtors in possession in the ordinary course.

G.      **Exclusivity**

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan; and (b) to solicit acceptances of their timely filed Plan before other parties in interest are permitted to file plans.  The Debtors filed the Plan and this Disclosure Statement on June 19, 2014.  Accordingly, no other party may file a plan unless the Solicitation Period expires or the Bankruptcy Court orders otherwise.

H.      **Claims Bar Date.**

On June 19, 2014, the Debtors filed a motion for entry of an order (i) establishing bar dates for filing proofs of claim for prepetition claims against the Debtors, (ii) establishing ramifications for failure to comply therewith, (iii) approving electronic proof of claim system and form of proof claim and (iv) approving form and manner of bar date notice and publication notice.  Specifically, the Debtors have requested that the Bankruptcy Court enter an order establishing the following bar dates: (i) **August 4, 2014 at 5:00 p.m. Eastern Time** as the deadline for each person or entity (other than governmental units, as defined in Section 101(27) of the Bankruptcy Code) to file proofs of claim for prepetition claims against the Debtors; and (ii) **December 16, 2014 at 5:00 p.m. Eastern Time** as the deadline for governmental units to file proofs of claim.

## VIII.

## POTENTIAL LITIGATION

### A.    Avoidance Actions.

The Plan provides that the Plan Trust will retain and be authorized to pursue all claims of the Debtors under sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code after the Effective Date of the Plan for the benefit of the Debtors' Estates, other than those transferred to the Buyer pursuant to the terms of the Asset Purchase Agreement.

### B.    Other Estate Causes of Action.

The Plan provides that the Plan Trust will retain and be authorized to pursue all other claims and Causes of Action of the Debtors that were not acquired by the Buyer pursuant to the Asset Purchase Agreement.

### C.    Retention of Litigation Claims.

Under the Plan, the Plan Trustee will be authorized to prosecute all such claims on behalf of the Plan Trust, subsequent to the Effective Date and will determine whether to bring, settle, release, compromise or enforce such claims in accordance with the Plan and the Plan Trust Agreement.

### D.    Pending Litigation.

As of the Petition Date, the following material actions were pending: (i) Boyd et al. v. Revel Entertainment Group, LLC et al., Case No. No. 13-cv-05965 before the United States Bankruptcy Court for the Southern District of New York; (ii) IDEA Boardwalk, LLC v. Revel AC, Inc. (In re Revel AC, Inc.), Adv. Pro. No. 13-02013 before the United States Bankruptcy Court for the District of New Jersey; (iii) Stone Concrete, Inc. v. Revel Entertainment Group, LLC and Revel Atlantic City, LLC, Case No. ATL–L 5056-10 before the Superior Court of New Jersey; (iv) Helmark Steel, Inc. v. Revel Entertainment Group, LLC et al, Case No. ATL–L-120-13 before the Superior Court of New Jersey; (v) Imperial Woodworking Enterprise, Inc., et al. v. Revel Atlantic City, LLC, et al., Case No. ATL–L-1207-13 before the Superior Court of New Jersey; (vi) Philadelphia D&M, Inc. v. Revel Entertainment Group, LLC, et al., Case No. ATL–L-4902-13 before the Superior Court of New Jersey; (vii) Tishman Construction Company of New Jersey v. Revel Entertainment Group, LLC, Case No. ATL–L-154-14 before the Superior Court of New Jersey; and (viii) Ravel  Hotel LLC v. Revel Entertainment Group LLC, Case No. 1:13-CV-02581 before the United States District Court for the District of New Jersey.  A complete list of actions pending as of the Petition Date is contained in the Debtors' Schedules.

# IX.

# THE CHAPTER 11 PLAN

As a result of the Chapter 11 Cases and through the Plan, the Debtors submit that creditors will obtain a greater recovery under the Plan than any recovery that would be available if the Debtors' Assets were liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit "A" and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

A.    **Plan Treatment of Claims and Equity Interests.**

Classified Claims against and Equity Interests in the Debtors shall be treated under the Plan as follows:

1.    **Class 1 – Priority Claims**

Each holder of an Allowed Priority Claim against the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, except as provided in sections 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Priority Claim shall be paid on the Plan Distribution Date in full and in Cash.

2.    **Class 2 – Non-Lender Secured Claims**

Each holder of an Allowed Non-Lender Secured Claim against the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Non-Lender Secured Claim in respect of such Claim shall be fully reinstated and retained, except as provided in sections 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Non-Lender Secured Claim shall be paid on the Plan Distribution Date in full and in Cash.

3.    **Class 3 – First Lien Lender Claims**

Subject to and in accordance with the First Lien Intercreditor Rights, each holder of an Allowed First Lien Lender Claim against the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed First Lien Lender Claim, its Pro Rata Share of the Available Proceeds which constitute proceeds of the First Lien Collateral until such Allowed First Lien Lender Claim is paid in full and in Cash.

4.    **Class 4 – Second Lien Lender Claims**

Subject to the prior payment in full and in Cash of all Allowed First Lien Lender Claims and in accordance with the Second Intercreditor Rights, each holder of an Allowed Second Lien Lender Claim against the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed Second Lien Lender Claim, its Pro Rata Share of the Available Proceeds which

constitute proceeds of the Second Lien Collateral until such Allowed Second Lien Lender Claim is paid in full and in Cash.

### 5.    Class 5 – Unsecured Claims

Subject to the prior payment in full and in Cash of all Allowed Non-Lender Secured Claims and Allowed Lender Claims, each holder of an Allowed Unsecured Claim against the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed Unsecured Claim, its Pro Rata Share of the Available Proceeds.

### 6.    Class 6 – Revel Equity Interests

On the Effective Date, all Equity Interests in Revel AC, Inc. shall be cancelled, and each holder of an Equity Interest in Revel AC, Inc. shall neither receive nor retain any property under the Plan on account such interest.

### 7.    Class 7 – Other Equity Interests

On the Effective Date, each holder of an Allowed Equity Interest in any Debtor other than Revel AC, Inc. shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles such holder in respect of such Equity Interest shall be fully reinstated and retained on and after the Effective Date.

## B.    Consummation of the Sale

On the Effective Date and to the extent not already consummated during the Chapter 11 Cases pursuant to section 363 of the Bankruptcy Code, the transactions required to be consummated under the Asset Purchase Agreement and any documents entered into in connection therewith shall be incorporated into, and shall be deemed part of, the Plan and shall be entitled to all of the rights, benefits and protections of the Bankruptcy Code with respect thereto, including, without limitation, those set forth in Section 15.9 of the Plan.  After the Confirmation Date, the Debtors shall be authorized to enter into non-material amendments to the Asset Purchase Agreement or any other documents in furtherance of the transactions contemplated thereby without the need for further notice or Bankruptcy Court approval.

## C.    Sources of Cash for Plan Distributions.

All Cash necessary to make payments and Plan Distributions shall be obtained from (i) the Debtors' existing Cash balances, (iii) the liquidation of the Debtors' Assets and Causes of Actions and/or (iv) the proceeds of the Sale.  The Plan Trustee shall make all Plan Distributions.

## D.    Plan Trust

### 1.    Execution of the Plan Trust Agreement

The Plan Trust Agreement, in a form reasonably acceptable to the Debtors and the Committee, shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Plan Trust and the beneficial interests therein, which shall be for the

benefit of holders of Allowed Claims. Article IX of the Plan sets forth certain of the rights, duties and obligations of the Plan Trustee. In the event of any conflict between the terms of Article IX of the Plan and the terms of the Plan Trust Agreement, the terms of the Plan Trust Agreement shall govern.

### 2.      Purpose of Plan Trust

The Plan Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

### 3.      Vesting of Assets in the Plan Trust; Dissolution of the Debtor.

On the Effective Date, the authority, power and incumbency of the Debtors shall terminate, and vest in the Plan Trustee, and all Assets of the Debtors not sold to the Buyer shall become assets of the Plan Trust.

### 4.      Governance of Plan Trust.

The Plan Trust shall be governed and administered by the Plan Trustee, subject to the supervision of the Oversight Committee, as provided under the Plan and the Plan Trust Agreement. Notwithstanding anything to the contrary herein, the Oversight Committee shall act in furtherance of, and consistent with, the purpose of the Plan Trust and shall act in the best interests of the beneficiaries of the Plan Trust.

### 5.      Role of the Plan Trustee.

In furtherance of and consistent with the purpose of the Plan Trust and the Plan, the Plan Trustee shall (i) be authorized to take all steps necessary to wind down the affairs of the Debtors, (ii) have the power and authority to hold, manage, sell and distribute the assets of the Plan Trust to the holders of Allowed Claims, (iii) hold the assets of the Plan Trust for the benefit of the holders of Allowed Claims, (iv) have the power and authority to hold, manage, sell and distribute Cash or non-Cash  assets of the Plan Trust obtained through the exercise of its power and authority, (v) have the power and authority to prosecute and resolve, in the name of the Debtors and/or the name of the Plan Trustee, the Estates' Avoidance Actions and Causes of Action, (vi) administer the Non-Lender Secured Reserve and release amounts therefrom to the holders of Claims as Plan Distributions as appropriate when Contested Non-Lender Secured Claims become Allowed, Disallowed or are otherwise resolved by settlement, (vii) have the power and authority to perform such other functions as are provided in the Plan and (viii) have the power and authority to administer the closure of the Chapter 11 Cases. The Plan Trustee shall be responsible for all decisions and duties with respect to the Plan Trust and its assets. In all circumstances, the Plan Trustee shall act in the best interests of all beneficiaries of the Plan Trust and in furtherance of the purpose of the Plan Trust.

The Plan Trustee may be removed by the Oversight Committee with the approval of the Bankruptcy Court upon application for good cause shown. In the event of the resignation, removal, death or incapacity of the Plan Trustee, the Oversight Committee shall designate another person to become the Plan Trustee and thereupon the successor Plan Trustee, without

any further action, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Plan Trustee.

### 6.      Cash

The Plan Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

### 7.      Compensation of the Plan Trustee

The Plan Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings.

### 8.      Retention of Professionals by the Plan Trustee

The Plan Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Plan Trustee on such terms as the Plan Trustee deems appropriate without Bankruptcy Court approval.  The Plan Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

### 9.      Noncertificated Plan Trust Interests.

The beneficial interests in the Plan Trust shall not be certificated, except as otherwise provided in the Plan Trust Agreement.

### 10.      Dissolution of the Plan Trust.

The Plan Trustee and the Plan Trust shall be discharged or dissolved, as the case may be, at such time as (i) all assets of the Plan Trust have been liquidated and (ii) all distributions required to be made by the Plan Trustee under the Plan have been made, but in no event shall the Plan Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Plan Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Plan Trust.

### 11.      Securities Exempt

The issuance of any beneficial interests of the Plan Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

# X.

## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.     Overview

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a liquidation of the debtor's assets.  In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to holders of impaired Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible."  The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.  **The Debtors believe that the Plan satisfies all applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors' test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a chapter 11 plan for the bankruptcy court to determine that the class has accepted the plan.  Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class.  Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote.  Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  A class is "impaired" if the legal, equitable or contractual rights associated with the claims or equity interests of that

class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. **Class 1 – Priority Claims, Class 2 – Non-Lender Secured Claims and Class 7 – Other Equity Interests are unimpaired, and Class 6 – Revel Equity Interests will not receive a distribution under, and is deemed to reject, the Plan. Accordingly, Class 3 – First Lien Lender Claims, Class 4 – Second Lien Lender Claims and Class 5 – Unsecured Claims are the only classes entitled to vote on the Plan**.

The bankruptcy court also may confirm a chapter 11 plan even though fewer than all of the classes of impaired claims and equity interests accept such plan. For a chapter 11 plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan has been structured so that it will satisfy the foregoing requirements as to the rejecting class of Equity Interests, and can therefore be confirmed over the objection of Class 6 – Revel Equity Interests.

**B.**     **Confirmation of the Plan**

      **1.**     **Elements of Section 1129 of the Bankruptcy Code**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

      a.     The Plan complies with the applicable provisions of the Bankruptcy Code.

      b.     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

c.      The Plan has been proposed in good faith and not by any means proscribed by law.

d.      Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

e.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

f.      With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

g.      In the event that the Debtors do not move to confirm the Plan non-consensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

h.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full, in Cash, on the Effective Date and Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the allowed amount of such Tax Claims.

i.      At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

j.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any other successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

k.      All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtors believes that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

2.      **Acceptance**

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims.  Each class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a class of Equity Interests, by at least two-thirds in amount of the Allowed Equity Interests of each class of Equity Interests.

3.      **Best Interests of Creditors Test**

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtors in a chapter 7 liquidation case.  The proceeds that would be available for satisfaction of impaired claims against and Equity Interests in the Debtors would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtors and the cash held by the Debtors at the time of the commencement of the liquidation case.  Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 cases.  Whereas the Plan Trustee and its counsel has the background and familiarity with the remaining assets to be liquidated to realize the most money for the costs to be incurred to complete the process, a chapter 7 trustee and the persons it employs will need time to develop the necessary industry and debtor specific knowledge necessary to assist the chapter 7 trustee examine and distribute the Debtors' assets.  In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation

proceeds before the balance of those proceeds would be made available to pay impaired Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtors (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the additional costs associated with the appointment of the chapter 7 trustee and (ii) the erosion in value of assets in chapter 7 cases in the context of the expeditious liquidation required under chapter 7, the Debtors have determined that confirmation of the Plan will provide each holder of an impaired Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 4. Feasibility

The Bankruptcy Code conditions confirmation of a chapter 11 plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the Plan Trustee's capacity to service its obligations under the Plan. Based upon their analysis, the Debtors submit that the Plan Trustee will be able to make all payments required to be made under the Plan.

## C. Cramdown

In the event that any impaired class does not accept the Plan, the Debtors nevertheless may move for confirmation of the Plan. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.

### 1. No Unfair Discrimination

A chapter 11 plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or Equity Interests. The Debtors believe that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Equity Interests that are similarly situated, if any, and no class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Equity Interests in such class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

### 2. Fair and Equitable Test

The Bankruptcy Code establishes different "fair and equitable" tests for classes of secured claims, unsecured claims and equity interests as follows:

    **a.**    ***Secured Claims.***  Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

    **b.**    ***Unsecured Claims.***  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

    **c.**    ***Equity Interests.***  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (A) the fixed liquidation preference or redemption price, if any, of such stock or (B) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

BECAUSE CLASS 6 – REVEL EQUITY INTERESTS IS DEEMED TO REJECT THE PLAN, IF CLASS 3 – FIRST LIEN LENDER CLAIMS, CLASS 4 – SECOND LIEN LENDER CLAIMS OR CLASS 5 – UNSECURED CLAIMS ACCEPTS THE PLAN, THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN PURSUANT TO THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE.

**D.**    <u>**Effect of Confirmation**</u>

    Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

**XI.**

<u>**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**</u>

    The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Internal Revenue Code, as in effect on the date of this Disclosure Statement, and on United States Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively

and could affect the tax consequences described below.  There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder of an Allowed Claim or Equity Interest.  The tax treatment of a holder of an Allowed Claim or Equity Interest, as the case may be, may vary depending upon such holder's particular situation.  The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and holders of an Allowed Claim or Equity Interest.  This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services, or persons who are not United States persons (as defined in the Internal Revenue Code).

EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE.  THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES.  THIS DESCRIPTION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN.  TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims.**

     1.     **General Tax Considerations for Holders of Allowed Claims**

     a.  *Gain or Loss*

In general, a holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the amount realized by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim representing accrued but unpaid interest).

Where a gain or loss is recognized by a holder in respect of its Allowed Claim, the character of such gain or loss (as long-term or short-term capital, or ordinary) will be determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder and how long it had been held, whether such Claim was originally issued at a discount or acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

     b.  *Distributions in Discharge of Accrued Interest*

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan generally is binding for U.S. federal income tax purposes. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and OID for tax purposes.

     c.  *Bad Debt Deduction and Worthless Security Deduction*

The U.S. federal income tax consequences of the Plan to holders of Allowed Claims will depend, in part, on whether the indebtedness underlying their Claims constitutes securities for the purposes of section 165(g) of the Internal Revenue Code. For purposes of section 165(g) of the Internal Revenue Code, a Claim constitutes a "security" if it is: a share of stock in a corporation; a right to subscribe for, or to receive, a share of stock in a corporation; or a bond,

debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.

A holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Internal Revenue Code who receives, pursuant to the Plan, an amount of consideration that is less than such holder's tax basis in the claim in exchange of that claim, may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Internal Revenue Code, or may be entitled to a loss under section 165(a) of the Internal Revenue Code in the year of receipt.  A holder of stock or securities, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Internal Revenue Code.  The rules governing the timing and amount of such deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed.  Any such loss would be limited to the holder's tax basis in the indebtedness or equity interest underlying its claim.  Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to claim such deductions.

### d. *Market Discount*

If a holder of an Allowed Claim purchased the underlying security or debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes.  Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date should be treated as ordinary income to the extent of any market discount accrued on the underlying securities or debt obligation by the holder on or prior to the date of the exchange.

### e. *Information Reporting and Withholding*

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding).  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, Treasury Regulations promulgated in early 2003 require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, the following: (a) certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds; and (b) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year.  These categories are very broad; however, there are numerous exceptions.  Holders are urged to consult their tax advisors regarding these regulations and

whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

2.    **Additional Tax Considerations for Holders of Allowed Class 3 – First Lien Lender Claims, Class 4 – Second Lien Lender Claims and Class 5 – Unsecured Claims**

Pursuant to the Plan, each holder of an Allowed Class 3 – First Lien Lender Claim, Allowed Class 4 – Allowed Second Lien Lender Claim and Allowed Class 5 – Unsecured Claim will receive, on the Plan Distribution Date, its Pro Rata Share of the Available Proceeds, in each case subject to and in accordance with the Plan.  See "The Chapter 11 Plan – Treatment of Classified Claims and Equity Interests."  In general, a holder of an Allowed Claim in such classes will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim representing accrued but unpaid interest).

Holders of Allowed Class 3 – First Lien Lender Claims, Allowed Class 4 – Allowed Second Lien Lender Claims and Allowed Class 5 – Unsecured Claims will receive a beneficial interest in the Plan Trust, entitling them to share in any proceeds from its assets.  However, for federal income tax purposes, because the Plan Trust has been structured to qualify as a "grantor trust," each holder of an Allowed Class 3 – First Lien Lender Claim, Allowed Class 4 – Allowed Second Lien Lender Claim and Allowed Class 5 – Unsecured Claim will be treated as directly receiving, and as a direct owner of, its allocable percentage of the assets of the Plan Trust. Accordingly, each holder should take into account in determining the "amount realized" in respect of its Claim its share of any cash and the fair market value of its undivided interest in the other underlying assets of the Plan Trust (subject to any liabilities assumed by the Plan Trust to which such assets are subject) as if received and held directly.  As soon as reasonably practicable, the Plan Trustee will make a good faith valuation of the assets of the Plan Trust, and all parties must consistently use such valuation for all federal income tax purposes.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Any amount a holder receives following the Effective Date as a distribution in respect of an interest in the Plan Trust should not be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's interest in the Plan Trust.  See "Tax Treatment of the Plan Trust".

Where gain or loss is recognized by a holder in respect of its Allowed Class 3 – First Lien Lender Claims, Allowed Class 4 – Allowed Second Lien Lender Claims or Allowed Class 5 – Unsecured Claims, the character of such gain or loss (as long-term or short-term capital, or ordinary) will be determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder and how long it had been held, whether such Claim was originally issued at a discount or acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

3.     **Additional Tax Considerations for Holders of Allowed Class 6 – Revel Equity Interests**

Pursuant to the Plan, on the Effective Date, all Class 6 – Revel Equity Interests will be canceled, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Class 6 – Revel Equity Interests.  A holder of a Class 6 – Revel Equity Interests will generally recognize a loss in an amount equal to such holder's adjusted tax basis in such Class 6 – Revel Equity Interests. Capital losses are subject to various limitations under the Internal Revenue Code.

B.     **U.S. Federal Income Tax Consequences to Holders of Contested Claims**

To the extent a Contested Claim is allowed, payments and distributions to the holder of such claim will be made in accordance with the provisions of the Plan governing the class of Allowed Claims to which the respective holder belongs.

C.     **Tax Treatment of the Plan Trust**

Upon the Effective Date, the Plan Trust shall be established for the benefit of holders of Allowed Claims, whether Allowed on or after the Effective Date.

(i)     ***Classification of the Plan Trust***

The Plan Trust is intended to qualify as a liquidating trust for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a disregarded entity).

However, merely establishing a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Plan Trust has been structured with the intention of complying with such general criteria.  In conformity with Revenue Procedure 94-45, all parties (including the Plan Trustee and holders of Allowed Claims) are required to treat, for federal income tax purposes, the Plan Trust as a grantor trust of which the holders are the owners and grantors.  The following discussion assumes that the Plan Trust will be so respected for federal income tax purposes.  However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Plan Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the federal income tax consequences to the Plan Trust and the holders of Allowed Claims could vary from those discussed herein.

(ii)     ***General Tax Reporting by the Trust and Beneficiaries***

For all federal income tax purposes, all parties must treat the transfer of the Debtors' assets to the Plan Trust as a transfer of such assets directly to the holders (including the Contested Claims), followed by the transfer of such assets by the holders to the Plan Trust. Consistent therewith, all parties must treat the Plan Trust as a grantor trust of which such holders

are the owners and grantors.  Thus, such holders (and any subsequent holders of interests in the Plan Trust) will be treated as the direct owners of an undivided interest in the assets of the Plan Trust for all federal income tax purposes.  Pursuant to the Plan, as soon as reasonably practicable the Plan Trustee will determine the fair market value of the assets of the Plan Trust as of the Effective Date, and all parties, including the holders, must consistently use such valuation for all federal income tax purposes, such as in the determination of gain, loss and tax basis.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, each holder will be required to report on its federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Plan Trust.  See "Allocation of Taxable Income and Loss" below.  The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligations of a holder are not dependent upon the Plan Trust distributing any cash or other proceeds.  Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Plan Trust even if the Plan Trust has not made a concurrent distribution to the holder.  In general, a distribution of cash by the Plan Trust to a holder will not be taxable to the holder as such holder is regarded for federal income tax purposes as already owning the underlying assets or realizing the income.

The Plan Trustee will file with the IRS returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  The Plan Trustee will also send as soon as reasonably practicable to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

### (iii)     *Allocation of Taxable Income and Loss*

The Plan provides that allocations of Plan Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein on in the Plan) if, immediately prior to such deemed distribution, the Plan Trustee had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Plan Trust interests, taking into account all prior and concurrent distributions from the Plan Trust.  Similarly, taxable loss of the Plan Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Plan Trust.  The tax book value of the assets of the Plan Trust for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

**THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.**

**XII.**

**REGULATORY ENVIRONMENT**

**A.**     **General Governmental and Gaming Regulations**

The following description should not be construed as a complete summary of all of the regulatory requirements that the Debtors face in connection with their current gaming operations and that the Buyer will face with its contemplated gaming operations.

The ownership and operation of the Debtors' gaming facilities are subject to pervasive regulation under the laws and regulations of New Jersey.  Gaming laws generally are based upon declarations of public policy designed to protect gaming consumers and the viability and integrity of the gaming industry.  Gaming laws also may be designed to protect and maximize state and local revenues derived through taxes and licensing fees imposed on gaming industry participants as well as to enhance economic development and tourism. To accomplish these public policy goals, gaming laws establish procedures to ensure that participants in the gaming industry meet certain standards of character and fitness.  In addition, gaming laws generally require gaming industry participants to:

- demonstrate their financial stability;
- establish and maintain responsible accounting practices and procedures;
- maintain effective controls over their financial practices, including establishment of minimum procedures for internal fiscal affairs and the safeguarding of assets and revenues;
- maintain systems for reliable record keeping;
- file periodic reports with gaming regulators;
- ensure that contracts and financial transactions are commercially reasonable, reflect fair market value, and are arm's-length transactions entered into with suitable persons;
- establish procedures designed to prevent cheating and fraudulent practices; and
- establish programs to promote responsible gaming.

Typically, a state regulatory environment is established by statute and is administered by one or more regulatory agencies with broad discretion to regulate, among other things, the affairs of owners, managers, and persons with financial interests in gaming operations. Among other things, gaming authorities in New Jersey:

- adopt rules and regulations under the implementing statutes;
- interpret and enforce gaming laws, rules, and regulations;
- impose disciplinary sanctions for violations, including fines and penalties;

- review the character and fitness of participants in gaming operations and make determinations regarding their suitability or qualification for participation and licensure;
- grant licenses and other permissions for participation in gaming operations;
- collect and review reports and information submitted by participants in gaming operations; and
- review and approve certain transactions, such as acquisitions or change-of-control transactions, involving gaming industry participants, securities offerings, and debt transactions engaged in by such participants; and establish and collect fees and taxes.

The ownership and operation of casino gaming facilities in the State of New Jersey is governed by the New Jersey Casino Control Act and regulations promulgated thereunder (collectively, the "New Jersey Act") by the New Jersey Casino Control Commission (the "NJ CCC") and the New Jersey Division of Gaming Enforcement ("NJ DGE"). They collectively have comprehensive powers, including the authority to adopt rules and regulations governing all aspects of gaming, and the responsibility to grant or deny license applications and adjudicate all other matters arising under the New Jersey Act. The NJ DGE, under the Office of the State Attorney General, also has the duty and authority to conduct all necessary investigations and prosecute cases before the NJ CCC. The operation of a casino requires a casino license issued by the NJ CCC after an investigation of the qualifications of all Entities that must be found qualified in conjunction with the casino licensee or applicant for a casino license.

Any change in the laws or regulations of a gaming jurisdiction could have a material adverse effect on the gaming operations of the Debtors.

**B.      Relationship of Gaming Laws to Chapter 11 Cases and the Plan**

The gaming laws require that various transactions contemplated by the Plan, including the Sale, be reviewed and, as necessary, approved by the gaming regulators in New Jersey. In addition, the Buyer and persons who may acquire or have an equity interest in the Buyer may need to be licensed, undergo suitability determinations, or obtain waivers. Accordingly, various actions contemplated by the Plan are subject to approval by the state gaming regulators, and failure to secure such approvals may materially and adversely affect the ability of the Debtors to achieve confirmation and consummation of the Plan.

**C.      Licensing of the Debtors and Individuals Involved Therewith**

Gaming laws required the Debtors and the Buyer, as applicable, as well as their directors (with respect to corporations), managers (with respect to limited liability companies), members (with respect to limited liability companies), officers, and certain other key employees, to obtain licenses, findings of suitability or other approvals from gaming authorities. Licenses or findings of suitability typically require a determination that the applicant is suitable or otherwise qualifies to hold the license or the finding of suitability necessary to hold the equity or debt securities of the gaming licensee or its affiliated entities.

Gaming authorities generally have broad discretion in determining whether an applicant qualifies for licensing or should be deemed suitable or otherwise qualified. To determine

whether to grant a license or finding of suitability to an entity to conduct gaming operations, gaming authorities generally consider the following factors:

- the financial stability, integrity, and responsibility of the applicant, including whether the operation is adequately capitalized and has the ability to pay all debts when due and the ability to make capital expenditures adequate to maintain a first class facility;
- the quality of the applicant's casino facilities;
- the amount of revenue to be derived by the applicable state from the operation of the applicant's casino;
- the applicant's practices with respect to minority hiring and training;
- the effect on competition and general impact on the community; and
- the good character, honesty and integrity of the applicant and its parent entities.

Licenses under gaming laws generally are not transferable. Licenses in New Jersey are granted without set terms, but periodic resubmissions are required from time to time. They are subject to revocation and the revocation of any of the Debtors' licenses would have a material adverse effect on their gaming operations. In evaluating individual applicants, gaming authorities generally consider the individual's business probity and casino experience, the individual's reputation for good character, honesty, and integrity, the individual's criminal history, and the character and reputation of those with whom the individual associates.

## D.    Findings of Qualification and Suitability Determinations

As noted above, gaming authorities may investigate any individual who has a material relationship to, or material involvement with, the Debtors to determine whether such individual is suitable or should be licensed or found suitable as a business associate of a gaming licensee. In New Jersey, the Debtors' or Buyer's, as applicable, directors (with respect to corporations), managers (with respect to limited liability companies), members (with respect to limited liability companies), officers, and certain other key employees must file applications with the gaming authorities and may be required to be licensed, qualify, or otherwise be found suitable.

Qualification and suitability determinations generally require the submission of detailed personal and financial information—and in the case of a Person other than a natural person, a list of beneficial owners—followed by a thorough investigation. The applicant must pay all the costs of the investigation. Changes with respect to the individuals who occupy licensed positions must be reported to gaming authorities and—in addition to their authority to deny an application for licensure, qualification, or a finding of suitability—gaming authorities have authority to disapprove a change in a corporate position.

If New Jersey gaming authorities were to find that a director (with respect to corporations), manager (with respect to limited liability companies), member (with respect to limited liability companies), officer, or other key employee of the Debtors or the Buyer, as applicable, does not qualify, is unsuitable for licensing, or is unsuitable to continue having a relationship with the Debtors or the Buyer, as applicable, the Debtors or the Buyer, as applicable, may be required to sever all relationships with such person. In addition, gaming authorities may require the Debtors or the Buyer, as applicable, to terminate the employment of any person who refuses to file appropriate applications. Moreover, certain holders of debt and equity securities

of the Debtors or the Buyer, as applicable, may be required to undergo a suitability investigation similar to that described above.

In New Jersey, each Person who directly or indirectly acquires any beneficial interest or ownership in securities issued by a casino licensee or any holding, intermediate, or parent company of such a company (collectively, a "New Jersey Licensee"), may have to obtain prior approval from the NJ CCC.  Five (5) business days' notice must be provided to the NJ CCC of any proposed sale or transfer of any ownership interest in a New Jersey Licensee. If the NJ CCC does not object to such sale or transfer within such five (5) business days, the sale or transfer may proceed.  If the purchaser or transferee of an ownership interest in a New Jersey Licensee is required to be licensed, ordinarily, the approval is obtained by utilizing the interim casino authorization provisions of the New Jersey Act (the "New Jersey Interim Casino Authorization").  Generally speaking, the New Jersey Interim Casino Authorization provisions require that any contract to transfer ownership of equity securities of an ongoing casino operation must have a closing date of 121 or more days after filing a completed application. The New Jersey Interim Casino Authorization process requires extensive filings and disclosures by the New Jersey Interim Casino Authorization applicant and all qualifiers thereof, and a subsequent investigation by and report of the NJ DGE.

Generally within four months after submission of a completed New Jersey Interim Casino Authorization application, the NJ CCC will determine whether the applicant can obtain the interest in the New Jersey Licensee on a temporary basis, pending plenary qualification and subject to the imposition of a New Jersey Interim Casino Authorization trust, whereby the applicant's interests are placed in a non-active but fully executed trust held by a qualified New Jersey Interim Casino Authorization trustee. If the NJ CCC ultimately denies the New Jersey Interim Casino Authorization application, the trust will be activated and the applicant's interest terminated with rights only in an amount not to exceed the lower of actual cost of the interest or the value of the interest on the date the trust became activated.  The disqualified holder will have the right to appeal to the New Jersey Superior Court, Appellate Division. If the NJ CCC grants New Jersey Interim Casino Authorization, the applicant will be allowed to close on the acquisition and thereafter exercise all its rights, including, if applicable, management of the casino property pending plenary qualification, which generally occurs (or not) within 12 months, after the NJ DGE reports the findings of its investigation.

Certain owners or investors may have the qualification requirement waived if the Director of the NJ DGE determines that waiver is appropriate.  For example, each Person directly or indirectly holding a beneficial interest or ownership of equity securities of a New Jersey Licensee that is not significantly involved in the activities of the New Jersey Licensee, and does not have the ability to control the New Jersey Licensee or elect a majority of its directors, may be eligible for waiver. There is a presumption that any Entity holding 5% or more of the equity securities of a New Jersey Licensee, or an Entity having the ability to elect one or more of the directors of such New Jersey Licensee, has the ability to control the New Jersey Licensee and, may have to submit for qualification by the NJ CCC.

An "institutional investor," as defined in the New Jersey Act (principally, pension funds, insurance companies, and registered advisors under securities laws), may be eligible for a waiver

to own up to 25% of the equity securities of a New Jersey Licensee, provided the institutional investor certifies that it holds the securities for investment purposes only and has no intention to influence or control the New Jersey Licensee. If the NJ CCC finds at any time that a beneficial owner of any security in a New Jersey Licensee is not qualified under the New Jersey Act, it has the right to take any remedial action it deems appropriate, including requiring the Debtors or the Buyer, as applicable, to purchase such equity securities. In the event a disqualified beneficial owner fails to divest itself of such securities, the NJ CCC has the power to revoke or suspend the associated casino license or deny the application for same.

This summary is not intended to be complete, and is qualified in its entirety by the New Jersey Act and the rulings of the NJ CCC and NJ DGE.

Additionally, the Buyer's certificates of incorporation will contain provisions establishing the right of the NJ CCC to the prior approval of the transfer of securities and the right of the Buyer to redeem at the lesser of purchase price or the market price any transfer disapproved by the NJ CCC and the securities of unsuitable holders if (i) the holder is determined by a gaming authority, or the Buyer has been notified by the staff of a gaming authority that it will recommend that the gaming authority determine the holder to be, unsuitable, unqualified, or disqualified to own or control such securities or unsuitable to be connected with a person engaged in gaming activities in New Jersey, or (ii) the holder causes the Buyer or any affiliate of Buyer to lose or have modified, or to be threatened with the loss, suspension, condition or modification of, or who, in the sole discretion of the Buyer, is deemed likely to jeopardize the right of the Buyer or any of its affiliates to the use of or entitlement to or ability to reinstate any gaming license or liquor license.

### E.   Violations of Gaming Laws

The New Jersey gaming authorities may, among other things, limit, condition, suspend, or revoke a gaming license or approval to own the equity interests of the Debtors' for any cause deemed reasonable by the New Jersey licensing authority. In addition, if the Debtors violate applicable gaming laws, their gaming licenses could be limited, conditioned, suspended, or revoked by gaming authorities, and the Debtors and any other persons involved could be subject to substantial fines. Further, gaming authorities may appoint a supervisor or conservator to operate the Debtors' gaming properties or, in some jurisdictions, take title to the Debtors' gaming assets. Under certain circumstances, earnings generated during such appointment could be forfeited to the applicable state or states. Finally, New Jersey gaming jurisdictions prohibit certain types of political activity by a gaming licensee, its directors (with respect to corporations), managers (with respect to limited liability companies), members (with respect to limited liability companies), officers, and certain other key people. A violation of such a prohibition may subject the offender to criminal and disciplinary action.

### F.   Reporting and Record-Keeping Requirements of Gaming Authorities

The Debtors are required to submit detailed financial and operating reports on a periodic basis and furnish any other information that gaming authorities may require. Under federal law, the Debtors are required to record and submit detailed reports of currency transactions at their casinos involving more than $10,000 as well as any suspicious activity that may occur at such

facilities.  Additionally, the Debtors are required to maintain a current stock ledger that may be examined by gaming authorities at any time.

### G.    Review and Approval by Gaming Authorities of Certain Transactions

As described herein, certain transactions contemplated by the Plan must be approved by New Jersey gaming authorities.  In addition, substantially all material loans, leases, sales of securities, and similar financing transactions by the Debtors must be reported to, and in some cases approved by, gaming authorities.  The Debtors may not make a public offering of securities without the prior approval of gaming authorities.  Changes in control through merger, consolidation, stock or asset acquisitions, management or consulting agreements, or otherwise, are subject to prior approval of gaming authorities.

Gaming authorities may also require controlling stockholders, directors (with respect to corporations), managers (with respect to limited liability companies), members (with respect to limited liability companies), officers, and certain other key employees having a material relationship or involvement with the entity proposing to acquire control to be investigated and licensed or qualified as part of the approval process relating to the transaction. Because of regulatory restrictions, the Debtors' ability to grant a security interest in any of their gaming assets is limited and subject to receipt of approval by gaming authorities.

### H.    License for Sale of Alcoholic Beverages

The service and sale of alcoholic beverages at the Revel Casino Resort is subject to licensing, control, and regulation by the NJ DGE.

## XIII.

## RISK FACTORS

There are many risks and uncertainties in respect of the Debtors' business and/or the Plan and its implementation.  The holders of Claims against and Equity Interests in the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan.  The risk factors identified below they should not be regarded as the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Certain Bankruptcy Considerations

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims against and Equity Interests in the Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other

Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.  Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims or Allowed Equity Interests as those proposed in the Plan.

### 3.  The Debtors May Not Be Able Secure Confirmation or Consummation of the Plan

The Plan requires the acceptance of a requisite number of holders of Claims or Equity Interests that are entitled to vote on the Plan, and the approval of the Bankruptcy Court, as described in the section of this Disclosure Statement entitled "Confirmation and Consummation Procedures – Overview."  There can be no assurance that such acceptances and approvals will be obtained and therefore, that the Plan will be confirmed.  In addition, confirmation of the Plan and the occurrence of the Effective Date of the Plan are subject to the satisfaction of certain conditions precedent.  Although the Debtors believe that the conditions precedent to the confirmation of the Plan and to the occurrence of the Effective Date of the Plan will be met, there can be no assurance that all such conditions precedent will be satisfied. If any condition precedent is not satisfied or waived pursuant to the Plan, the Plan may not be confirmed or the Effective Date may not occur.

Furthermore, although the Debtors believe that the Plan will be confirmed and the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur.  Further, and notwithstanding the foregoing or anything in the Plan to the contrary, the Debtors have reserved their rights pursuant to Section 12.5 of the Plan to delay the occurrence of the Effective Date with respect to one or more of the Debtors' Estates to a later date; provided, however, that any such election by the Debtors to delay the occurrence of the Effective Date with respect to one Estate shall not prevent the occurrence of the Effective Date with respect to any of the other Estates.  If the Plan is not confirmed or the Effective Date does not occur, there can be no assurance that any alternative chapter 11 plan would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan.  In addition, if a protracted reorganization or liquidation were to occur, there is a substantial risk that holders of Claims and Equity Interests would receive less than they would receive under the Plan. A liquidation analysis prepared by the Debtors with the assistance of their advisors is attached hereto as Schedule 2.

The Plan contemplates consummation of the Sale.  Although the Bankruptcy Court has already entered the Bid Procedures Order and thereby approved the bid procedures set forth therein, consummation of the Sale may be subject to the prior approval of one or more governmental entities, including the NJ CCC and the NJ DGE.   The consummation of the Sale and Plan may also require filings with respect to and consent, approvals or expiration or

termination of any waiting period, required under United States antitrust or investment laws which may include the Hart-Scott-Rodino Antitrust Improvement Act of 1976.  Such approvals may be denied, conditioned or delayed and therefore may not be received when required to facilitate the Sale and the Plan.

If the Plan is not confirmed and does not go effective for any reason and the Debtors or some other party in interest decide to prosecute a different plan, recoveries to holders of Claims against or Equity Interests in the Debtors may be negatively impacted.  If the Plan is confirmed but the Effective Date does not occur, it may become necessary to amend the Plan to provide for alternative treatment of Claims and Equity Interests.  There can be no assurance that any such alternative treatment would be on terms as favorable to the holders of Claims and Equity Interests as the treatment provided under the Plan.  If any modifications to the Plan are materially adverse to any holders of Claims or Equity Interests, it would be necessary to resolicit votes from holders of such Claims or Equity Interests, which would, at the very least, further delay confirmation and consummation of the Plan, and could  jeopardize the consummation of the Plan.

### 4.    Actual Plan Distributions May Be Less than Estimated for the Purposes of this Disclosure Statement

The Debtors project that the Claims and Equity Interests asserted against the Debtors will be resolved in and reduced to an amount that approximates the estimates set forth herein. However, there can be no assurance that these estimates will prove accurate.  In the event the allowed amounts of such Claims and/or Equity Interests are materially higher than the projected estimates, actual distributions to holders of Allowed Claims could be materially less than estimated herein.

## B.    Risks Related to the Sale

There is no guarantee that a Person will express interest in acquiring the Debtors' Assets. Additionally, even if an asset purchase agreement is executed, there can be no assurance that a Sale will be consummated.  The Buyer could breach or fail to perform under the agreement or conditions to consummation of the agreement could fail to be satisfied.

## C.    Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan.  Holders of Claims and Equity Interests, and other interested parties, should read carefully the discussion set forth in the article of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences" for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

# XIV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have concluded that the Plan will maximize recoveries to holders of Claims and Equity Interests.  If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because (i) the chapter 7 trustee's unfamiliarity with the Debtor and its industry would lead to additional costs for the Estates and (ii) in a liquidation of the Debtors under chapter 11, the Causes of Action retained by the Estates likely will be pursued in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, potentially resulting in greater recoveries.  Accordingly, the Debtors have determined that confirmation of the Plan will likely provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

# XV.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated:  June 19, 2014        Respectfully submitted,

REVEL AC, INC., on behalf of itself and each of the other Debtors

By: _____
    Name: _____
    Title:  _____

# EXHIBIT A

# THE PLAN

NEWYORK 9185976

**EXHIBIT B**

**DISCLOSURE STATEMENT ORDER**

**EXHIBIT C**

**SELECTED FINANCIAL INFORMATION**

# SCHEDULE 1

## LIST OF OTHER DEFINED TERMS

**Terms in this Schedule 1 are defined in the Disclosure Statement at the pages indicated below.[1]**

---

[1]      Certain terms listed on this Schedule 1 may also appear as defined terms in Section 1.1 of the Plan.  To the extent there is a conflict between how such terms are defined in the Disclosure Statement and how such terms are defined in the Plan, the Plan shall control.

**SCHEDULE 2**

**LIQUIDATION ANALYSIS**

## SCHEDULE 3

## <u>SCHEDULE OF REJECTED EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

# SCHEDULE 4

## SCHEDULE OF ASSUMED AND ASSIGNED EXECUTORY CONTRACTS AND UNEXPIRED LEASES