UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esq.
Raymond M. Patella, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax (609) 348-6834
mviscount@foxrothschild.com
rpatella@foxrothschild.com

**WHITE & CASE LLP**
John K. Cunningham, Esq. (admitted *pro hac vice*)
Richard S. Kebrdle, Esq. (admitted *pro hac vice*)
Kevin M. McGill, Esq. (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700/fax (305) 358-5744
jcunningham@whitecase.com
rkebrdle@whitecase.com
kmcgill@whitecase.com

*Co-Counsel to the Debtors and
Debtors in Possession*

| | |
|---|---|
| In re:<br><br>REVEL AC, INC., et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 14-22654 (GMB)<br><br>Jointly Administered<br><br>**Proposed Objection Deadline: TBD**<br>**Proposed Hearing Date: TBD** |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER MODIFYING THE BID PROCEDURES ORDER TO APPROVE CERTAIN BID PROTECTIONS INCLUDING BREAK-UP FEE AND GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856). The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

Revel AC, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit "A" (the "Bid Protections Order"), modifying the Court's order dated July 14, 2014 approving certain procedures (the "Bid Procedures") for the sale of substantially all of the Debtors' assets [Docket No. 227] (the "Bid Procedures Order"),[2] and approving certain bid protections including a break-up fee and granting related relief, including modifying the form of proposed sale order (the "Proposed Sale Order") filed with the Bid Procedures Order to provide that the Debtors are seeking a determination from the Court at the Sale Hearing that the sale of substantially all of the Debtors' assets (the "Sale") is exempt from New Jersey Transfer Taxes (as defined below). In support of the Motion, the Debtors respectfully represent as follows:

### Preliminary Statement

1.  The Bid Procedures Order set August 4, 2014 and August 7, 2014 as the dates for the submission of Qualified Bids and the Auction, respectively. Although the Debtors received certain bids by the August 4, 2014 bid deadline, such bids did not constitute Qualified Bids and the Debtors filed a notice of the continuation of the Auction without date in accordance with the Bid Procedures Order.

2.  The Bid Procedures Order also provided that the Debtors reserve the right to modify the Bid Procedures in any manner that will best promote the goals of the Sale. As stated, the Debtors have worked diligently towards obtaining a Qualified Bid to commence the Auction.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order.

2

3.Accordingly, the Debtors have entered into that certain Asset Purchase Agreement dated as of September 5, 2004 (the "Polo APA")[3] with Polo North Country Club, Inc. (the "Stalking Horse Purchaser"), by and through its principal Glenn Straub, for the sale of substantially all of the assets of the Debtors to the Stalking Horse Purchaser for $90 million in cash (the "Purchase Price"). The Polo APA contains no financing, due diligence or gaming or licensing approval contingencies. The Stalking Horse Purchaser has deposited $10 million in cash into escrow in connection with the Polo APA.

4.The terms of the Polo APA require, among other things, approval by the Bankruptcy Court of a break-up fee to the Stalking Horse Purchaser in the amount of $3 million (the "Break-Up Fee") in the event the Debtors consummate an Alternative Transaction (as defined in the Polo APA).

5.Because the Debtors did not have a stalking horse bid at the time of entry of the Bid Procedures Order in July, such order did not include approval of a break-up fee in connection with the Sale. By this Motion, the Debtors are requesting modification of the Court's Bid Procedures Order to approve the Break-Up Fee in connection with the Polo APA. In accordance with Section 5.6(c) of the Polo APA, the Debtors propose to schedule (i) a revised Bid Deadline (the "Revised Bid Deadline") for 4:00 p.m. (prevailing Eastern Time) on September 23, 2014 and (ii) commencement of the Auction at 9:00 a.m. (prevailing Eastern Time) on September 24, 2014 at the office of Debtors' counsel, White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036. All other bidders will be requested to submit Qualified Bids by the Revised Bid Deadline on the basis of the Polo APA and reflect any changes with respect thereto.

---

[3]A copy of the Polo APA is attached hereto as Exhibit "B".

3

MIAMI 1025021

## Background

6. On June 19, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases. The Debtors continue to manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On July 2, 2014, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). No trustee or examiner has been requested or appointed in these Chapter 11 Cases as of the date hereof.

8. Additional background facts on the Debtors, including an overview of the Debtors' business, information on the Debtors' debt structure and information on the events leading up to the Chapter 11 Cases are contained in the Declaration of Shaun Martin in Support of First Day Motions and Applications [Docket No. 5].

## Jurisdiction

9. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

10. By this Motion, the Debtors request entry of the Bid Protections Order, approving the Break-Up Fee and granting related relief to accommodate an auction process with the Stalking Horse Purchaser. The Debtors further request a determination from the Court, to be made at the Sale Hearing, that the Sale be exempt from New Jersey Transfer Taxes.[4]

---

[4] Accordingly, the Debtors intend to modify the Proposed Sale Order to include the following decretal paragraph: "ORDERED that the Sale is exempt from any applicable New Jersey Transfer Taxes."

4

## Basis for Relief

### A. The Break-Up Fee is Necessary and Appropriate

11. The relief requested herein is authorized pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

12. Although section 363 itself does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of estate property outside the ordinary course of business, applicable case law provides that a bankruptcy court should approve a transaction that is out of the ordinary course of a debtor's business if the debtor can demonstrate that it exercised sound business judgment in deciding to enter into the transaction. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991)); Dai-Ichi Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999).

13. Further, section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(1); see also U.S. v. Energy Res. Co., 495 U.S. 545, 549 (1990); Adelphia Comm'cns Corp. v. Am. Channel (In re Adelphia Comm'cns Corp.), 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ("Section 105(a) provides broad equitable power for a Bankruptcy Court to maintain its own jurisdiction and to facilitate the reorganization process."); Gillman v. Cont'l

Airlines (In re Cont'l Airlines), 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code.").

14. The Stalking Horse Purchaser has engaged in arm's length and good faith negotiations with the Debtors and has expended, and likely will continue to expend, considerable time, money and energy pursuing the Sale. To compensate the Stalking Horse Purchaser for serving as a "stalking horse" whose bid will be subject to higher and/or otherwise better offers, the Debtors seek authority for the Debtors to provide the Stalking Horse Purchaser with the Break-Up Fee as set forth in the Polo APA if the Debtors, inter alia, enter into a binding asset purchase agreement with a third party that is ratified, approved and confirmed by an order from the Court and such sale to a third party is consummated.

15. The Break-Up Fee was an essential inducement and condition relating to the Stalking Horse Purchaser's entry into, and continuing obligations under, the Polo APA. The Debtors believe the Break-Up Fee: (i) is reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions and the considerable efforts and resources that have been and will be expended by the Stalking Horse Purchaser; (ii) has been negotiated by the parties and their respective advisors at arm's length and in good faith; and (iii) is necessary to induce the Stalking Horse Purchaser to continue to pursue the Sale and to continue to be bound by the Polo APA.

16. Moreover, unless it is assured that the Break-Up Fee will be available, the Stalking Horse Purchaser is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Polo APA (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bid Procedures).

MIAMI 1025021

Thus, absent entry of the Proposed Order and approval of the Break-Up Fee, the Debtors may lose the opportunity to obtain what may be the highest and best available offer for their assets.

17. The Debtors believe that the Break-Up Fee is necessary to preserve and enhance the value of Debtors' estates. The paramount goal in any proposed sale of property of a debtor is to maximize the proceeds received by the estate. See generally In re Cont'l Airlines, 91 F.3d 553, 565 (3d Cir. 1996) (acknowledging a "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself . . ."); see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand."). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

18. Bidding incentives encourage a potential buyer to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant in the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," which prescribes against judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., O'Brien, 181 F.3d at 533-35 (noting that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions and by some bankruptcy courts, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in

the bankruptcy context and, accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate).

19. Approval of break-up fees in connection with the sale of significant assets has become an established practice in chapter 11 cases. See, e.g., In re Ashley Stewart Holdings, Inc., Case No. 14-14383 (MBK) (Bankr. D.N.J. Apr. 3, 2014); In re RIH Acquisitions NJ, LLC, Case No. 13-34483 (GMC) (Bankr. D.N.J. Nov. 19, 2013); In re Centaur, LLC, Case No. 10-10799 (KJC) (Bankr. D. Del. July 28, 2010) In re RNI Wind Down Corp., Case No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24, 2006); Russell-Stanley Holdings, Inc., Case No. 05-12339 (BLS) (Bankr. D. Del. Sept. 8, 2005); In re Pharm. Formulations Inc., Case No. 05-11910 (MFW) (Bankr. D. Del. Aug. 8, 2005); In re AAIPharma Inc., Case No. 05-11341 (CSS) (Bankr. D. Del. June 8, 2005).

20. Historically, courts have evaluated break-up fees by considering whether the parties engaged in self-dealing or manipulation of the bidding process, whether the fee encouraged or inhibited bidding, and whether the fee was reasonable in proportion to the contract purchase price. See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992). The Third Circuit has stated that a break-up fee may be approved when it is necessary to preserve the value of a debtor's estate. O'Brien, 181 F.3d at 536. In O'Brien, the Third Circuit determined, inter alia, that a break-up fee provides an actual benefit to a debtor's estate if "assurance of a break-up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537; see also Wintz v. Am. Freightways, Inc. (In re Wintz Cos.), 230 B.R. 840, 846 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000). Alternatively, a break-up fee may be approved under O'Brien if it

serves as a minimum or a floor bid upon which other bidders may rely, thereby increasing the likelihood that the price at which the debtor sells its assets reflects their true worth. O'Brien, 181 F.3d at 537.

21. The Break-Up Fee and its potential benefits to the Debtors' estates should encourage bidding. The Break-Up Fee is one of the enticements for the Stalking Horse Purchaser to submit a bid that will serve as the floor bid for the Debtors' assets, and on which the Debtors' creditors and other bidders can rely. The Stalking Horse Purchaser has provided a material benefit to the Debtors and their stakeholders by increasing the likelihood that the best possible purchase price for the assets will be received. Accordingly, the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtors' estates. The Stalking Horse Purchaser's bid will encourage fair and competitive bidding by setting a minimum price for the Sale while subjecting the Stalking Horse Purchaser's offer to a competitive bidding process.

22. The amount of the Break-Up Fee as proposed herein would total no more than $3 million (approximately 3.33% of the Purchase Price), to be paid to the Stalking Horse Purchaser upon and subject to the Debtors' entry into a binding asset purchase agreement with a third party that is ratified, approved and confirmed by an order from the Court. A break-up fee that is approximately 3.33% of the purchase price is within the range of precedent established by bankruptcy courts within this circuit. See, e.g., In re Ashley Stewart Holdings, Inc., Case No. 14-14383 (MBK) (Bankr. D.N.J. Apr. 3, 2014) (approving break-up fee of 3.0% of purchase price plus amount of certain assumed liabilities); In re Maxide Acquisition, Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3.0%, or $2.25 million in connection with a $75 million sale); In re Am. Classic Voyages Co., Case No. 01-10954 (EIK)

(Bankr. D. Del. Mar. 20, 2002) (approving break-up fee of 6.67%, or $250,000 in connection with a $3.75 million sale); In re Fruit of the Loom, Inc., Case No. 99-04497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving break-up fee of 3.0%, or $25 million, in connection with $835 million sale).

23. Under O'Brien, break-up fees are evaluated under the same standard as general administrative expenses. O'Brien, 181 F.3d at 535 ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). Because the requested Break-Up Fee is within the range of precedent, fair and reasonable and intended to maximize the value of the Debtors' estates, the Debtors submit that approval of the Break-Up Fee is warranted.

24. In sum, the Debtors' ability to offer the Break-Up Fee enables them to ensure the sale of the assets to a contractually committed bidder at a price they believe to be fair while, at the same time, providing them with the potential of obtaining even greater benefit to the estates. Accordingly, the Break-Up Fee should be approved.

**B.     The Sale Should be Exempt from the New Jersey Transfer Taxes**

25. In connection with the sale of real estate in New Jersey, the State imposes realty transfer taxes upon the grantor under N.J.S.A. 46:15-7 and 7.1 (the "Realty Transfer Taxes") and taxes upon the grantee under N.J.S.A. 46:15-7.2 (the "Mansion Taxes" and together with the Realty Transfer Taxes and any other sale and transfer taxes under New Jersey law, the "New Jersey Transfer Taxes"). However, pursuant to certain exceptions under New Jersey law, the Sale should be declared exempt from all New Jersey Transfer Taxes.

26. Specifically, under New Jersey law, sales by a trustee are exempt from New Jersey Transfer Taxes. Section 46-15-10(g) of the New Jersey Statutes provides that "the

fee imposed by this act shall not apply to a deed by a receiver, **trustee in bankruptcy or liquidation**, or assignee for the benefit of creditors." See N.J.S.A. 46-15-10(g) (emphasis added). Under the Bankruptcy Code, a debtor in possession has the same rights and powers as a trustee, and thus, is effectively a trustee. See 11 U.S.C § 1107(a) ("a debtor in possession shall have all of the rights . . . and powers, and shall perform all of the functions and duties . . . of a trustee serving in a case under this title.") (emphasis added). As such, the Sale by the Debtors, as debtors in possession in these Chapter 11 Cases, is in effect a sale by trustees exempt from the New Jersey Transfer Taxes under New Jersey law.

27. Accordingly, the Debtors request that the Court determine at the Sale Hearing that the Sale shall be exempt from any New Jersey Transfer Taxes.

### Notice

28. Notice of this Motion has been provided to the (i) Office of the United States Trustee for the District of New Jersey, (ii) counsel to the First Lien Lenders, (iii) counsel to the Second Lien Lenders, (iv) counsel to the DIP Agent, (v) counsel to the Creditors' Committee, (vi) all parties requesting notices pursuant to Bankruptcy Rule 2002, (vii) the Office of the Attorney General for the State of New Jersey, (viii) the DGE, (ix) the New Jersey Casino Control Commission, (x) the Office of the Governor for the State of New Jersey, (xi) the United States Attorneys' Office for the District of New Jersey, (xii) the United States Attorney General, (xiii) the Internal Revenue Service, (xiv) the Securities and Exchange Commission, (xv) the Chief of Staff for the New Jersey Division of Taxation and (xvi) counsel for the County of Atlantic, New Jersey. The Debtors submit that no other or further notice need be provided.

29. No previous motion for the relief sought herein has been made to this or any other court.

MIAMI 1025021

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: September 10, 2014
Atlantic City, New Jersey

                FOX ROTHSCHILD LLP

By: /s/ Michael J. Viscount, Jr.
    Michael J. Viscount, Jr., Esq.
    Raymond M. Patella, Esq.
    1301 Atlantic Avenue, Suite 400
    Atlantic City, NJ 08401
    (609) 348-4515/fax (609) 348-6834
    mviscount@foxrothschild.com
    rpatella@foxrothschild.com

            – and –

John K. Cunningham, Esq.
(admitted *pro hac vice*)
Richard S. Kebrdle, Esq.
(admitted *pro hac vice*)
Kevin M. McGill, Esq.
(admitted *pro hac vice*)
WHITE & CASE LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
(305) 371-2700/fax (305) 358-5744
jcunningham@whitecase.com
rkebrdle@whitecase.com
kmcgill@whitecase.com

*Co-Counsel to the Debtors and Debtors in Possession*