**DECOTIIS, FITZPATRICK & COLE, LLP**
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666
(201) 928-1100
(201) 928-0588 Telecopier
rpassamano@decotiislaw.com
Russell J. Passamano, Esq. (RP 014231986)
Attorneys for the City of Atlantic City

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN THE MATTER OF:**<br><br>**REVEL AC, INC., et al.,**<br><br>**Debtors.** | Case No. 14-22654(GMB)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>Hearing: October 7, 2014 at 10:00 a.m.<br><br>Oral Argument: Requested |

## BRIEF IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY

On the Brief:

    Russell J. Passamano, Esq.

1714069

## PRELIMINARY STATEMENT

This Brief is submitted on behalf of the City of Atlantic City (the "City") in support of the City's Motion for Relief from the Automatic Stay (the "Motion"). In the Motion, the City seeks relief from the automatic stay for cause so as to be permitted to sell a Tax Certificate for the Debtors' unpaid real estate taxes. As detailed herein and in the Declaration of Michael P. Stinson, the City's Director of Revenue and Finance (the "Stinson Dec."), the Debtors will not in any way be prejudiced by lifting the stay. The City will, however, suffer harm if the stay continues. For these reasons, the City respectfully submits that cause exists to lift the stay and the Motion should be granted.

## STATEMENT OF FACTS

### A.    Background.

The City is a resort community located along the ocean in Atlantic County, New Jersey and is the only municipality in the State of New Jersey that allows casino gambling. The City covers an area of approximately 12 square miles and has a population of approximately 40,000. Stinson Dec. at ¶ 4, 5. The Debtors own real property and improvements in the City (the "Property") on which they operate a casino/resort hotel known as the "Revel". Stinson Dec. at ¶ 6, 7.

The Revel is one of eleven (11) casino/hotels that operate in the City. Eight (8) of the casinos are located on the City's boardwalk and three (3) are located in the City's Marina District. The Revel is one of the eight located on the boardwalk. Stinson Dec. at ¶ 8. Three of the boardwalk casinos, including the Revel, are scheduled to close at the end of August or in September of this year. Stinson Dec. at ¶ 9.

The Revel is a premium facility having a modern casino gaming area, upscale hotels rooms (each with an ocean view), premium restaurants and nightclubs, other guest amenities; with forty-seven (47) floors, the Revel is the tallest building in the City. Stinson Dec. at ¶ 11. The Revel, which cost approximately $2.4 billion to build, opened in 2012. Stinson Dec. at ¶ 10.

From the start, the Revel has been plagued by financial difficulties. Stinson Dec. at ¶ 12. In March of 2013, within a year of opening, the Revel's owners sought relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). After it emerged from bankruptcy in May of 2013, the Revel's troubles continued. On June 19, 2014 (the "Petition Date"), the Debtors again filed for relief under Chapter 11 of the Bankruptcy Code. Stinson Dec. at ¶ 13, 14.

As of the Petition Date, the Debtors were in default of their obligation to pay real estate taxes. The defaults have continued post-petition. Stinson Dec. at ¶ 15.

### B. The Importance of Real Estate Taxes to the City.

As with other municipalities in New Jersey, the City relies on real estate taxes to fund essential municipal services such as police and fire protection and municipal governance. Stinson Dec. at ¶ 17. When there are defaults in payment of real estate taxes, the City suffers a budget shortfall, which threatens the ability to provide essential public safety services. Stinson Dec. at ¶ 24.

In addition to funding municipal services, part of the tax levy goes to fund schools and county government. Those amounts, although they do not go to the City, are collected as a part of the real estate tax levy and the City is responsible for turning over to the schools and county their respective portions. The City is required to make full payment to the schools and the county regardless of

whether or not the taxpayer pays the City. Unpaid taxes thus cause further hardship for the City and further strain the City's budget. Stinson Dec. at ¶ 18. The importance of the real estate tax levy in New Jersey is shown by the fact that municipalities are given a statutory priming lien for unpaid taxes, and the fixing of that lien has been given a specific exception to the automatic stay imposed under Section 362 of the Bankruptcy Code. Stinson Dec. at ¶ 19.

The real estate tax levy is based on the assessed valuation of taxable property within the City. With the exception of some tax exempt uses, real estate taxes are paid by all property owners. Stinson Dec. at ¶ 20. The taxes are paid quarterly and are due on February 1, May 1, August 1, and November 1 of each year. Stinson Dec. at ¶ 21.

The City relies heavily on the casino industry as a source of revenue. Stinson Dec. at ¶ 22. That industry accounts for over sixty (60%) of the City's total real estate tax levy. Stinson Dec. at ¶ 23.

### C.    Taxes Owed by the Revel.

On April 1, 2014, the Debtors paid the real estate tax installment that had been due on February 1, 2014. Stinson Dec. at ¶ 25. The Debtors have not paid the installments due on May 1, 2014 and August 1, 2014, which represent the second and third quarters payments. Stinson Dec. at ¶ 26. As of August 5, there was outstanding the sum of $19,637,896.22 in unpaid real estate taxes, and $395,293.63 in interest for a total of $20,033,189.85. Stinson Dec. at ¶ 27; Exhibit "A".

### D.    Cause Exists to Grant Relief from the Automatic Stay.

Taxes will continue to accrue on the Property after the sale of the Tax Certificate and the purchaser of the Certificate will have the option to pay the subsequent taxes. The purchaser will earn interest on any taxes that it pays. Stinson Dec. at ¶ 33. Selling a Tax Certificate at a tax sale is the City's recourse for unpaid taxes. Stinson Dec. at ¶ 31. In New Jersey, Tax Certificates are sold at municipal tax sales through a competitive bidding process. Stinson Dec. at ¶ 29. Any taxes that are delinquent as of November 10 are subject to an accelerated tax sale in December of the same year. Stinson Dec. at ¶ 30.

The City will hold its tax sale on December 11, 2014. The first notices of the sale will be sent to property owners on November 14, and the sale will be published starting November 28. Stinson Dec. at ¶ 32. After two (2) years, from any sale the purchaser will have the ability to initiate a proceeding in Superior Court to foreclose on the Property. If there is no purchase, the City will own the Tax Certificate and will be able to initiate a proceeding to foreclose six (6) months from the date of the tax sale. Stinson Dec. at ¶ 34.

The Property owner is able to redeem the Tax Certificate prior to foreclosure by paying the taxes, interest and fees. Stinson Dec. at ¶ 35. The sale of a Tax Certificate does not deprive the Debtors of any of rights to use and occupy the Property. Nor will the sale of a Tax Certificate prevent the Debtors from conveying the Property, subject to the tax lien. Stinson Dec. at ¶ 36.

The City will be highly prejudiced absent the ability to sell a Tax Certificate for the Debtor's unpaid taxes. Stinson Dec. at ¶ 38. The Debtors will not suffer any prejudice from the sale of the Tax Certificate. Stinson Dec. at ¶37.

4

The City's fiscal year runs from January 1 to December 31 of each year and the City's total budget for fiscal year 2014 is $200,000,000. Stinson Dec. at ¶39. The Debtors' tax levy of approximately $37,000,000 for the year represents approximately 18% of the total. Stinson Dec. at ¶ 39. The tax levy on the Revel is an important and significant part of the City's budget. Stinson Dec. at ¶ 40. Absent the ability to sell a Tax Certificate, the City will be hindered in its ability to manage its budget and finances. Stinson Dec. at ¶ 41.

The City's Audit Report for the Year Ended December 31, 2013 (the "Audit Report") states that "[t]he municipality is responsible for remitting 100% of the school and county taxes to the respective agency. The loss for delinquent or uncollectible accounts is borne by the municipality and not the school district, or county." Stinson Dec. at ¶¶ 42, 43; Exhibit "B". The Audit Report further shows that Net Revenue from Collections for 2013 was $354,102,158.20. The amount "Allocated to: School, County and Other Taxes" was $166,659,365.13. The "Balance for Support of Municipal Budget Appropriations" was $187,442,793.07. Stinson Dec. at ¶ 45. As shown by that Statement, approximately forty-seven (47%) of the Net Revenue from Collections was allocated to the schools, county and other taxes. Stinson Dec. at ¶ 46. As shown on page 30 of the Audit Report, the City is responsible for those payments, notwithstanding "any loss for delinquent or uncollectible accounts." Stinson Dec. at ¶ 47.

The Audit Report provides an outline of the tax levy, the dates for tax payment and states that "[a]ny taxes that have not been paid by the 11th day of the 11th month in the fiscal year levied are subject to being included in the tax sale and the lien enforce by selling the property in accordance

with NJSA 54:5 et seq." Stinson Dec. at ¶¶ 48, 49. The effect of the tax sale is that it allows the City (or any other municipality in the State) to realize within the same fiscal year, the revenues necessary to meet the obligations that are paid out of the tax levy – notwithstanding that the properly owner failed to make the payment. Stinson Dec. at ¶ 50.

By allowing the tax sale to include the taxes unpaid on the 11th day of the 11th month of the fiscal year, the City is able to obtain the revenues needed to fund its obligations for that fiscal year. Stinson Dec. at ¶ 51. Absent the ability to go forward with the tax sale, the City would be in the position where (using the numbers from the Audit Report (from year end 2013, the most recent which is available)) as an example, it would have to pay forty-seven (47%) of the tax levy to the school district and county, with no practical way to actually collect on any unpaid portion of the levy. Stinson Dec. at ¶ 52. While the numbers for the 2014 budget will vary in some of the particular dollar amounts from what is shown in the year end 2013 Audit Report, the overall picture will be consistent. Stinson Dec. at ¶ 53.

The Debtors' tax levy of approximately $37,000,000 for the year 2014 equals approximately 18% of the City's total budget and represents approximately 10% of the total tax levy, which is then allocated between the City's budget and the portion to be paid to the school district and county. Stinson Dec. at ¶ 54. The inability to realize those revenues during the fiscal year will have a severe adverse impact on the City's budget and finances. Stinson Dec. at ¶ 55.

For the reasons set forth herein and in the pleadings and papers filed herewith, the City respectfully submits that sufficient cause has been shown to lift the automatic stay so as to include the Revel's unpaid taxes in the tax sale that will take place on December 11, 2014.

## LEGAL ARGUMENT

### POINT ONE

### THE CITY HAS SHOWN CAUSE TO JUSTIFY RELIEF FROM THE STAY.

On the filing of a Petition for Relief under the Bankruptcy Code, an automatic stay comes into effect that stays actions to obtain possession of, or exercise control over, property of the estate; to create, perfect or enforce any lien against property of the estate; or to collect, assess or recover any prepetition claims against the Debtor. See 11 U.S.C. § 362(a). A specific statutory exception provides that the post-petition perfection of real estate tax liens does not violate the automatic stay. See 11 U.S.C. § 362(b)(18). While the perfection of the lien is not subject to the stay, Courts have held that the automatic stay does prevent the sale of a Tax Certificate. The reasoning of those Courts, generally, is that the sale of a Tax Certificate constitutes a step in the process to enforce the lien. See, In re Isley, 104 B.R. 673 (Bankr. D.N.J. 1989). While it may be argued that the sale of a Tax Certificate should be seen as a transfer of a claim, and not an act of enforcement, the City respectfully submits that the Court need not address that issue as sufficient cause exists to warrant relief from the stay in any event.

The Court may grant relief by terminating, annulling, modifying or conditioning such stay for cause, including the lack of adequate protection of an interest in the property of a party in interest. See 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause", nor does it provide any specific test for determining when "cause" to lift the stay has been shown. Whether or not cause to lift the stay exists is a question for the Court and is "determined on a case by case basis." In re

DBSI, Inc., 407 B.R. 159, 166 Bankr. Del. 2009). In considering that question, the Courts look at the totality of the circumstances. In re Bogdanovich, 292 F.3d 104, 110 (2d Cir. 2002); In re Continental Airlines, Inc., 152 B.R. 420, 424 (D. Del. 1993).

In In re Continental, the Court held that:

> There is no rigid test for determining whether sufficient cause exists to modify an automatic stay. Rather, in resolving motions for relief for "cause" from the automatic stay courts generally consider the policies underlying the automatic stay in addition to the competing interests of the debtor and the movant. In balancing the competing interests of the debtor and the movant, Courts consider three factors: (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probable success on the merits if the stay is lifted.

Id. at 424.

That same test has been adopted by the Courts in New Jersey, as articulated in a string of unpublished opinions. See In re St. Clair, 2011 WL 6888369 (Bankr. D.N.J. 2011) (citations omitted); In re McGowan, 2011 WL 2415534 (Bankr. D.N.J. 2011). In In re St. Clair, the Court held that "[T]he determination to grant a party relief from the stay is made on a case-by-case basis. … However, factors to consider in deciding whether "cause" has been shown include: (i) prejudice to the debtor's estate, (ii) hardship to the moving party, and (iii) probability of success on the merits. Some Courts also consider whether or not lifting the stay would impede the orderly administration of the debtor estate or set off a "race to the courthouse." In re DBSI, 407 B.R. at 167.

"The movant bears the initial burden to produce evidence sufficient to show that cause exists to grant relief from the stay. Once that threshold showing has been made, the burden then shifts to

the debtor to show facts sufficient to justify continuing the stay. Id. at 166. The burden of proof in a lift stay motion is a shifting one. Section 362(d)(1) "requires an initial showing of "cause" by the movant, while § 362(g) places the burden of proof on the debtor for all issues other than 'the debtor's equity in property.'" In re Patriot Contacting Corp., 2006 WL 4457346 (Bankr. D.N.J. 2006).

In the case under consideration, the City has established all of the elements of the test for lifting the stay. The City's showing is sufficient not just to shift the burden, but to warrant granting the relief requested.

### A.   The Debtors will not Suffer any Prejudice if the Stay is Lifted.

The Debtors will not suffer any prejudice by lifting the stay to allow the sale of a Tax Certificate. The New Jersey statutes concerning tax sales provide that the purchaser of a Tax Certificate cannot foreclose on its lien until two years from the date of the sale. In circumstances where there is no purchaser, and the municipality becomes the owner of the Certificate, a foreclosure cannot take place until six months from the date of the sale. A review of the New Jersey tax sale law shows that it was designed to create a framework for municipalities to efficiently raise funds while giving property owners the opportunity to redeem. The tax sale law was not designed to prejudice the property owner, nor does it do so in practice.

### i.   New Jersey Tax Sale Law.

In New Jersey, "[t]axes on lands shall be a continuous lien on the land on which they are assessed and all subsequent taxes, interest, penalties and costs of collection which thereafter fall due or accrue shall be added to and be a part of such initial lien." N.J.S.A. §54:5-6. The lien is a

priming lien that takes priority over all other encumbrances and conveyances. Id. at §54:5-9. The New Jersey tax statute is "deemed to be a remedial statute and to operate both prospectively and retrospectively, and be liberally construed to effectuate the remedial objects thereof." Id. at §54:5-3.

"The sale of tax liens is a municipal financing option that provides a mechanism to transform a non-performing asset into cash without raising taxes." Varsolona v. Breen Capital Services Corp., 180 N.J. 605, 609 (2004). A sale of the lien may be conducted on either a standard or accelerated basis. N.J.S.A. at §54:5-32. Under Section 54:5-32:

> When unpaid taxes or any municipal lien, or part thereof, on real property remains in arrears on the 11th day of the eleventh month in the fiscal year when the taxes or lien became in arrears, the collector or other officer charged by law in the municipality with that duty, shall enforce the lien by selling the property in the manner set forth in this article by conducting an accelerated tax sale by selling the property in the manner set forth in this article, provided that the sale is conducted and completed no earlier than in the last month of the fiscal year.
>
> \* \* \*
>
> The sale shall be made in fee to such person as will purchase the property, subject to redemption at the lowest rate of interest, but in no case in excess of 18% per annum. If at the sale a person shall offer to purchase subject to redemption at a rate of interest less than 1%, or at no interest, he may, in lieu of any rate of interest to redeem, offer a premium over and above the amount of taxes, assessments or other charges, as in this chapter specified, due the municipality, and the property shall be struck off and sold to the bidder who offers to pay the amount of such taxes, assessments or charges, plus the highest amount of premium.

Id.

Where there is no third-party purchaser for a Tax Certificate, the municipality takes the Certificate from the sale. Id. at §54:5-34. The property owner, or others having an interest in the

Property, may redeem at any time up to the foreclosure. Id at §54:5-54. The redemption period is two years, if the Tax Certificate is purchased by a third party, and six months in the event that the Certificate is purchased by the municipality. Id. at §54:5-86a.

### ii.  The Sale of a Tax Certificate will not have a Negative Impact on the Debtors.

The Debtors will not suffer any prejudice from lifting the stay to allow the City to sell a Tax Certificate for the unpaid taxes. The sale of a Tax Certificate "conveys the lien interest of the taxing authority" to the certificate holder, subject to the property owner's statutory right of redemption." In re Rossiter, 412 B.R. 677, 679 (D. N.J. 2008). In viewing a lift stay motion in the context of the sale of a Tax Certificate, the Rossiter Court began its analysis:

> by reviewing the New Jersey Tax Sale Law, under which title to the residence occupied by Appellant was transferred to Appellee. As the New Jersey Supreme Court recently explained,
>
>> [m]unicipal governments depend on real estate taxes and other property-related assessments as their primary sources of revenue. When those taxes or assessments remain unpaid for a period of time, the municipality is granted "a continuous lien on the land" for the delinquent amount as well as for "all subsequent taxes, interest, penalties and costs of collection." N.J.S.A. 54:5–6; see also N.J.S.A. 54:5–7 to –8. The Tax Sale Law converts that lien into a stream of revenue by encouraging the purchase of tax certificates on tax-dormant properties. See N.J.S.A. 54:5–19, –31 to –32; Varsolona v. Breen Capital, 180 N.J. 605, 620, 853 A.2d 865 (2004) ("The Legislature created the [Tax Sale Law] as a framework to facilitate the collection of property taxes.").

> Simon, 189 N.J. at 318, 915 A.2d 489. The purchase of a tax sale certificate "is a conditional conveyance of the property to the purchaser," id. at 319, 915 A.2d 489, whose interest in the property becomes "entirely subordinate to the statutory right of redemption of the [original] property owner." Cherokee Equities, 382 N.J.Super. at 206, 887 A.2d 1203 (citation omitted).

In re Rossiter, 412 B.R. 677, 679, 681 (D. N.J. 2008) ("'[a] tax sale certificate is not an outright conveyance. It creates only a lien on the premises and conveys the lien interest of the taxing authority.'" In re Princeton Office Park, L.P., 423 B.R. 795, 800 (Bankr. N.J. 2010) (citations omitted).

> The inchoate interest consists of three rights: the right to receive the sum paid for the certificate with interest at the redemption rate for which the property was sold; the right to redeem from the holder a subsequently issued tax sale certificate; and the right to acquire title by foreclosing the equity of redemption of all outstanding interests, including that of the property owner.
>
> Id. (citing Jefferson Twp. V. Block 447A, Lot 10, 228 N.J.Super. 1, 4–5, 548 A.2d 521 (1988) (emphasis added)).

In re Princeton Office Park, 423 B.R. at 800.

The property owner has two years from the time of the sale within which to redeem the Tax Certificate. In re Rossiter, 412 B.R. at 679. If the property owner fails to redeem the Certificate within that two year period, the Certificate holder may institute an action to foreclose on the property. Id. The judgment from the foreclosure of a Tax Certificate vests title in the Certificate holder, without further sale. Id. at 681. The purchaser of the Tax Certificate is not vested with equitable title to the property. Id. at 683.

While the Debtors will not suffer any prejudice from lifting the stay, the City will be expressly prejudiced in the event that the stay is continued. The prejudice suffered by the City will not only far outweigh any prejudice that the Debtors could suffer by lifting the stay, but comes at a price where there is no offsetting benefit that comes from a continuation of the stay.

### B. The Balance of Hardship Favors Lifting the Stay.

While the stay prevents the City from auctioning a Tax Certificate for the unpaid taxes, the Debtors still enjoy the benefits of municipal services. Stinson Dec. at ¶ 17. Moreover, regardless of whether or not the Debtors pay their taxes, the City will be responsible for the school and county portion of the tax levy. Stinson Dec. at ¶ 18. The sale of a Tax Certificate is the means by which the City can mitigate that damage. Stinson Dec. at ¶¶ 38 – 41.

> "The sale of tax liens is a municipal financing option that provides a mechanism to transform a non-performing asset into cash without raising taxes." Varsolona v. Breen Capital Servs. Corp., 180 N.J. 605, 609, 853 A.2d 865 (N.J.2004) (citing Georgette C. Poindexter, Lizabethann Rogovoy & Susan Wachter, Selling Municipal Tax Receivables: Economics, Privatization, and Public Policy in an Era of Urban Distress, 30 Conn. L.Rev. 157, 158 (1997)). To provide municipalities with the power to collect un-paid taxes, the New Jersey Legislature enacted the Tax Sale Law, N.J.S.A. 54:5–1 et seq., which, among various other aspects, provides for the sale of tax sale certificates. "When municipal taxes are delinquent for the period stated by statute, a lien arises on the land on which the taxes are assessed, N.J.S.A. 54:5–6, and the municipality may enforce the lien by selling the property as prescribed by statute. N.J.S.A. 54:5–19." Savage v. Weissman, 355 N.J.Super. 429, 436, 810 A.2d 1077 (2002). "Under this mechanism, a municipality receives the tax monies from third parties," I.E.'s, L.L.C. v. Simmons, 392 N.J.Super. 520, 523–24, 921 A.2d 483 (2006); and "[t]he purchaser acquires the lien, with the title, N.J.S.A. 54:5–42, and receives a certificate of sale, the [tax sale certificate]. N.J.S.A. 54:5–46." Varsolona, 180 N.J. at

618, 853 A.2d 865; N.J.S.A. 54:5–31.

In re Princeton Office Park, 423 B.R. at 800.

Allowing the City to proceed with the December auction of the Tax Certificate will not prejudice the Debtors or other creditors. The Debtors will continue to own the Revel, and they will be able to convey the Revel to a new operator. The Debtors or a new operator will have the ability to redeem the Tax Certificate. Stinson Dec. at ¶¶ 35-36. The taxes must be paid.

> Finally, the court notes that this ruling is consistent with the New Jersey legislature's directive that the Tax Sale Law is remedial legislation that is to "be liberally construed to effectuate the remedial objectives thereof." An interpretation of the Tax Sale Law that discourages parties from purchasing tax sale certificates runs counter to the objective of "transform[ing] a non-performing asset into cash without raising taxes."

In re Kopec, 473 B.R. 597, 603 (Bankr. N.J. 2012) (citing Varsolona v. Breen Capital Services Corp., 180 N.J. 605, 609 (2004)).

### i. Continuing the Stay will have a Negative Impact on the City and its Residents..

While the Debtors will not suffer any prejudice from lifting the stay, continuing the stay will have a negative impact on the City and its residents. The Stinson Dec. sets out in detail, with supporting financial information the impact that continuing the stay will have on the City. There are no countervailing equities or facts that would justify continuing the stay.

In light of the facts of this case, there is no question that the City has met its burden of making a showing sufficient to justify granting relief from the stay. In re DBSI, 407 B.R. at 166.

## CONCLUSION

For the reasons set forth herein and in the Declaration of Michael P. Stinson, the City respectfully requests that this Court grant the City's Motion for Relief from the Automatic Stay so as to be permitted to sell a Tax Certificate.

                    **DeCOTIIS, FITZPATRICK & COLE, LLP**
                    Attorneys for the City of Atlantic City


                    /s/ Russell J. Passamano
                    Russell J. Passamano, Esq.

Dated: September 12, 2014
1707736