| |
|---|
| **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY** |
| Caption in Compliance with D.N.J. LBR. 9004-2(c) |
| **DLA PIPER LLP (US)** <br> Stuart M. Brown (NJ ID #38826) <br> Timothy J. Lowry (NJ ID #013342002) <br> Richard Chesley (admitted *pro hac vice*) <br> 17 Gordon's Alley, Suite 100 <br> Atlantic City, NJ  08401 <br> (609) 449-7000 <br><br> *Counsel to ACR Energy Partners LLC* |

| | |
|---|---|
| In re: <br><br> REVEL AC, INC., <u>et al</u>. <br><br> DEBTORS.[1] | **Chapter 11** <br><br> Case No. 14-22654 (GMB) <br><br> **(Jointly Administered)** |

**MOTION OF ACR ENERGY PARTNERS, LLC FOR AN
ORDER MODIFYING THE AUTOMATIC STAY**

ACR Energy Partners, LLC ("**ACR Energy**"), by and through its undersigned attorneys, files this Motion (the "**Motion**") for an Order Modifying the Automatic Stay, and in support of this Motion, respectfully states as follows:

**PRELIMINARY STATEMENT**

1.　From the earliest days of these cases through the recently concluded evidentiary hearing and closing argument on the Debtors' Motion for Order Determining the Fair Market Value of Postpetition Services Under the Energy Sales Agreement (the "**CUP Motion**") [D.I. 30], what has become evident is that ACR Energy has continued to bear the financial burden of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Revel AC, Inc. (3856), Revel AC, LLC (4456), Revel Atlantic City, LLC (9513), Revel Entertainment Group, LLC (2321), NB Acquisition, LLC (9387) and SI LLC (3856). The location of the Debtors' corporate headquarters is 500 Boardwalk, Atlantic City, New Jersey 08401.

the Debtors' chapter 11 cases. While it was originally contemplated that the period of this burden would be limited, as the months have dragged on, the financial drain to ACR Energy has led to defaults to its creditors, and the increasing likelihood of its own bankruptcy proceeding. To compound these dire consequences, it has now been revealed that this entire process was crafted by the Debtors and their lenders solely to reduce the amount of borrowing under the debtor-in-possession financing facility.

2.      With the risks to ACR Energy from the Debtors' calculated litigation strategy only increasing, the Debtors have this week announced in their Motion for Entry of an Order (I) Rejecting Agreements with ACR Energy Partners, LLC *Nunc Pro Tunc* to the Date of the Motion and (II) Granting Related Relief (the "**Rejection Motion**") [D.I. 1032], that Polo North Country Club, Inc. as the potential buyer of the Debtors assets "has elected not to have the ESA assumed and assigned to it in connection with such sale." (Rejection Motion at ¶ 6). This, in combination with the Debtors' view that "the fees required under the ESA are burdensome to their estates," (*id),* has led the Debtors to conclude that they no longer seek to incur the "burdens" imposed by the Second Amended and Restated Energy Sales Agreement dated April 11, 2011 by and between ACR Energy Partners, LL and Revel Entertainment Group, LLC (the "**ESA**").

3.      While the Debtors go to great pains to simply ignore the factual record regarding the reasonableness of the energy fees under the ESA, much of this is of no moment with respect to the actual issue before the Court; the Debtors' determination to rid itself of the ESA balanced against the increasing harm to ACR Energy resulting from the extended duration of these cases. For these reasons, ACR Energy respectfully requests that the Court grant it relief from the

automatic stay to permit it to terminate all energy services under the ESA and in its discretion, to terminate the ESA.

## JURISDICTION

4. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5. Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a) and 362(d) of the Bankruptcy Code.

## FACTUAL BACKGROUND

6. While ACR Energy believes that the Court is fully aware of the issues attendant to the ESA and the critical role provided by ACR Energy since the inception of these cases, several facts are particularly relevant to the Court's consideration of the Motion.

7. First, the factual record is uncontroverted that it was the Debtors, in their request for proposal, that requested proposals for a constructed central utility plant (the "**CUP**"), and crafted the structure of the economics underlying the ESA (December 4, 2014 Transcript of Hearing on CUP Motion "**CUP Tr.**" at 103-04)(relevant portions attached as Exhibit A). The evidence was also not in dispute that the ESA and its pricing structure were not only negotiated at arms-length between sophisticated parties with support by industry experts, but the terms and structure of the ESA were standard and customary in the industry. (*Id.* at 115-16; 164-65). Dr. Colin Blaydon, the only proffered and recognized expert at the hearing on the CUP Motion was unequivocal that the structure of the ESA is standard and customary in the energy industry with independent power producers such as ACR Energy and its CUP. (*Id.* at 163). He also testified that the fee structure contained in the ESA represented the fair market value of the energy

services delivered to the Debtors, and if the contract was negotiated today, it would likely look quite similar. (*Id.* at 165). And, while much has already been made regarding the self-confined limits of the testimony of the Debtors' purported expert, Dr. Dean Murphy, even he was forced to acknowledge that he is aware of no options available to acquire the full range of energy services at any cost, let alone at a cost below that of the continued operation of the CUP and payment of the fees charged under the ESA. (*Id.* at *75*).

8.    Against this backdrop, even the casual observer must question why the Debtors have, from the very first day of these cases, focused their energies on the same contract that they had assumed less than a year earlier during their first chapter 11. The answer is clearly revealed in the CUP litigation strategy (in addition to the strategy to pay ACR Energy absolutely nothing for energy services rendered during March, April and May 2014) that was launched well before the commencement of these chapter 11 cases, and which continues today. In fact, as early as May 2014, the Debtors had determined that the "Central Utility Plant CUP is not considered to be a critical vendor and only the variable portion of the expense will be paid post petition." (Exhibit B at 10). As was made clear, the Debtors' decision to file the highly unorthodox CUP Motion was driven by their desire to seek to delay, if not reduce, the costs of these cases, with a concomitant reduction in the borrowing under the debtor-in-possession financing.

9.    At the inception, this strategy (like all good ones) had an alternative in the event that the scheme failed. At that time, the Debtors recognized that if the "CUP litigation is unsuccessful, the company would need to pay an additional $2.0 MM per month[2] in fixed costs during the bankruptcy." (Exhibit C at 2 fn. 2). Of course, the Debtors contemplated, and one

---

[2] The $2.0 million amount includes the O&M Fees and Fixed Monthly Fees; however, the O&M Fees are being paid currently by the Debtors and were withdrawn from the scope of the CUP Motion.

EAST\87871070.1    4

must assume with the support of their lenders, that if this litigation strategy failed, the DIP financing would have to be increased. (Exhibit B at 10).

10. With the CUP litigation strategy crafted by the Debtors finding no support in the applicable law or the evidentiary record, the only option available to the Debtors is to rid itself of the ESA through the Rejection Motion, which is a right conferred on them by section 365 of the Bankruptcy Code. In doing so, however, the Debtors have requested that the Court allow it to simultaneously retain the benefits of the ESA by compelling performance by ACR Energy under section 366 of the Bankruptcy Code. While the Debtors' request is in contravention of the law of this Circuit and all notions of bankruptcy jurisprudence, again the Debtors demand that ACR Energy continue to provide them with energy services at a rate less than 50% of the amount that the undisputed record before the Court established is the fair market value for energy services.[3] As ACR Energy is no longer willing and able to sustain its own operations while supporting that of the Debtors with substantially below-market energy fees, ACR Energy now asks this Court to lift the automatic stay and permit ACR Energy to terminate energy services to the Revel and in its discretion to terminate the ESA.

## RELIEF REQUESTED

11. By this Motion, ACR Energy seeks entry of an order, pursuant to sections 105(a) and 362(d) of the Bankruptcy Code, modifying the automatic stay to permit ACR Energy to terminate energy services to the Revel and in its discretion to terminate the ESA.

## BASIS FOR RELIEF

12. Section 362(d) of the Bankruptcy Code provides, in part, that:

---

[3] ACR Energy will file an objection to the Rejection Motion in advance of the objection deadline, which will address the Debtors' novel section 366 argument, as well as its other ill-supported propositions.

EAST\87871070.1   5

> the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay –
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362(d).

13. A court may grant relief from the automatic stay for "cause." *See* 11 U.S.C. § 362(d)(1). While the Bankruptcy Code does not define "cause," it is a flexible concept, and whether sufficient cause exists to modify the stay is determined by the totality of the circumstances on a case-by-case basis. *See Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).

14. In evaluating whether "cause" exists to modify the stay, "[a] court may consider the policies reflected in the bankruptcy code, and the interests of the debtor, other creditors and any other interested parties." *See In re Mu'min*, 374 B.R. 149, 164 (Bankr. E.D. Pa. 2007) (citing *In re Brown*, 311 B.R. 409, 412–13 (E.D. Pa. 2004)); *see also Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.),* 141 B.R. 574, 576 (Bankr. D. Del. 1992). Courts will consider: (i) the hardship to the estate if relief is granted; (ii) the hardship to the movant if stay relief is not granted; and, where an underlying dispute is at issue, (iii) the underlying merits. *See, e.g., In re Rexene Prods. Co.*, 141 B.R. at 576. Further, "cause" is not limited to lack of adequate protection. *In re Cumberland Farms*, 162 B.R. 62, 69 (Bankr. D. Mass. 1993) ("Grounds for lifting the automatic stay are not limited to the creditor's lack of adequate protection."); *In re Madison Hotel Corp.*, 175 B.R. 94, 97 (Bankr. N.D. Ala. 1994) ("Although Congress singled out lack of adequate protection as sufficient cause for modification of the automatic stay, it also made clear that cause under section 362(d)(1) was not limited to lack of adequate protection.").

15. As to the first factor – hardship to the estate if relief is granted – in this case, there is little, if any, actual hardship to the estate if the Motion is granted. First and foremost, the Debtors long ago ceased operations at the Revel facility. Since that time, the Debtors, in conjunction with their lenders have been engaged in a sale process that has now led to Polo North Country Club, Inc. as the potential buyer of the Debtors assets. The Debtors hold the view that "the fees required under the ESA are burdensome to their estates," and consequently, the Debtors have concluded that they no longer seek to incur the "burdens" imposed by the ESA. (Rejection Motion at ¶ 6). As ACR Energy does not question the business judgment of the Debtors in rejecting the ESA, there can be no hardship to the Debtors were the Court to modify the stay to permit ACR Energy to terminate service and in ACR Energy's discretion to terminate the ESA; after all this is entirely consistent with the relief the Debtors themselves have requested of the Court.

16. As to ACR Energy, refusing to grant relief from the automatic stay and requiring the continued operation of the CUP with (i) payments far less than the agreed contractual rate and which, as the evidence confirmed, compensate ACR Energy for the actual costs of manufacturing and distributing the full range of energy services to the Revel (CUP Tr. at 168-71), (ii) the Debtors continuing to prosecute entry of a final DIP order that will inevitably lead to the Debtors' administrative insolvency and foreclose all opportunities for ACR Energy and other unpaid administrative creditors to receive payment on account of their allowed administrative claims, (iii) the Debtors and their lenders prosecuting the entry of an order directing the distribution of 100% of the sale proceeds, when received, to the Debtors lenders, save a small wind down budget that does will not provide for payment of ACR Energy's allowed administrative claim, (iv) ACR Energy incurring mounting obligations that it likely will not be

able to pay, and (v) ACR Energy having received default and acceleration notices from its own lenders, has and will indeed cause substantial hardship to ACR Energy and its stakeholders, as well as violate all notions of bankruptcy law and equity.

17. As the undisputed evidence confirmed, the amounts that the Debtors are willing to pay ACR Energy for – the variable cost of gas and high voltage power necessary to produce stepped-down electricity, hot and chilled water, parasitic and utility services and operations and maintenance fees, do not reimburse ACR Energy for costs of manufacturing and transmitting the energy services to the Revel. (CUP Tr. at 168-71). Moreover, they fail to provide ACR Energy with any margin or profit from which ACR Energy may pay its creditors. (CUP Tr. at 172).

18. Moreover, with the Debtors having ceased to operate, at this point the chapter 11 process is being used by the Debtors to satisfy the lenders' demands to foreclose on their collateral. The lenders are hopelessly undersecured and should be called upon by the Debtors to pay the costs incurred by the Debtors to preserve their collateral under Bankruptcy Code section 506(c). What is really going on in these cases is the lenders are exploiting the "breathing spell" provided by Bankruptcy Code sections 362 and 366 as though they themselves were the debtors, while not being subject to the burdens they would incur were they to foreclose under state law. In that situation, ACR Energy would have all of its contractual and state law rights to terminate service if the fees charged under the ESA were not being paid. Certainly, under such circumstances the lenders would pay the energy services fees in full or ACR Energy would have the right to discontinue service. Their lot should be no different in these cases; the lenders are not the Debtors and should not derive the benefit of the Bankruptcy Code's debtor protection provisions at the expense of ACR Energy.

19. Accordingly, cause exists to modify the stay imposed under section 362(a) to permit ACR Energy to exercise and enforce its rights under the ESA and applicable state law.

20. ACR Energy has not and will not consent to any extension of time and specifically seeks to enforce the time constraints set forth under section 362(e) of the Bankruptcy Code.

## WAIVER OF MEMORANDUM OF LAW

21. In accordance with Rule 9013-2 of the District of New Jersey Local Bankruptcy Rules, ACR Energy does not file a brief in support of this Motion because the legal principles involved are not novel or in dispute and are adequately set forth in the Motion.

## NOTICE

22. Notice of this Motion has been provided to the (i) Debtors and counsel to the Debtors, (ii) Office of the United States Trustee for the District of New Jersey, (iii) counsel to the First Lien Lenders, (iv) counsel to the Second Lien Lenders, (v) counsel to the DIP Agent, (vi) counsel for the Official Committee of Unsecured Creditors, (vii) all parties requesting notices pursuant to Bankruptcy Rule 2002, (viii) the Office of the Attorney General for the State of New Jersey, (ix) the New Jersey Division of Gaming Enforcement, (x) the New Jersey Casino Control Commission, (xi) the Office of the Governor for the State of New Jersey, (xii) the United States Attorney's Office for the District of New Jersey, (xiii) the United States Attorney General, (xiv) the Internal Revenue Service, and (xv) the Securities and Exchange Commission. ACR Energy submits that no other or further notice need be provided.

23. No previous motion for the relief sought herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, ACR Energy respectfully requests entry of the Proposed Order attached as Exhibit D, substantially in the form annexed hereto granting it the relief requested by this Motion and such other and further relief as is just and proper.

Dated: December 19, 2014

**DLA PIPER LLP (US)**
By: */s/ Stuart M. Brown*
Stuart M. Brown (NJ ID #38826)
Timothy J. Lowry (NJ ID #013342002)
Richard A. Chesley (admitted *pro hac vice*)
Atlantic City, NJ  08401
17 Gordon's Alley, Suite 100
(609) 449-7000

*Counsel to ACR Energy Partners, LLC*